# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 1:24-cv-24253

DWAYNE WILSON, TYRONE HARRIS,
and GARY WHEELER, individually
and on behalf of those similarly situated,

      Plaintiffs,

vs.

RICKY DIXON, in his official capacity
as Secretary of the Department of Corrections,
FRANCISCO ACOSTA, in his official capacity
as Warden of Dade Correctional Institution, and
FLORIDA DEPARTMENT OF CORRECTIONS,
an agency of the State of Florida,

      Defendants.

_____

## CLASS ACTION COMPLAINT

> When you are in the facility, and you visit a dorm that does not have air conditioning . . . it is absolutely oppressive. We are going to have to take steps . . . to mitigate the heat, or Florida will find itself on the receiving end of a lawsuit, and it will be a lot more expensive.[1]

The climate of South Florida is hotter today than it has been since recordings began.

Temperatures are soaring and breaking records at an alarming rate. Meanwhile, our scientific

understanding of heat-related illness has evolved.

Yet the Florida Department of Corrections (FDC) has chosen to detain hundreds of

elderly and disabled people at Dade Correctional Institution (Dade CI) without taking any

meaningful action to abate the risk caused by these extreme conditions. The dormitories lack air

---

[1] Florida Senate Committee Meeting held on October 11, 2023, Appropriations Committee on Criminal and Civil Justice (Statement of Chairperson Senator Jennifer Bradley), available at www.flsenate.gov/media/VideoPlayer?EventID=1_zc8d1g0v-202310111100&Redirect=true.

conditioning, and to the extent they ever had functional ventilation systems, those systems have fallen into abysmal disrepair. As a result, the hot air is stagnant, fetid, and contaminated with rust, bacteria, and mold. These conditions cause people incarcerated at Dade CI to suffer, fall ill, and die, while the FDC ignores their pleas for relief.

Such deliberate indifference to the dangers of extreme heat and unventilated air violates Plaintiffs' rights under the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act. Plaintiffs respectfully ask the Court to declare their conditions of confinement unconstitutional and order Defendants to protect the lives and health of the people it incarcerates.

## PRELIMINARY STATEMENT

1.      Plaintiffs, on behalf of themselves and those similarly situated, bring this lawsuit because the FDC refuses to cool or ventilate the dormitories at Dade CI, forcing people incarcerated there to endure cruel and dangerous conditions of confinement.

2.      Dade CI is located in Homestead, south of Miami, Florida, less than six miles from the Everglades National Park. It is hot and humid year-round. Between May and September, the heat index regularly exceeds 100ºF.

3.      FDC knowingly subjects Plaintiffs and the Class to unbearable heat and abysmal air quality in violation of the Eighth and Fourteenth Amendments to the Constitution.

4.      FDC is acutely aware of the health risk that these conditions pose, especially to people who, due to their age or medical conditions, are especially prone to heat-related illness. Yet FDC refuses to make reasonable accommodations for people with disabilities, in violation of the Americans with Disabilities Act and Rehabilitation Act.

5.     Injunctive and declaratory relief are the only means to address FDC's deliberate indifference to the harm and danger caused by these conditions. Plaintiffs ask the Court to order FDC to take immediate action to abate the substantial risk of serious harm faced by everyone incarcerated at Dade CI.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

7.     Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

8.     Plaintiff Dwayne Wilson has been incarcerated at Dade CI since March 2023. He is 66 years old. He has hypertension and an enlarged prostate, and takes medication for both of those conditions. He has a large burn scar over much of his body that impairs his ability to sweat. He has fainted from the heat and required medical treatment.

9.     Plaintiff Tyrone Harris has been incarcerated at Dade CI since July 2022. He is 54 years old. He has hypertension and takes medication for it. He also takes medications for depression and anxiety. He has asthma that has required him to receive breathing treatments several times per week.

10.     Plaintiff Gary Wheeler has been incarcerated at Dade CI since July 2023.  He is 65 years old. He suffers from chronic obstructive pulmonary disease (COPD) that requires the use of an inhaler, and sleep apnea that requires the use of a CPAP machine.

11.     Defendant Ricky Dixon is the Secretary of the Florida Department of Corrections. As such, he is the commanding officer of all FDC correctional officers, guards, and FDC employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in FDC custody. At all times described herein, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief. Defendant Dixon has statutory authority to implement the relief sought herein. *See, e.g.,* Fla. Stat. § 20.315.

12.     Defendant Francisco Acosta is the warden of Dade CI. At all times described herein, he was acting under color of state law. As the warden of Dade CI, he is responsible for ensuring constitutional conditions of confinement at Dade CI. He is sued in his official capacity for declaratory and injunctive relief.

13.     Defendant Florida Department of Corrections (FDC) is a state agency that operates Florida's prison system. At all relevant times, it operated Dade CI, a public facility with programs and services that incarcerated people with disabilities are entitled to enjoy.

## FACTS

**A.     South Florida Is Hot and Getting Hotter**

14.     South Florida has always been hot. From May through September, the average temperature regularly exceeds 80 degrees, with highs reaching into the upper 90s.

15.     As all Floridians know, it is not just the temperature but also the humidity that contributes to how people experience heat. It is for this reason that South Florida feels hotter to most people than areas with higher temperatures but lower humidity, such as the western United States. Humid heat feels hotter than dry heat.

16.     That is because high humidity decreases the body's ability to cool itself through sweating. Sweating cools the body through evaporation of sweat from the skin. Higher humidity results in slower evaporation and therefore less cooling.

17.     A common way that scientists measure apparent temperature—that is, how the human body experiences heat—is the "heat index." The heat index combines ambient temperature and relative humidity to approximate how hot a climate feels.

18.     The heat index is a more accurate measure than temperature alone on the effect of climate on the human body. A higher heat index causes more stress on the body and a higher risk of heat-related illness.

19.     The heat index does not take into account how sunny or cloudy it is; the temperature readings are taken under a shaded area, protected from the heating effects of direct sunlight.

20.     Exposure to a heat index above 88 degrees poses danger to human life, particularly to the elderly and people with medical conditions such as heart disease, high blood pressure, asthma, and diabetes.

21.     In South Florida, the heat index regularly exceeds 100ºF in the summer. During the summer of 2023, the heat index surpassed that threshold 46 days in a row—an all-time record. The previous record was set in 2020, when there were 32 consecutive days with a heat index surpassing 100ºF.

22.     Indeed, the summer of 2023 set at least six records for the highest daily heat index recorded on that day of the year, on May 15, 16, 17, 18, and 26.

23.     The summer of 2024 has continued to break records.

24.     May of 2024 was the hottest May in Miami's history. The temperatures and heat indexes were "completely off the charts."[2]

25.     September 2024 was the hottest September in Miami's history, setting a monthly record for the highest average peak heat index, at 102.8°F.

26.     In the summer of 2024, the National Weather Service issued dangerous heat advisories for Miami-Dade County on nearly half the days in July, over half the days in August, and at least a third of the days in September. On almost all of these days, the heat index reached 105°F; on some of them it reached 112°F.

27.     On August 13, 2024, the daily *average* heat index for that 24-hour period in Miami was a record-breaking 98.6 degrees.

28.     The hot summers of 2023 and 2024 are not anomalies. Temperature and humidity recordings since 1950 irrefutably show that South Florida is getting hotter.

---

[2] Ashley Miznazi, "It's the hottest May ever in Miami. Heat index 'completely off the charts.'" *Miami Herald* (May 21, 2024), available at https://www.miamiherald.com/news/local/environment/climate-change/article288594929.html.



Source: University of Miami, *Heat Index and Dewpoint Climatology for Miami, FL*, available at https://bmcnoldy.earth.miami.edu/mia/mia_hi_threshold_trends.png.

29.     As the figure above shows, in the 1950s, on average, the heat index surpassed 90 degrees roughly 1125 hours per year. Thus, during approximately 13% of the year, the heat index exceeded 90°F.

30.     In the 2020s, by contrast, the heat index surpasses 90°F nearly twice as often— roughly 2250 hours of the year, or 25% of the year.

31.     In the 1950s, the heat index surpassed 95°F 400 hours of the year on average, roughly 4.6% of the year. In the 2020s, by contrast, the heat index surpasses 95°F more than 1000 hours per year, on average. We can now expect 11% of the hours each year to have a heat index above 95°F.

32.     As the following chart shows, the warming is most dramatic with respect to extreme temperatures.





Includes data ending 2024-05-19

33.    In the 1950s, it was rare for the heat index to exceed 100°F—less than 100 hours per year, or 1.1% of the year. In the 2020s, such extreme heat indexes occur roughly 300 hours per year, a threefold increase.

34.    Prior to 2020, heat indexes above 110°F were anomalous in South Florida. They are now expected.

35.    It is significantly hotter in South Florida —both in temperature and heat index— than it was even 25 years ago.

36.    Temperature and heat index records are being broken every year, at an alarming rate. There is broad scientific consensus that this heating trend will continue in the upcoming decades.

8

**B.      Dade CI Is Dangerously Hot Much of the Year**

37.     Dade CI is an FDC prison in Miami-Dade County, Florida, south of Miami. It is six miles from the entrance to the Everglades National Park, Florida's largest wetlands. Along with the neighboring Homestead Correctional Institution, Dade CI is part of the southernmost prison complex in the continental United States.

38.     Dade CI opened in 1996. It has the capacity to imprison 1,521 people. It typically operates at or near capacity.

39.     The Miami Herald has described it as "by far the deadliest [prison] in Florida."[3] It is "[o]ne of the state's most problematic prisons," which "historically has been plagued by prisoner mistreatment and inmate deaths."[4]

40.     Dade CI consists of approximately fifteen buildings—a medical unit, a law library, a dining hall, a "programing" building, multiple administrative buildings, a mental health inpatient unit intended for short-term stays, and eight dormitories. The dormitories are designated A, B, C, D, E, F, G, and H.

41.     People are frequently transferred between dormitories at Dade CI. Most are transferred to a different dorm at least once a year.

42.     The dormitories and dining hall have concrete walls and little or no insulation.

---

[3] Julie K. Brown, "This Prison Is By Far the Deadliest in Florida," *Miami Herald*, Jan. 21, 2017, https://www.miamiherald.com/news/special-reports/florida-prisons/article127340579.html.

[4] Charles Rabin, "Corrections Officer Convicted of Killing Prisoner Admits to Taking Part in Beating," *Miami Herald*, Mar. 27, 2024, https://www.miamiherald.com/news/local/crime/article287107745.html.

43.     None of the dormitories have air conditioning. There are air conditioning units in the officers' control rooms, located next to the dormitories' entrances. There are no such units in areas of the dorms accessible to prisoners.

44.     There are few shade-providing trees on the prison compound. The dormitories and dining hall sit in the open sun and absorb its heat during the day. The buildings' concrete walls and concrete foundation retain that heat at night.

45.     Defendants have made a conscious decision not to regularly record the temperatures or heat indexes in the dormitories at Dade CI, despite knowing that they are dangerously hot.

46.     On October 11, 2023, Senator Jennifer Bradley, Chair of Florida's Appropriations Committee on Criminal and Civil Justice, urged the FDC to record the temperatures within FDC dormitories.

47.     Yet, in response to public record requests, FDC has claimed that it has no data regarding the temperatures or heat index within Dade CI's dormitories.

48.     Temperature and humidity are regularly recorded at Homestead Air Force Base (Homestead AFB), which is located approximately 8 miles from Dade CI.

49.     Temperature and humidity are also regularly recorded at Kendall-Tamiami Executive Airport (Kendall Airport), which is 16 miles from Dade CI, and at Miami International Airport (Miami Airport), 29 miles from Dade CI.

50.     Records taken at Homestead AFB, Kendall Airport, and Miami Airport reveal that the heat index does not significantly vary between those locations.

51.     As Homestead AFB is the closest location to Dade CI with regular temperature and humidity recordings, those recordings provide the best approximation of the heat index in the area where Dade CI is located.

52.     However, the average heat indexes inside Dade CI's dormitories likely *exceed* the average heat index at Homestead AFB. That is due to (a) the dormitories' concrete structures which absorb the sun's radiation and retain its heat; (b) additional heat added by showers, human bodies, lights, and motors; (c) increased humidity caused by showers, floods, and leaks; and (d) the lack of adequate ventilation.

53.     Put simply: It is bound to be hotter in a crowded concrete box than outside under the shade (where the Homestead AFB recordings are taken).

54.     Nonetheless, until the FDC or a third party records the heat indexes within Dade CI's dormitories, the recordings at Homestead AFB provide the best approximation currently available.

55.     The National Weather Service (NWS) publishes a chart that illustrates how exposure to high heat indexes increases the risk of heat-related illnesses:[5]

---

[5] Available at: https://www.weather.gov/ama/heatindex.



Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity

☐ Caution  ☐ Extreme Caution  ☐ Danger  ☐ Extreme Danger

56.     As temperature and relative humidity rise, the likelihood of heat-related illness increases dramatically. The NWS correlates heat index ranges to four risk levels:

| Classification | Heat Index | Effect on the body |
|---|---|---|
| Caution | 80°F - 90°F | Fatigue possible with prolonged exposure and/or physical activity |
| Extreme Caution | 90°F - 103°F | Heat stroke, heat cramps, or heat exhaustion possible with prolonged exposure and/or physical activity |
| Danger | 103°F - 124°F | Heat cramps or heat exhaustion likely, and heat stroke possible with prolonged exposure and/or physical activity |
| Extreme Danger | 125°F or higher | Heat stroke highly likely |

57.     Importantly, the NWS chart predicts the risk of heat-related illness to healthy and young people, not people at an increased risk of heat-related illness due to medical conditions, medications, or age.

58.     As discussed below, the population at Dade CI is not young or healthy.

59.     During the summer, the heat index at Dade CI regularly reaches into the "Danger" range, between 103°F and 124°F. According to the NWS, prolonged exposure will likely cause heat exhaustion and may cause heat stroke, for a young and healthy person.

60.     It rarely falls below "Extreme Caution" range of 90°F to 103°F during the day. According to the NWS, prolonged exposure to a heat index in this range may cause heat exhaustion and heat stroke, for a young and healthy person.

61.     Even the lowest heat index at night rarely drops below the "Caution" heat index range of 80°F to 90°F.

62.     The following chart depicts the maximum heat index each day at Homestead AFB during the summer of 2023 (defined as May 1 to September 30), shaded according to the four NWS risk levels described above. The chart is based on temperature and relative humidity recordings at Homestead AFB, and published by the National Centers for Environmental Information (NCEI).

**2023 Daily Peak Heat Index at Homestead AFB**

| Day | May | June | July | Aug. | Sept. |
|---|---|---|---|---|---|
| 1 | 84.4 | * | 97.2 | 100.4 | 105.0 |
| 2 | 89.9 | 89.9 | 100.2 | 95.4 | 99.1 |
| 3 | 88.3 | 93.0 | 98.3 | 100.3 | 92.0 |
| 4 | 84.4 | 92.6 | 100.4 | 95.6 | 96.1 |
| 5 | 86.0 | 92.9 | 99.4 | 98.2 | 95.4 |
| 6 | 87.8 | 89.5 | 105.0 | 105.4 | 92.2 |
| 7 | 85.4 | 94.8 | 100.7 | 103.4 | 94.3 |
| 8 | 85.2 | 96.0 | 102.2 | 105.9 | 94.1 |
| 9 | 88.5 | 98.5 | 105.0 | 104.6 | 95.6 |
| 10 | 87.8 | 117.6 | 102.6 | 105.1 | 100.6 |
| 11 | 89.6 | 117.6 | 104.3 | 103.0 | 103.4 |
| 12 | 88.4 | 115.4 | 103.2 | 101.6 | 100.7 |
| 13 | 85.7 | 126.6 | 107.2 | 105.1 | 100.9 |
| 14 | 89.6 | 123.0 | 103.1 | 105.1 | 102.9 |
| 15 | 90.4 | 105.1 | 102.5 | 107.2 | 100.4 |
| 16 | 91.1 | 103.0 | 104.7 | 98.2 | 98.3 |
| 17 | 92.8 | 102.8 | 102.7 | 102.2 | 102.5 |
| 18 | 95.6 | 105.4 | 102.8 | 97.6 | 101.1 |
| 19 | * | 99.7 | 100.4 | 98.2 | 88.2 |
| 20 | 94.2 | 102.8 | 101.0 | 95.9 | 96.7 |
| 21 | 93.0 | 105.1 | 101.0 | 98.6 | 94.9 |
| 22 | 93.3 | 99.7 | 106.7 | 98.2 | 94.1 |
| 23 | 93.0 | 105.4 | 104.2 | 98.2 | 91.2 |
| 24 | 92.3 | 105.4 | 105.9 | 100.3 | 95.7 |
| 25 | 90.8 | 105.4 | 102.9 | 101.0 | 102.5 |
| 26 | 89.6 | 117.2 | 95.1 | 100.0 | 102.8 |
| 27 | 90.6 | 100.8 | 96.1 | 102.4 | 97.6 |
| 28 | 94.7 | 102.7 | 99.7 | 102.9 | 97.6 |
| 29 | 90.2 | 99.3 | 100.6 | 108.0 | 102.1 |
| 30 | 92.9 | 98.2 | 101.5 | 105.3 | 105.4 |
| 31 | 91.8 | | 100.1 | 107.4 | |

*Insufficient data to calculate the peak heat index on this day.

63.     During the summer of 2023 (May 1 – September 30), the heat index reached the NWS's "Caution" zone of 80°F every single day. It reached 88°F on all but 8 days. It reached 90°F ("Extreme Caution") on 135 (out of 153) days. It reached 103°F ("Danger") on 38 days, including nine consecutive days in June. It surpassed 115°F 5 days in a row. On June 13, it reached a remarkable 126.6°F--within the "Extreme Danger" zone, in which heat stroke is "highly likely" for a young and healthy person, according to the NWS.

64.     Out of 3276 total summer hours, the heat index surpassed 80°F at least 2706 hours (74% of all hours). It surpassed 88°F for at least 1588 hours (43% of all hours), 90°F for at least 1300 hours (35%), and 103°F for 87 hours (2%).

65.     The summer of 2024 has been even hotter.

66.     The following chart depicts the maximum heat index each day at Homestead AFB during the summer of 2024 (defined as May 1 to September 30), shaded according to the four NWS risk levels described above. The chart is based on temperature and relative humidity recordings at Homestead AFB, and published by the NCEI.

**2024 Daily Peak Heat Index at Homestead AFB**

| Day | May | June | July | Aug. | Sept. |
|-----|-----|------|------|------|-------|
| 1 | 88.1 | 96.1 | 95.5 | 106.1 | 100.2 |
| 2 | 88.1 | 91.5 | 106.8 | 106.6 | 103.3 |
| 3 | 87.5 | 91.8 | 103.9 | 100.2 | 103.3 |
| 4 | 87.8 | 92.7 | 103.6 | 101.2 | 109.7 |
| 5 | 88.1 | 99.5 | 105.4 | 104.0 | 106.6 |
| 6 | 88.1 | 103.3 | 102.7 | 104.6 | 101.8 |
| 7 | 90.6 | 102.5 | 106.1 | 104.2 | 102.1 |
| 8 | 91.8 | 99.7 | 105.4 | 101.5 | 103.4 |
| 9 | 92.7 | 102.1 | 103.1 | 103.1 | 107.5 |
| 10 | 98.1 | 100.2 | 104.7 | 103.3 | 104.3 |
| 11 | 97.9 | 95.5 | 99.1 | 105.2 | 103.6 |
| 12 | 98.1 | 95.9 | 96.4 | 102.8 | 104.0 |
| 13 | 98.1 | 97.3 | 101.2 | 105.4 | 109.7 |
| 14 | 101.4 | 98.1 | 105.9 | 106.6 | 106.6 |
| 15 | 104.2 | 92.5 | 100.8 | 104.0 | 105.4 |
| 16 | 101.3 | 96.8 | 100.8 | 101.2 | 106.6 |
| 17 | 104.5 | 98.6 | 102.7 | 98.4 | 101.5 |
| 18 | 108.6 | 96.1 | 104.0 | 97.6 | 106.1 |
| 19 | 109.4 | 98.1 | 104.7 | 102.4 | 100.0 |
| 20 | 96.4 | 96.6 | 104.7 | 106.6 | 97.6 |
| 21 | 95.9 | 103.6 | 105.4 | 101.4 | 99.1 |
| 22 | 94.7 | 103.3 | 101.4 | 100.2 | 99.7 |
| 23 | 93.0 | 98.1 | 103.3 | 102.0 | 99.7 |
| 24 | 91.8 | 95.7 | 105.4 | 93.9 | 104.0 |
| 25 | 97.5 | 95.2 | 101.4 | 101.8 | 106.6 |
| 26 | 103.2 | 103.3 | 102.8 | 101.8 | 103.3 |
| 27 | 100.7 | 101.8 | 101.5 | 105.2 | 103.9 |
| 28 | 101.4 | 103.4 | 103.3 | 103.0 | 104.6 |
| 29 | 104.0 | 105.4 | 104.0 | 97.6 | 102.7 |
| 30 | 99.7 | 92.6 | 101.4 | 100.6 | 103.3 |
| 31 | 94.3 |  | 102.8 | 100.2 |  |

67.    During the summer of 2024 (May 1 to September 30), the heat index reached 80°F ("Caution") every single day. It reached 88°F on all but 2 days. It reached 90°F ("Extreme

16

Caution") on 147 (out of 153) days. It reached 103℉ ("Danger") on 63 days (41% of all summer days), including 9 consecutive days in September.

68.     Out of 3276 total summer hours, the heat index surpassed 80℉ for 3384 hours (92% of all hours). It surpassed 88℉ for 2256 hours (61% of all hours), 90℉ for 1913 hours (52%), and 103℉ for 156 hours (4%).

69.     In short, on *nearly every single day* from May to September of 2023 and 2024, the heat index exceeded 88℉. In 2023, it exceeded 90℉ *for half the entire time*.

70.     The temperatures and heat indexes in the dormitories at Dade CI in 2023 and 2024 are significantly hotter than they were in the late 1990s. Those levels will continue or rise in coming years.

### C.     The Dormitories at Dade CI Have Unventilated, Contaminated Air

71.     The dangerous heat in the dormitories at Dade CI is compounded by the problem of unventilated, contaminated air.

72.     Even when working as designed, the ventilation systems of the dormitories at Dade CI are incapable of lowering the heat index below the heat index outside.

73.     Upon information and belief, none of the ventilation systems in the dormitories work as designed. The systems have not been adequately maintained since they were installed decades ago. Critical components—such as fans and motors—are the wrong size, set to the wrong amperage, or missing entirely.

#### a.     The Insufficient Ventilation Systems

74.     Dorms A through E are "open bay dormitories." Each dorm has two sides. In each side, there is a large sleeping room with up to eighty metal beds. Most are bunkbeds, but several are single beds, which are reserved for people with serious disabilities.

75.     Dorm E is currently closed.

76.     The open bay dorms have windows and exhaust fans that blow out air from inside the dorm. They have internal fans that circulate air within the rooms but do not provide fresh air from outside.

77.     The exhaust fans constantly break down and sometimes months go by before they are fixed.

78.     Bathrooms and showers adjoin the open bay dormitories. The showers have only one knob for turning the water on or off. The temperature cannot be adjusted, and it is typically set to hot. Therefore, some prisoners who want to take a cool shower will turn on all of the showers at once, to quickly deplete the system of hot water, so that they can then take a cool shower.

79.     There are exhaust fans in the bathrooms, but many are broken. As a result, much of the hot air and humidity from the showers goes into the open bay, where people are locked in at night.

80.     Dorms F, G, and H are known as "T-Dorms," which consist of three wings. Each wing has forty small cells, most of which have two beds. The cells are roughly the size of an average parking space. Inside each cell is a bunkbed, sink, and toilet. Prisoners are locked in these cells at night, but are normally permitted to access the day room during the day, except for those on confinement status. Individuals in confinement can be locked in their cells up to 23 hours a day.

81.     The primary exhaust systems of F, G, and H dorms are missing necessary parts. There are louver vents outside the dormitories which are supposed to be in front of exhaust fans

that run on motors. However, the fans and motors have been removed. Also, the outside of the louver vents have been covered. So the primary exhaust systems are not functioning at all.

82.     There are exhaust fans at the end of each wing in F, G, and H dorms. They are supposed to blow air out of the buildings. But they are not equipped with the proper size motors, so they generate very little air flow.

83.     In these dorms, Dade CI sometimes runs a heating system without a furnace, to blow air into the cells. Even if it were working properly, this system would not provide sufficient ventilation, since it is not designed for that purpose. They do not draw fresh air from outside, but rather stale air from inside the dormitory.

84.     The system is in terrible disrepair. There has been no maintenance on the duct work. As a result, the ducts are full of dust and dirt. The little air that goes through the ducts comes out dirty. The ducts are made of metal, which corrodes and rusts in South Florida's climate, and is never repaired. As a result, the duct work is full of holes, which further reduces air flow.

85.      There are internal fans within the common areas of F, G, and H dorms. They do not transfer or exchange fresh air from outside the dormitories. There are no fans or electrical outlets inside the cells.

86.     F and G dorms have windows that are approximately three feet long by eight inches high. They open slightly—barely enough for a hand to fit through the opening. Some of the cells in F and G dorms have broken windows that do not open at all.

87.     By design, H Dorm lacks windows that open. In place of windows are metal slabs, about 6 by 8 inches in size. The metal slabs are perforated with holes roughly the size of a pencil. Very little air comes through, even when it is windy outside, because metal sheets have

been installed on the outside of the building, several inches in front of the slabs. The result is that people in H Dorm cannot see outside and get little to no fresh air in their cells.

88.     H Dorm is known as "Hell Dorm" among those confined at Dade CI.

89.     The stagnant air in F, G, an H dorms is contaminated with smoke, mold spores, and aerosolized sewage.

90.     The smoke is caused by individuals who smoke cigarettes, methamphetamine, synthetic marijuana, and other substances. As in most prisons, such drug use is common due to the fact that such a high proportion of prisoners suffer from drug addiction, often as a coping response to traumas, illnesses, and intolerable prison conditions themselves.

91.     The deleterious effects of second-hand tobacco smoke have been well documented. Chronic exposure to even more noxious smoke vapers, such as methamphetamine and synthetic cannabinoids, likely causes similar damage.

92.     F, G, and H dorms have drains on the floors of the corridors. Particularly when water levels are high, the drains are prone to clogging and even become backed up with sewage.

93.     F, G, and H dorms are covered with black mold. The buildings leak every time it rains, often leaving the hallways and common areas flooded with up to two inches of standing water. When the floor drains function properly, that water gradually subsides, but not before it thoroughly soaks the floor, walls, and anything on the ground. Cells on the lower tier often flood. Predictably, black mold proliferates in such conditions. As a result, the air reeks of mold and is contaminated with spores.

94.     In sum, in addition to being hot and humid, the air in F, G, and H dorms is stagnant and perpetually contaminated with smoke, mold, and fecal matter.

95.     Many prisoners have written grievances about the lack of ventilation in Dade CI's dormitories. In response, Dade CI officials simply write that the ventilation systems are working properly, and they were last tested in December 2022.

### b.  Ventilation and ASHRAE Standards

96.     The national reference standards for indoor air quality and related HVAC systems are developed by the American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE). ASHRAE specifies minimum ventilation rates and other measures intended to provide indoor air quality (IAQ) that is acceptable to human occupants and that minimizes adverse health effects. ASHRAE establishes minimum standards for heat and humidity, ventilation, and air quality.

97.     Insufficient ventilation and poor IAQ cause diseases to proliferate, exacerbate breathing conditions such as asthma, and lead to "sick building syndrome," that is, "acute health and comfort effects that appear to be linked to time spent in a building[.]"[6]

98.     In October 2022, the FDC enlisted the firm KPMG to develop a 20-year master plan for the FDC. In December 2023, KPMG published its report entitled, "Final Multi-Year Master Plan: Charting a Path to a Safer, More Efficient Correctional System."

99.     The KPMG report assesses FDC prisons according to ASHRAE standards. The KPMG report concludes that most FDC dormitories—including those at Dade CI—require retrofitting to "comply with current ventilation standards and promote indoor air quality."

100.    According to the KPMG report, "over one-third of FDC facilities were assessed to be in 'critical' or 'poor' condition."

---

[6] United States Environmental Protection Agency, *Indoor Air Facts No. 4: Sick Building Syndrome* (Feb. 1991), available at
www.epa.gov/sites/default/files/2014-08/documents/sick_building_factsheet.pdf.

101.    The KPMG report notes that repairs would "improve indoor air quality by removing contaminants from outdoor air before channeling it into the building" and "[i]mprove dehumidification, thereby helping prevent moisture-related problems like sick building syndrome and mold growth."

102.    According to the ASHRAE guidelines, the indoor air in a prison should not exceed 77°F or 50% relative humidity. As demonstrated above, the air at Dade CI exceeded those levels every single day of the summers of 2023 and 2024.

103.    Upon information and belief, the dormitories at Dade CI fall well below the ASHRAE standards relating to ventilation and air quality.

**D.    There Is Little to No Access to Cool Air or Water**

104.    People at Dade CI spend most of their time in the dormitories. Although there are air-conditioned spaces, such as the law library, visiting room, medical, and education building, prisoners' access to those places is strictly limited.

105.    Being in the dormitories in the summer is unbearable.  The heat is sweltering, and people confined there sweat profusely, even right after showering. The ventilation system barely moves the air, and people struggle to breathe.  It is akin to being locked in a parked car in the midday tropical heat.

106.    Sleeping is extremely difficult due to the high heat and lack of ventilation. Many people wet their sheets and sleep on the concrete floor, which is slightly cooler than their beds.

107.    Many people are not able to enter an air-conditioned space more than once or twice per week. At night, access to air-conditioned areas is categorically prohibited, except for those in the infirmary or mental health inpatient unit.

108.    The chow hall does not have air conditioning in the areas accessible to prisoners. The kitchen—where prisoners prepare food and clean dishes for no pay—is swelteringly hot and lacks sufficient ventilation. In the dining hall, where hundreds of people eat at a time, interior fans provide little relief from the heat. People sweat profusely as they eat, especially during lunch and dinner, when temperatures are highest. Officers stationed in the dining hall suffer from the same conditions, and they hurry prisoners to finish eating as quickly as possible so the officers can return to air-conditioned spaces.

109.    People in F, G, and H dorms build air tunnels out of cardboard, plastic, or whatever materials they can find. They place these air tunnels over the small windows and vents in their cells to direct the tiny bit of airflow toward their faces. Building such contraptions is prohibited, and guards are constantly confiscating prisoners' air tunnels as "contraband."

110.    People in confinement spend an average of 23 hours a day in their hot, unventilated cells. They must eat, sleep, and use the toilet in a cell smaller than an average parking space. They are allowed a limited number of showers per week.

111.    At least one individual, who spent months in confinement, bathed himself with toilet water at night because the toilet water was cooler than the sink water.

112.    Due to the excessive heat and stifling air in the dormitories and day rooms, prison guards remain in the control rooms of the dormitory buildings—the only rooms with air conditioning in those buildings—and avoid leaving those areas. Prisoners are prohibited from entering those areas.

113.    Guards regularly complain of the excessive heat in the dormitories.

114.    In some of the dormitories, the water fountains have warm rather than cold water.

23

115.    In some of the dormitories, officers sometimes bring a cooler full of ice in the summer. They do not seem to bring ice more often when it is hotter; how often they bring ice depends more on which officers are on duty on a given day.

116.    The prisoners add water to the ice coolers so that they can have a cup of cool water. But the ice is insufficient to provide cool water for all people in the dormitory. It runs out quickly. People who are not fast to get in line—including the elderly and those who rely on walkers or wheelchairs—sometimes get no cool water at all.

**E.      The Extreme Heat at Dade CI Causes Illness, Injury, and Death**

117.    Extreme heat is the number one weather-related killer in the United States, killing more people most years—approximately 1,300—than hurricanes, floods, and tornadoes combined.[7]

118.    The National Commission on Correctional Health Care (NCCHC) recently released a position statement stating: "Extreme indoor and outdoor temperatures adversely affect the health of people residing and working in carceral settings. Every carceral facility should implement standards to minimize extreme temperature exposure indoors and outdoors and adopt steps for prevention and mitigation." Citing decades of research, the statement also notes that "[t]here is robust evidence that high temperatures in carceral facilities are associated with morbidity and mortality."

119.    According to data collected by the Centers for Disease Control and Prevention (CDC), Florida of all states has the most hospitalizations and ER visits for heat-related illness.[8]

---

[7] Terri Adams-Fuller, "Extreme heat is deadlier than hurricanes, floods, and tornadoes combined." *Scientific American* (July 1, 2023), available at https://www.scientificamerican.com/article/ extreme-heat-is-deadlier-than-hurricanes-floods-and-tornadoes-combined/.

120.    "Maintaining a consistent internal body temperature, generally 98.6°F, is essential to normal physical functioning."[9] Excessive heat can "stress the body's ability to maintain this ideal internal temperature. If individuals fail or are unable to take steps to remain cool and begin to experience increasing internal temperatures, they increase their risk of experiencing a range of potential adverse health outcomes."

121.    High temperatures and humidity prevent the human body from regulating its temperature. When exposed to heat, the heart will beat faster to increase blood flow to the skin, in order to dissipate heat and keep the internal organs from overheating. As the blood circulates to the skin, excess heat escapes into the cooler air. With so much blood pumped to the skin, the body struggles to maintain its normal functions.

122.    The body also cools itself through sweating. The body produces sweat, which evaporates to cool the body. But when the humidity is high, sweat evaporates slower, preventing the body from cooling.

123.    In addition, continued exposure to heat causes the body to lose water and become dehydrated. When the body loses enough water, it also loses oxygen.

124.    Thus, when exposed to high heat and humidity, the body cannot cool itself through sweating and circulation, the body's temperature rises, and heat-related illnesses may develop.

---

[8] Centers for Disease Control and Prevention, "National Environmental Public Health Tracking Network," available at https://ephtracking.cdc.gov/DataExplorer/.
[9] United States Environmental Protection Agency, *Excessive heat Events Guidebook* (Updated Mar. 2016) at 10, available at www.epa.gov/sites/default/files/2016-03/documents/eheguide_final.pdf.

125.    Continued exposure to high heat and humidity can cause permanent injuries to the body, including heat stroke and death. High temperatures can also cause less deadly, but still painful, heat-related illnesses, including heat exhaustion and heat cramps.

126.    **Heat Rash**: Heat rash occurs when sweat is trapped in the skin. It frequently occurs during prolonged exposure to hot and humid conditions. Symptoms range from small blisters to deep, inflamed pustules. They are often itchy or painful. Heat rash can lead to severe infection, particularly in the unsanitary conditions at Dade CI.

127.    All Plaintiffs have suffered from heat rash during their incarceration at Dade CI.

128.    Upon information and belief, most prisoners at Dade CI suffer from heat rash during the summer months.

129.    **Heat Exhaustion**: Symptoms of heat exhaustion, according to the federal National Institute for Occupational Safety and Health (NIOSH), include fatigue, heavy sweating, nausea, dizziness, elevated body temperature, and shallow breathing.

130.    All Plaintiffs experience symptoms of heat exhaustion routinely throughout the summer at Dade CI.

131.    Upon information and belief, many prisoners at Dade CI suffer from heat exhaustion during the summer months.

132.    **Heat Cramps**: Heat cramps can consist of "[m]uscle pain or spasms usually in the abdomen, arms, or legs," according to NIOSH.

133.    **Heat Stroke**: NIOSH describes heat stroke as "the most serious heat-related disorder," in which "the body temperature can rise to 106 degrees Fahrenheit or higher within 10 to 15 minutes." Symptoms include hot, dry skin; hallucinations; chills; headaches; confusion;

and slurred speech. "Heat stroke can cause death or permanent disability if emergency treatment is not given."

134.    In extreme temperatures, heat-related illnesses can arise and exacerbate quickly to cause death, often without warning. According to NIOSH, "[t]he different forms of heat-related illness . . . increase in severity as heat strain increases. This allows for a quick, deadly progression from heat exhaustion to heat stroke."

135.    Prolonged exposure to extreme heat also causes psychological distress and exacerbates mental illness. Studies have shown a strong positive correlation between excessive temperatures and suicides. There have been at least three suicides in the past three years at Dade CI.

136.    Prolonged exposure to extreme heat also increases violence and aggression. There are more incidents of violence during the summer months at Dade CI compared to the winter months.

137.    Many people at Dade CI, regardless of underlying medical conditions, suffer at least some symptoms of heat-related illness. Typical symptoms include heat rash, headaches, dizziness, nausea, lightheadedness, elevated temperature, and heavy sweating.

138.    Prolonged exposure to a heat index of 88 degrees or higher subjects an otherwise "healthy" person to a substantial risk of serious harm, including by suffering from any of the above-mentioned heat-related illnesses, which can cause significant and irreversible harm, including death.

**F.    Certain Groups of People Are at Heightened Risk.**

139.    The population at Dade CI is not young and healthy. Dorms A, B, C, and D are designated "Geriatric Dorms," in accordance with Rule 33-601.217 of the Florida Administrative

Code, which defines "elderly" as over the age of 50. Approximately half of the people within these dorms are over 65.

140.    Dorms F, G, and H are not designated geriatric dorms, but they house elderly individuals. Approximately 8% of prisoners in these dorms are over 65.

141.    The FDC has designated Dade CI as a facility that houses people with physical disabilities. There are individuals with disabilities in all of the inhabited dormitories at Dade CI.

142.    Over 50% of all prisoners at Dade CI are over the age of 50, and nearly 25% are over 65. Many—both young and old—have medical conditions or disabilities that increase their susceptibility to heat-related illness.

143.    Though all people suffer in the extreme heat at Dade CI, certain groups of people face a heightened risk of severe heat-related illness.

           a.    Age

144.    According to the CDC, the heat stroke mortality rate increases with age. For example, the rate of heat stroke deaths doubles between ages 35 and 55. The CDC also recognizes that people over the age of 65 are more prone to heat stress.

145.    People over the age of 65 are more likely to have the chronic medical conditions, such as heart disease or diabetes, that place them at increased risk of heat stroke and heat-related illness disorder. They are also more likely to take medications that adversely affect the body's ability to thermoregulate, thereby placing them at increased risk of heat stroke and heat-related illness.

146.    Even healthy people over the age of 65 who do not suffer chronic medical conditions or take those medications are at greater risk of heat stroke and heat-related illness. Age is associated with a reduction in aerobic capacity, an important factor in the ability of the

body to respond to heat stress. After peaking at about age 20, the aerobic capacity declines about 10% each decade after age 30. Older adults simply cannot increase their heart rates as much as younger people and, as a result, their hearts will not perform as well during periods of heat stress.

147.    Aging is also associated with other physiologic changes that modify the body's response to heat. People over the age of 65 cannot sweat as well as younger people, and their ability to vasodilate may also be reduced. Finally, older adults may not sense high heat or thirst as acutely, and therefore may fail to properly hydrate or take other measures.

148.    Yet Defendants make no accommodations for prisoners based on age, even though it is known to be associated with increased risk of heat-related illness, injury, and death.

### b.    Medical Conditions

149.    People with certain medical conditions are at increased risk of heat-related illness, injury, or death. This is both because certain conditions impair the body's ability to cool itself, but also because extreme heat exacerbates and causes life-threatening medical complications associated with those conditions.

150.    For instance, heat can cause or aggravate other illnesses, even triggering medical emergencies such as heart attacks. According to the World Health Organization (WHO), "heat increases death rates from cardiovascular and respiratory disease by placing extra stress on an already stressed system." Similarly, NIOSH warns that there is substantial evidence that extreme heat is a risk factor for cardiovascular disease and death.

151.    The CDC, NWS, and EPA recognize that sudden exposure to heat contributes to a variety of illnesses, including cardiovascular disease, and increases the likelihood of illness and death.

152. There are hundreds of people with heat-sensitive disabilities at Dade CI, including the following:

153. **Hypertension** is a cardiovascular disease. It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow exerts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems and result in organ damage if untreated or exacerbated.

154. Patients taking diuretics or beta blockers to treat hypertension are at increased risk of heat-related illness.

155. Hypertension can substantially limit a patient's ability to walk, stand, and breathe, and limit the operation of the respiratory, circulatory, and cardiovascular systems, especially when the patient is exposed to extreme temperatures.

156. People with hypertension have blood vessels that have abnormal compliance. In other words, the elasticity and the ability of the blood vessels to open and close are decreased. As a result, the heart must pump much harder, and it will struggle to increase cardiac output during periods of heat stress.

157. Hypertension also increases a patient's susceptibility to heat stress because it diminishes the body's ability to regulate internal temperature. Thus, a patient with hypertension in extreme heat faces a substantially greater risk of suffering from a stroke, heart attack, syncope (loss of consciousness), and death.

158. **Cardiovascular disease** is a term for a range of conditions that affect the heart and blood vessels. Heat stresses the cardiovascular system because the heart needs to work harder to increase cardiac output.

159.    People with cardiovascular disease, by definition, have a compromised cardiovascular system. Their bodies therefore struggle to maintain sufficient cardiac output to maintain the body's temperature. For this reason, they are more susceptible to heat stroke and death.

160.    Moreover, because the heat causes the cardiovascular system to work harder, the heat is likely to exacerbate underlying cardiovascular disease, increasing the risk of causing heart attacks, strokes, or death.

161.    **Asthma** is a chronic lung disease that inflames and narrows the airways. It substantially limits sufferers' ability to breathe, causing recurring periods of wheezing, chest tightness, shortness of breath, and coughing. Asthma also substantially limits the operation of the respiratory system.

162.    Heat and humid air can trigger asthma symptoms, causing asthma patients to suffer more pain and punishment in hot environments than people without asthma.

163.    Asthma places patients at increased risk of heat-related illness, including heat exhaustion and heat stroke. An asthma patient in extreme heat faces a substantially greater risk of a fatal asthma attack.

164.    **Diabetes** is a chronic disease caused by an insulin imbalance. It affects the endocrine, digestive, circulatory, and nervous systems.

165.    Diabetes causes blood vessels to be unable to dilate adequately and unable to deliver sufficient blood and nutrients to the body. That compromises vasodilation and increases the risk of heat stroke. Diabetes may also impair kidney function and the kidneys' ability to maintain electrolyte/fluid balance, impairing an important part of the body's response to heat stress.

166.    Diabetes impairs the body's ability to adjust to increases in temperatures by affecting diabetics' ability to sweat. Sweating is critical to cool the body in extreme heat. Reduced ability to sweat results in a higher body core temperature, profoundly aggravating the risk of heat stroke.

167.    Diabetes also reduces blood circulation by impairing the action of the heart and by decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat and prevent heat stroke.

168.    Diabetes substantially increases the risk of heat-related illness, including heat exhaustion and heat stroke.

169.    **Chronic Obstructive Pulmonary Disease (COPD)** is a disease that makes it difficult to breathe. It includes chronic bronchitis and emphysema.

170.    COPD causes frequent coughing, shortness of breath, and tightness in the chest, among other symptoms.

171.    COPD impairs the operation of the respiratory, circulatory, and cardiovascular systems.

172.    Heat exacerbates COPD, because the body needs to breathe in additional oxygen to help cope with the heat. This requires additional breathing, which is impaired by COPD.

173.    COPD substantially increases the risk of heat-related illness, including heat exhaustion and heat stroke.

174.    **Obesity** impairs thermoregulation and heat dissipation, in part because excess weight causes the body to retain more heat.

175.    People with obesity are at an increased risk of serious heat-related illness, including heat stroke and death.

32

176. **Cystic fibrosis** is a genetic condition that causes the body to produce thick mucus that can block airways and damage organs. It impairs vasodilation and sweating, the body's two primary mechanisms for dissipating heat. Accordingly, it renders people more susceptible to serious heat-related illness, including heat stroke and death.

177. **Thyroid dysfunction** refers to conditions that cause the thyroid gland to produce too much or too little thyroid hormone, which controls the speed of metabolism. When the thyroid is not working properly, the body struggles to appropriately adjust the basal metabolic rate, which is an important component of heat regulation. Therefore, people with thyroid dysfunction are at a heightened risk of serious heat-related illness, including heat exhaustion, heat stroke, and death.

178. **Sweat gland dysfunction** is a term that encompasses several disorders affecting the sweat glands. As explained above, perspiration is the body's key mechanism for dissipating heat. Any disorder that impairs the functioning of the sweat glands will impair the body's ability to thermoregulate, increasing the risk of serious heat-related illness.

179. **Psychiatric diseases and mental health disorders** place people at an increased risk of heat stroke and heat-related illness because they may have impaired behavioral responses to heat stress. They may not have the ability to reason, take precautions, or help themselves during a period of heat stress. People suffering from heat disorder must be able to express themselves and have the mental energy and interpersonal skills to ask for help.

180. People who suffer from depression or anxiety - two very common diagnoses among incarcerated people - may be unable to communicate well with others, or may experience apathy and inability to take on and overcome challenging circumstances during times of physiologic heat stress. Moreover, many of the symptoms of heat-related problems such as

feeling poorly, irritability, anxiety, and confusion can also be seen in a variety of mental illnesses. This often results in people with mental illness - and their treating providers, or the people who live or work around them - not appreciating that they are suffering from heat-related health problems versus a manifestation of their mental illness.

181.     Moreover, as discussed further below, many common medications that are used to treat mental health disorders affect the body's ability to thermoregulate.

### c.     Medications.

182.     There are also a number of medications that make people more susceptible to heat-related illness by interfering with the body's ability to cool itself, typically by inhibiting sweating or reducing blood flow, which is critical for cooling. These medications include but are not limited to anticonvulsants, anticholinergics, antipsychotics, antihistamines, antidepressants, beta blockers, and diuretics. People taking these medications face a substantially increased risk of heat-related illness and disorder.

183.     Anticonvulsants are medications used to treat seizure disorders such as barbiturates and benzodiazepines.

184.     Anticholinergics are medications that block certain neurotransmitters and are used to treat a variety of conditions such as mental illness, itching, and gastrointestinal disorders. Many of these medications—including Benadryl (diphenhydramine), Atarax, (hydroxyzine) and Vistaril (hydroxyzine)—cause sweat gland dysfunction. Sweat glands work through the neurotransmitter called acetylcholine, which is blocked by anticholinergic drugs. Many drugs have anticholinergic properties, including drugs used to treat mental illness, itching, and gastrointestinal disorders. Examples of drugs having an anticholinergic effect include

antihistamines, cyclic antidepressants, phenothiazines (i.e. Thorazine) and butyrophenones (i.e. Haldol). Phenothiazines and butyrophenones are also called neuroleptics or tranquilizers.

185.   In addition to their anticholinergic effects, the phenothiazines and butyrophenones further impair thermoregulation by interfering with the hypothalamus, the part of the brain that regulates temperature. In other words, the body's thermostat is broken. This results in disruption of signals from the brain, further impairing sweating and vasodilation, as well as other heat loss responses.

186.   Antipsychotics are medications used to treat psychosis, and include Haldol, Thorazine, Abilify, Zyprexa, and Seroquel. They also block neurotransmitters, inhibit sweating, and have similar anticholinergic effects.

187.   Antihistamines block histamines, and are used for allergies, cold and flu symptoms, nausea, and motion sickness. They include Benadryl, Zyrtec, and Claritin. They affect neurotransmitters that regulate the body's ability to sweat.

188.   Antidepressants and selective serotonin reuptake inhibitors (SSRIs) are used to treat depression and anxiety and other mental health disorders and include Abilify, Benadryl, Elavil, Losartan, Loxitane, Synthroid, Wellbutrin, Zyprexa, and Zyrtec. These medications affect the hypothalamus (the body's thermostat), and prevent sweat glands from working properly.

189.   Beta blockers are used to treat hypertension and other cardiovascular conditions, and have the effect of lowering the heart's ability to pump as much blood, and thereby decreasing the body's ability to cool itself. They include Atenolol and Metoprolol.

190.   Diuretics are medications that increase the amount of urine output, which causes the body to lose salt and water, leading to dehydration, which impairs the body's ability to sweat.

### G.      Extreme Heat Has Contributed to Recent Deaths at Dade CI

191.     Exposure to extreme heat can be fatal.

192.     For example, in 2017, Hurricane Irma caused a power outage at a nursing home in Broward County, Florida. The nursing home was left without air conditioning for three days. In that short time, twelve patients died of heatstroke. Criminal charges were brought against the nursing home's administrators for failing to protect patients from the sweltering heat. Temperatures during those days were in the 80s—far lower than temperatures seen in more recent years, and lower than temperatures routinely seen at Dade CI.

193.     Thereafter, the Florida Administrative Code set forth standards for the environmental control of nursing homes. According to those standards, the temperature in nursing homes "shall not exceed eighty-one (81) degrees Fahrenheit." FAC § 59A-4.1265.

194.     The FDC does not systematically record deaths that are caused by heat. The FDC only records four categories of causes of death: "homicide," "suicide," "accident," and "natural." A death caused by heat stroke would most likely be categorized by the FDC as a "natural" death.

### a.      J.G.B.

195.     On September 24, 2024, J.B. was found dead in his cell in H Dorm. He was 81 years old and confined to a wheelchair. Due to his physical disability, he was assigned to a one-man cell.

196.     For weeks prior to his death, he complained of severe pain in his chest and struggled to breath. He was constantly gasping for breath. Prisoners noticed that his gasping was worse in the hot, unventilated air of H Dorm than outside, in the chow hall, or in the infirmary.

197.    On or around September 20, 2024, Plaintiff Dwayne Wilson heard J.B. hollering "help, help," from inside his cell in H Dorm. He saw him lying on the bare floor, gasping and begging for help.

198.    Wilson alerted a guard that J.B. was having a medical emergency, and Wilson wheeled him to the infirmary. There, J.B. received a breathing treatment. The medical staff then ordered J.B. to return to his cell.

199.    J.B. called for help in similar circumstances on other mornings during the weeks leading up to his death. Other prisoners brought him to the infirmary. They heard medical staff tell J.B. that there was nothing wrong with him. The medical staff accused J.B. of coming to the air-conditioned infirmary simply to get out of the heat. They would order him to return to his cell within half an hour. Prisoners attempted to advocate on J.B.'s behalf, telling medical staff and officers that he was very ill.

200.    In the early morning of September 24, a prisoner heard J.B. begging for help from inside his cell. A prisoner pushed him to the infirmary. Within fifteen minutes, the medical staff ordered him to return to his cell.

201.    Shortly thereafter, when it was time to go to breakfast, people in H Dorm noticed that J.B. had not gotten up. They went to his cell and found him immobile on his bed. His mouth was wide open, as if he had been gasping for air the moment he died.

202.    On the day he died, the heat index reached 104°F. According to the NWS, a heat index of 104°F is within the "Danger" range for healthy individuals. J.B. was 81 years old, wheelchair-bound, and suffered from a breathing impairment.

203.    On the day he died, the exhaust fans in J.B.'s dormitory were not functioning. It took FDC approximately one week to fix them.

204.    It is likely that prolonged exposure to the hot, unventilated air at Dade CI contributed to J.B.'s death.

      **b.**    **C.G.**

205.    On July 3, 2023, C.G., a prisoner in B Dorm, died of heart failure.

206.    According to the Medical Examiner Report, he died at approximately 8:00 a.m. At that time, the temperature was 85 degrees, and the relative humidity was 70%, yielding a heat index of 92.7°F.

207.    According to the NWS, a heat index of 92.7°F is within the "Extreme Caution" range for healthy individuals. C.G. was 74 years old and suffered from hypertension, mobility impairments, and breathing problems.

208.    His autopsy attributes his death to "atherosclerotic and hypertensive heart disease." FDC deemed his death "Accidental." It is likely that prolonged exposure to Dade CI's heat was a contributory cause of his death.

      **c.**    **J.W.**

209.    On September 26, 2021, J.W. collapsed while walking to the infirmary, and later died.

210.    On that day, the heat index was 92.2°F, within the "Extreme Caution" range for healthy individuals. J.W. was 72 years old and suffered from asthma, hypertension, chronic obstructive pulmonary disease, and heart disease.

211.    His official cause of death was listed as "hypertensive and atherosclerotic cardiovascular disease." FDC deemed his death "Natural." It is likely that prolonged exposure to Dade CI's heat was a contributory cause of his death.

### d.   P.W.

212.   On August 15, 2021, P.W. was found unresponsive in his cell in F Dorm.

213.   On that day, the outside temperature reached 86 degrees, with a relative humidity of 75%. The heat index was 97.3 degrees—within the "Extreme Caution" range for healthy individuals. P.W. was 55-years-old and suffered from hypertension, obesity, anxiety, depression, myocardial infarction, and hyperlipidemia.

214.   His autopsy attributes his death to "hypertensive and atherosclerotic heart disease," with contributory cause "obesity." FDC deemed his death "Natural." It is likely that prolonged exposure to Dade CI's heat was a contributory cause of his death.

### H.   All Plaintiffs and Most Class Members Are Already Suffering from Multiple Heat-Related Illnesses

### a.   Dwayne Wilson

215.   Plaintiff Dwayne Wilson is 66 years old. He is six feet tall but weighs only 127 pounds. He has been incarcerated at Dade CI since March 2023.

216.   He has high blood pressure and takes medication that makes him especially sensitive to heat. This medication also causes him to urinate more frequently, which makes him dehydrate quickly.

217.   He has a prostate condition that also causes him to urinate frequently, placing him at a still higher risk of dehydration.

218.   He has a severe acid burn on his shoulder, back, and chest. In those areas, his skin does not sweat, and it becomes irritated and painful due to the heat. In the parts of his body where he does sweat, he sweats constantly.

219.     These conditions substantially limit Wilson's major life activities, including but not limited to breathing, exercising, and sleeping. The acid burn substantially limits his ability to sweat. Hypertension significantly limits the operation of his cardiovascular system.

220.     Wilson is otherwise qualified to participate in and benefit from FDC programs, services, and activities, including safe housing.

221.     When it is hot, Wilson feels drowsy and dizzy.

222.     On or around August 6, 2024, he fainted in his dormitory. He was carried to the medical unit, hooked up to an IV, and given water to drink. When he recovered, the medical provider advised him to drink and water and stay as cool as possible.

223.     On that day, the heat index reached 100°F.

224.     Wilson frequently suffers from heat exhaustion and dehydration. He faces a high risk of heat stroke and death due to the extreme heat at Dade CI.

**b.     Tyrone Harris**

225.     Plaintiff Tyrone Harris is 54 years old. He has been incarcerated at Dade CI since July 2022.

226.     He is currently housed in G dorm, but has been previously housed in B, C, D, and F dorms at Dade CI.

227.     He has high blood pressure and takes medication for it, including hydrochlorothiazide and Lisinopril, and also atorvastatin calcium for cholesterol. These medications increase his risk of suffering heat-related illness. The instructions on his blood pressure medication instruct him to stay out of the heat.

228.     He also takes Effexor, Abilify, Trileptal, and Buspar for mental health issues. These medications increase his risk of heat exhaustion and heat stroke.

229.    Harris has asthma and uses his inhaler at least two or three times per day.  He also takes Xopenex and Alvesco for his asthma. His asthma makes it harder to breathe and causes constant coughing.

230.    Harris frequently has to declare a medical emergency because of breathing difficulties, and has to be taken to medical to receive a 1-hour albuterol breathing treatment. In the summer of 2024, he had to do this two to three times per week.

231.    He often gets heat cramps, feels lightheaded, and had a bad heat rash.

232.    Harris works in the kitchen preparing food, where there is no air conditioning. The area where he works lacks sufficient ventilation.

233.    Harris's conditions—asthma, high blood pressure, and mental illness—substantially limit Harris's major life activities, including but not limited to breathing, exercising, and sleeping.

234.    Harris is otherwise qualified to participate in and benefit from FDC programs, services, and activities, including safe housing.

**c.    Gary Wheeler**

235.    Plaintiff Gary Wheeler is 65 years old. He has been incarcerated at Dade CI since July 2023.

236.    He has chronic obstructive pulmonary disease (COPD), which causes his airways to close and prevents him from getting sufficient oxygen. His COPD is worsened by the heat and lack of ventilation at Dade CI. He frequently sees lights flashing in his peripheral vision, indicating a deficiency of oxygen to his brain.

237.    Wheeler also has sleep apnea, which is also worsened by the heat. He wakes up throughout the night gasping for air. When this happens, he sees white spots in his vision, again indicating a lack of oxygen to his brain. He is afraid of suffocating and dying in his sleep.

238.    These conditions substantially limit Wheeler's major life activities, including but not limited to breathing and sleeping.

239.    Wheeler is otherwise qualified to participate in and benefit from FDC programs, services, and activities, including safe housing.

240.    He sweats all day and night at Dade CI. He has heat rash on his hands, arms, private areas, waistline, and chest.

241.    He suffers from heat exhaustion and is at a high risk of heat stroke and death due to the extreme heat at Dade CI.

242.    All Plaintiffs have exhausted all available administrative remedies.

### d.    Other Class Members

243.    Many people at Dade CI experience symptoms of heat-related illness in the summer. Some experience multiple symptoms. Others are at imminent danger of heat stroke and death. For example:

244.    **M.S.** is a 63-year-old military veteran. He is obese and confined to a wheelchair. He has diabetes, high blood pressure, and severe sleep apnea, among other ailments.

245.    M.S.'s body was covered in heat rash during the summer of 2024. It was worst on his upper arms, underarms, chest, back, behind his knees, and along his inner thighs. His skin was bright red and covered in pustules. From the rash itself and from scratching it, he developed infections and open wounds all over his body. He describes the sensation as lying on "a bed of red fire ants."

246.    He is unable to sleep without a CPAP machine, but he is unable to use the CPAP machine when it is hot. The CPAP machine requires a seal over his nose and mouth to function correctly. That seal cannot be established in the heat, because M.S.'s face becomes covered with sweat, preventing an adequate seal. Moreover, the sweat accumulates under the mask, eventually going into his mouth and choking him.

247.    M.S. is constantly exhausted. He feels "braindead" all the time, from the heat and the lack of sleep. He often enters into a confused daze, where he is unsure of where he is or what he is doing.

248.    M.S. has Stage 2 hypertension because his systolic pressure exceeds 140 mm Hg. He takes several medications to keep his blood pressure low, including lisinopril and amlodipine. Both of those medications make him heat intolerant.

249.    M.S. constantly experiences heat exhaustion and dehydration. He is in imminent danger of heat stroke, exacerbation of underlying conditions, and death due to the extreme heat at Dade CI.

250.    **A.B.** is 35 years old. He has spinal cord paraplegia and has no sensation from his waist down. He is confined to a wheelchair.

251.    He has constant pain in his spinal cord, which is aggravated by the heat. He describes the pain as someone "sticking an ice pick into my back." When he lies on his bed, he rocks his body back and forth to try to relive the pain, but nothing helps.

252.    He takes an anti-depressant, which makes him especially sensitive to the heat.

253.    A.B. also has sleep apnea, which is worsened by the heat. If he is lucky enough to fall asleep, he is soon wakened by the sleep apnea, which causes him to stop breathing in his sleep and results in him waking and gasping for air.

254.     He sweats profusely day and night. He constantly feels exhausted, especially around noon, and particularly on hot days.

255.     A.B. frequently experiences heat exhaustion and dehydration. He is at a high risk of heat stroke, exacerbation of underlying conditions, and death due to the extreme heat at Dade CI.

256.     **N.K.** is 67 years old. He spent much of 2024 in confinement in F Dorm. He was confined upwards of 23 hours per day in his hot, unventilated cell.

257.     He frequently washed in his cell to cool off. He used toilet water rather than sink water, because the toilet water is cooler.

258.     **J.I**. is a 41-year-old military veteran who served in Iraq. He reports that the temperatures in Iraq were sometimes higher than those at Dade CI, but Dade CI feels hotter due to the extremely high humidity. He felt cooler during the summer in Iraq in full combat uniform than in his dormitory at Dade CI.

259.     J.I. has severe asthma and chronic sinusitis. He is allergic to black mold, which grows throughout his dormitory, including on the floor of his cell. The combination of the heat, humidity, and poor air quality in his dormitory makes him struggle to breathe.

260.     Even with his inhaler, he is sometimes unable to catch his breath. He has had to use his inhaler eight times in a two-hour period.

261.     **J.P.** is 82 years old. He has high blood pressure, which is worsened by the heat. When it is hot, he often feels dizzy, unsteady, and lightheaded.

262.     J.P. has had several severe falls in the past few years. They are caused by his lack of stability and the chronically wet floors in his dormitory. At least one fall may have been caused by heat syncope. His falls have resulted in severe injuries, including broken bones.

263.    The medical provider at Dade CI advised J.P. to avoid the heat due to his high blood pressure. J.P. asked, "how?" He got no response.

264.    **G.M.** is 55 years old. He has hypothyroidism, for which he takes Levothyroxine. He takes a diuretic to reduce swelling in his feet and ankles.

265.    G.M. suffers from heat rash, which presents as itchy, red bumps on his arms, back and inner thighs.

266.    He often experiences heat exhaustion during the hottest times of the day, in the afternoon. He also feels confused and unfocused at such times.

267.    He struggles to breathe and sleep in his sweltering cell at night.

268.    He explains that conditions are particularly bad during count, which requires him to remain locked in his unventilated cell during the hottest time of the day. He describes his experience at such times as "being locked in a sardine can with no air to breathe."

269.    **E.M.** is 45 years old. He takes Propranolol for anxiety and high blood pressure, Depakote for epilepsy, and Zoloft for depression. Each of these medications independently make him sensitive to heat. In combination, they make him hyper-sensitive.

270.    On or around July 9, 2024, a hot weekend day, he felt dehydrated and feared that he would pass out. He went to the infirmary, where he was told to sit, enjoy the air conditioning, and drink cool water. He saw other people in the infirmary at that time receiving breathing treatments.

271.    He has had heat rash all over his body. He sweats all day and night, which makes his heat rash worse.

272.    When the heat index exceeds 100°F, he feels tired and exhausted and experiences severe headaches. He often feels this way from 3:00 or 4:00 in the afternoon until 9:00 p.m.

273.    **P.A.** is 69 years old. He sweats constantly in his dorm, even when he has the fortune of sitting in front of a fan. He has high blood pressure, for which he takes medication that places him at a heightened risk of suffering heat-related illness.

274.    He recently had prostate cancer. He received ten months of radiation at another FDC institution. Since he was transferred to Dade CI in June 2024, no one has tested his blood to evaluate his prostate condition.

275.    He also has asthma, for which he uses an inhaler with albuterol. He uses it twice a day at Dade CI. He had previously been detained at one of the few prisons in Florida that have air condition. He was able to breath much better there and used his inhaler half as often.

276.    At Dade CI, J.A. often struggles to breathe, especially at night, when he is locked in his cell.

277.    He feels exhausted all the time at Dade CI, every day during the summer.

278.    He tries to go to the air-conditioned law library as often as possible, but it is rare he is able to go more than once a week.

279.    J.A. is at a heightened risk of severe heat-related illness, including heat stroke, due to his numerous medical conditions. The heat also exacerbates those conditions, potentially leading to permanent injury or death.

280.    **J.F.B.** is 60 years old. He has not been diagnosed with any medical conditions that make him sensitive to the heat. He also does not take any medications that make him more heat sensitive.

281.    Nevertheless, J.B. suffers from the heat inside his dorm during summers at Dade CI. He reports sweating excessively during most summers, even at rest. He also reports feeling exhausted far more easily, and difficulty sleeping, during the summer.

282.    Thus, even prisoners without heat-sensitive medical conditions suffer at Dade CI due to the high heat index and unbreathable air.

283.    According to the NWS, even healthy people like J.B. will "likely" experience heat exhaustion and may suffer heat stroke from "prolonged exposure" to high heat indexes like those at Dade CI.

**I.    Defendants Are Aware of the Excessively Hot and Unventilated Conditions at Dade  CI**

284.    Defendants are acutely aware of the dangers posed by excessive heat.

285.    Defendants incorporate a version of the NWS chart into their policies and training materials. They are well aware of the facts described by NWS, including the danger of high heat indexes, and the heightened danger faced by the elderly and infirm.

286.    The Florida Legislature has warned FDC that it urgently must address the intolerably hot conditions in its prisons.

287.    On October 11, 2023, FDC Secretary Dixon appeared before the Florida Senate's Appropriations Committee on Criminal and Civil Justice.[10] At that hearing, he stated that 75% of FDC housing units statewide are not air-conditioned. He stated that air-conditioned units are prioritized for the elderly and the infirm. Thus, the FDC is aware that the elderly and infirm are especially vulnerable to heat.

288.    Secretary Dixon further explained that his primary concern related to heat is its impact on FDC staff, both because the staff prefer to work in cool conditions, and because heat negatively affects the behavior of both staff and prisoners.

---

[10]    A   videorecording   of   that   hearing   is   available   at   https://www.flsenate.gov/media/VideoPlayer?EventID=1_zc8d1g0v-202310111100&Redirect=true.

289.    In response to a question about other states' approaches to rising heat, Secretary Dixon explained that Texas has been following court orders to reduce the heat in that state's prisons, Tennessee has achieved 100% air-conditioned dormitories, and Alabama, Georgia, and Arkansas are building new prisons with improved climate control.

290.    At the end of the meeting, Republican State Senator Jennifer Bradley, Chair of Florida's Appropriations Committee on Criminal and Civil Justice, urged the FDC to immediately take meaningful steps to address the heat. She said: "When you are in the facility, and you visit a dorm that does not have air conditioning, and you look at the guards tasked with maintaining security in those places, it is absolutely oppressive." She further warned Secretary Dixon to mitigate the heat, "or Florida will find itself on the receiving end of a lawsuit, and it will be a lot more expensive."

291.    Senator Bradley also stated that it was "concerning" that FDC was not "actually tracking the temperatures inside the dorm[s]" and cells.

292.    Senator Bradley further stated that, in some of the air conditioned dorms, "the windows don't open. . . . So you have a dorm where windows don't open and a fan that just blows around hot air[.]"

293.    In response to Senator Bradley's comment about dorms with windows that don't open, Secretary Dixon responded, "Right."

294.    Senator Bradley concluded that heat mitigation is "a big issue for [FDC] to tackle, in the increasingly warm state of Florida."

295.    Other legislators have expressed similar concerns. According to Democratic State Senator Jason Pizzo, "I have a number of Republican colleagues that know and appreciate when

you have 100-degree heat index and 60+ of our state facilities don't have air conditioning, it can seem like an 8th Amendment violation."

296.    The KPMG report has a section entitled "HVAC Modernization," which entails "the installation of air-conditioning systems in all 515 of FDC's unconditioned housing units across the state[.]" KPMG explains that "[k]ey benefits of this undertaking include improved indoor air quality and thermal comfort, reduced stress levels, increased morale and productivity, decreased spread of infectious diseases, and reduced risk of heat-related litigation for inmates and staff, as has been experienced in other large southern US correctional systems."

297.    The KPMG report explains that, in addition to addressing the heat, FDC should install "dedicated outside air treatment units for the purposes of: Improv[ing] indoor air quality by removing contaminants from outdoor air before channeling it into the building" and "improving dehumidification, thereby helping prevent moisture-related problems like sick building syndrome and mold growth."

298.    The KPMG report indicates that dormitories such as those at Dade CI do not "comply with current ventilation standards." The report recommends "retrofitting/decommissioning existing exhaust fans" at such facilities and estimates that doing so would not be prohibitively expensive.

299.    Prisoners at Dade CI have sent dozens—if not hundreds—of grievances to the Warden of Dade CI and the Secretary of the Department of Corrections, in which prisoners describe the excessively hot and unventilated conditions at Dade CI and beg for relief.

300.    At Dade CI, there are postings throughout the staffing area warning about the dangers of excessive heat, and signs of heat-related illness.

301.     Each year, FDC's Office of Institutional Operations and Intelligence publishes a security advisory relating to "Heat Awareness." It is sent to all FDC wardens, including Warden Acosta. The 2021 version of this document contains instructions regarding the symptoms of heat exhaustion and heat stroke, and how to treat those conditions. It contains the NWS Heat Index Table and a link to the NWS's Heat Index Calculator.

302.     On July 28, 2023, Warden Acosta sent a Memorandum with the subject, "Heat Mitigation." It states: "As you know the past couple months have been extremely hot and unbearable when outside in the sun for long periods of time." It does not mention the conditions *within* the dorms, but it directs staff to provide cool water in the dorms and contact the Duty Warden if an "exhaust fan/system stops working."

303.     In an email dated July 27, 2023, FDC's Central Office sent an email to Dade CI officers entitled, "Urgent Concern – Heat Mitigation at Dade Inpatient Unit." The Inpatient Unit is a special housing area at Dade CI for prisoners with severe mental illness. Like the infirmary, it is supposed to be air conditioned.

304.     According to the July 27 email, there were "climate control malfunctions in the inpatient unit at Dade CI." The Central Office was "concerned about the prolonged exposure to higher temperatures on the inmates housed in the unit." The email contains an attachment listing psychotropic medications that "impair the body's ability to regulate its own temperature." Upon information and belief, there are people incarcerated at Dade CI who are on those medications but not in the Inpatient Unit.

305.     The July 27 email additionally states that "[i]ndividuals with chronic medical conditions (i.e., heart and pulmonary disease, diabetes, alcoholism, etc.) are especially vulnerable[ ]" to potentially fatal heat-related illness. Upon information and belief, there are

hundreds of people incarcerated at Dade CI with those chronic conditions who are not in the Inpatient Unit.

306. On September 6, 2023, Plaintiffs' counsel wrote to Warden Acosta. In that email, counsel explained that it had heard of many complaints from people at Dade CI about the extreme heat and lack of ventilation in the dormitories. It notified Warden Acosta that exhaust vents intended for ventilation had coverings on them, preventing them from working. Counsel warned that these conditions "pose a serious threat of medical harm to the inmates, particularly those with respiratory conditions such as asthma, people with heart conditions, and others with chronic medical issues." Warden Acosta did not respond.

**J.      FDC Has Taken No Meaningful Action to Address the Excessively Hot Conditions at Dade CI**

307. FDC has no policy to lower indoor temperatures or heat indexes in housing areas.

308. Defendants do not exclude people with medical conditions or other disabilities from dorms that lack air conditioning.

309. Despite Senator Bradley's recommendation that FDC record temperatures in dormitories and cells, FDC is not doing so.

310. Rather than fixing the broken ventilation systems at Dade CI, Defendants have *removed* exhaust fans and allowed the rest of the systems to decay into rust and dust.

311. Rather than helping prisoners ventilate their cells, Defendants punish them for attempting to do so.

312. Rather than showing compassion to the prisoners, some guards use heat as punishment. They turn off the exhaust system—thus punishing an entire wing of up to 80 prisoners—when they feel that some prisoners are misbehaving.

313.    Interior fans are insufficient to mitigate the effects of heat. Indeed, when indoor temperatures exceed 90°F—which happens regularly during the summer at Dade CI—such fans "can increase body temperature," according to the CDC.[11]

314.    Most prisoners at Dade CI suffer from at least one form of heat-related illness during the summer. Some suffer from multiple heat-related illnesses. Some have died of heat stroke or heart-related conditions that were exacerbated by prolonged exposure to extreme heat.

315.    Prisoners are routinely treated in the Infirmary for heat rash, heat exhaustion, and other heat-related illnesses. They are then returned to the dangerously hot conditions that caused their heat stress.

316.    In response to prisoners' grievances about the heat and ventilation, FDC officers reject many for procedural reasons, rather than addressing their substance.

317.    Other times, FDC responds to prisoners' grievances by stating that they are appropriately housed and that FDC has no control over the conditions of the facilities it operates.

318.    Other times, FDC states that the ventilation systems at Dade CI were last tested in December 2022. Upon information and believe, they were not adequately tested then, and they have not been tested since.

319.    In response to an informal grievance from E.M. about the heat, the FDC returned his grievance as improper, stating that "The Inmate is grieving a matter beyond the control of the Department[.]"

320.    In response to many grievances in which prisoners ask to be transferred to another facility because the heat is intolerable, FDC administrators respond that they should put in for sick call if they are having medical issues. When the prisoners do so, the staff at the Infirmary

---

[11] CDC, *About Heat and Your Health* (June 25, 2024), https://www.cdc.gov/heat-health/about/index.html.

tell them that they have no control over housing decisions. When prisoners appeal to the Secretary in Tallahassee that Dade CI is addressing their concerns, the Secretary's office responds that Dade CI has appropriately responded to their concerns.

## CLASS ACTION ALLEGATIONS

321.   Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action on behalf of themselves and all similarly-situated persons.

322.   Plaintiffs propose to represent a class composed of all prisoners who currently are, or who in the future will be, incarcerated at Dade CI. Each Plaintiff is typical of this class.

323.   Plaintiffs also seek to represent the following sub-classes:

a. **Heat-Sensitive Subclass**: This subclass consists of all class members who (i) have a physiological condition that places them at increased risk of heat-related illness, injury, or death (including, but not limited to, suffering from obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, chronic obstructive pulmonary disease, cystic fibrosis, asthma, sweat gland dysfunction, and thyroid dysfunction); or, (ii) are prescribed an anticonvulsant, anticholinergic, antipsychotic, antihistamine, antidepressant, beta blocker, or diuretic; or, (iii) are over age 65. All Plaintiffs are typical members of this subclass.

b. **Disability Subclass:** This subclass consists of all class members who suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of heat-related or respiratory illness, injury, or death due to their disability or any medical treatment necessary to treat their disability. All Plaintiffs are typical members of this subclass.

324.    Numerosity: The joinder of each class member would be impracticable because each class is so numerous. As of July 2024, Dade CI housed 1,316 people. According to the FDC's website, it has the capacity to house up to 1,512. Many more could potentially be housed at Dade CI at some point during this litigation, or in the future. Joining all members of the class is impracticable due to the number of potential members and the fluctuating population of Dade CI.

325.    The subclasses are also sufficiently numerous to satisfy Rule 23(a).

326.    As of July 25, 2024, there were 317 people over age 65 incarcerated at Dade CI. Apart from one death since then and possibly a few transfers, that number remains accurate. Upon information and belief, there are more than 310 people over age 65 incarcerated at Dade CI today.

327.    There are many more individuals below that age but who suffer from a condition that makes them heat sensitive. Joining over 310 individuals would be impracticable.

328.    Upon information and belief, Defendants have the ability to identify all class and subclass members through medical and other records in Defendants' possession.

329.    Disposition of this matter as a class action will provide substantial benefits and efficiencies to the parties and the Court.

330.    Commonality: Common questions of law and fact exist as to all members of the class.

331.    The common questions of law and fact for the proposed Class include but are not limited to:

1)    Are all prisoners at Dade CI exposed to high heat indexes and insufficient ventilation?

2)      Does exposing prisoners to the high heat indexes and insufficient ventilation in the housing areas at Dade CI violate the Eighth Amendment, by subjecting them to a substantial risk of serious harm?

3)      Are the members of the Class entitled to declaratory and injunctive relief?

4)      Have Defendants exhibited deliberate indifference to the class members' serious medical needs by failing to take steps to mitigate the adverse effects of high temperatures and inadequate ventilation?

332.    Further, the common questions of law and fact for the subclasses are:

1)      For the **Heat-Sensitive Subclass**:

    a)      Is the risk of heat-related injuries for the Heat-Sensitive Subclass increased when members are exposed to the high heat indexes and insufficient ventilation in housing areas of Dade CI?

    b)      Does exposing members of the Heat-Sensitive Subclass to the high heat indexes and insufficient ventilation in the housing areas at Dade CI violate their Eighth Amendment rights to not be subjected to a substantial risk of serious harm?

    c)      Are the members of the Heat-Sensitive Subclass entitled to declaratory and injunctive relief?

2)      For the **Disability Subclass**:

    a)      Do the members of the Disability Subclass face an increased the risk of heat-related illness due to their disability, or treatment for it?

b)     Does Dade CI provide reasonable accommodations to prisoners with heat-related disabilities exposed to high heat indexes in the housing areas at Dade CI?

d)     Are members of the Disability Subclass entitled to declaratory and injunctive relief?

333.    Typicality: Plaintiffs' claims are typical and representative of each class and sub-class member's claims against Defendants, as identified above. The claims of Plaintiffs and the Class all arise from the same conduct by Defendants (exposing them to unsafe heat and other conditions), are based not only on identical legal theories, and also seek identical remedies (injunctive and declaratory relief). Plaintiffs' interest in reducing the danger of heat-related illness, injury, or death is identical to every other class member's interest. All members of the class are similarly injured by Defendants' wrongful conduct: they are all subjected to a substantial risk of serious harm.

334.    Adequacy: Plaintiffs and their counsel will fairly and adequately represent the interests of the class. Plaintiffs have no interests contrary to those of class members. Plaintiffs' counsel includes a non-profit law firm, Florida Justice Institute (FJI), whose mission is to protect the civil rights of marginalized Floridians. FJI has prosecuted class actions and multi-plaintiff cases that obtained class-like injunctive and declaratory relief.

335.    Plaintiffs do not seek damages, except as may be incidental to declaratory or injunctive relief.

336.    The requirements of Rule 23(b)(2) are satisfied, as the party opposing the class has acted or refused to act on grounds generally applicable to the class to that final declaratory and injunctive relief would be appropriate to the class as a whole.

## CAUSES OF ACTION

### COUNT I – EIGHTH AND FOURTEENTH AMENDMENTS
**(All Plaintiffs and Classes against Defendants Dixon and Acosta)**

337.   Plaintiffs reallege and incorporate the allegations preceding the Causes of Action section as if set forth herein.

338.   This Count is brought by all Plaintiffs, the general class, the heat sensitive subclass, and the disability subclass, against Defendants Dixon and Acosta.

339.   Pursuant to 42 U.S.C. § 1983, Dixon and Acosta, in their official capacities, are deliberately indifferent to the substantial risk of serious harm to prisoners at Dade CI caused by chronic exposure to high heat indexes and insufficient ventilation.

340.   The high heat indexes and insufficient ventilation at Dade CI pose an unreasonable risk to prisoners' health.

341.   Defendants are aware that extreme heat in their facilities' housing areas poses a substantial risk of serious injury to prisoners, including Plaintiffs and the class. Defendants' knowledge is demonstrated by FDC's policies, practices, and statements. Defendants remain indifferent to the risk, failing to take reasonable steps to mitigate it.

342.   In light of the numerous public warnings about the risk posed by extreme temperatures from government agencies, scientific studies of the risk, warnings within FDC's own policy, knowledge of FDC's medical providers, and the history of prisoner and staff injuries, Defendants know of the risk of heat-related illness, injury, or death posed by the conditions at Dade CI.

343.   Defendants were and are subjectively aware that their conduct caused and causes a substantial risk of serious harm to the Plaintiffs and the class, yet failed and continue to fail to respond reasonably to the risk.

344.    Defendants are acting with deliberate indifference to Plaintiffs' and the Class's constitutional right to be free from cruel and unusual punishment by refusing to provide safe housing areas that protect prisoners from exposure to extreme heat, resulting in prisoners' severe injuries and deaths.

345.    Defendants' deliberate indifference to Plaintiffs' and the Class's serious medical needs puts Plaintiffs and the Class at substantial risk of serious bodily injury including, but not limited to, heat stroke, heat cramps, and heat exhaustion, as well as the myriad symptoms associated with these conditions and the exacerbation of serious underlying medical conditions.

346.    Defendants' policies, practices, acts, and omissions violate the Cruel and Unusual Punishments Clause of the Eighth Amendments, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

347.    As a proximate result of Defendants' unconstitutional policies, practices, acts, and omissions, Plaintiffs and Class members have suffered and will continue to suffer immediate and irreparable injury, including physical injury, risk of physical injury, and risk of death.

**COUNT II – THE AMERICANS WITH DISABILITIES ACT (ADA) 42 U.S.C. § 12101 et seq.; 28 C.F.R. § 35.130, 35.152**
**(All Plaintiffs and Disability Subclass against Defendant FDC)**

348.    Plaintiffs reallege and incorporate the allegations preceding the Causes of Action section as if set forth herein.

349.    This count is brought by all Plaintiffs and the disability subclass against Defendant FDC for violations of Title II the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. & 42 U.S.C. § 12131, et seq., and its implementing regulations.

350.    Defendant FDC is a public entity.

351.    For purposes of the ADA, Plaintiffs and other similarly-situated prisoners are qualified individuals with disabilities.

352.    Plaintiffs and the disability subclass have impairments that substantially limit one or more major life activities, and are regarded as such.

353.    Plaintiffs and the disability subclass have a record of having an impairment that substantially limits one or more major life activity.

354.    Plaintiffs and the disability subclass meet the essential eligibility requirements of the programs, services, and activities operated and provided by Defendant FDC.

355.     Defendant FDC denied Plaintiffs and the disability subclass the benefits of FDC services, programs, and activities, including but not limited to safe housing and classification, by reason of their disability.

356.    FDC fails to reasonably accommodate prisoners with heat-sensitive disabilities. These disabilities (such as asthma, COPD, hypertension, obesity, diabetes, depression, and mental illnesses treated with psychotropic medications) place prisoners at increased risk of heat-related illness, injury, or death, and cause them to suffer more pain and punishment than able-bodied prisoners.

357.    People with certain disabilities (like diabetes, hypertension or cardiovascular disease), or who take certain medications to treat their disabilities (like psychotropics, antihistamines, antidepressants, or diuretics), are much more vulnerable to extreme temperatures. Their medical conditions prevent their bodies from regulating their temperature, putting them at much greater risk of death from heat.

358.    Defendant FDC fails to provide Plaintiffs and the disability subclass with equal access and enjoyment to FDC aids, services, and benefits.

359.     Defendant FDC fails to make reasonable modifications in policies, practices, and procedures, and fails to provide reasonable accommodations, to avoid discrimination against Plaintiffs and the disability subclass on the basis of disability.

360.     Defendant FDC fails to properly accommodate Plaintiffs and the disability subclass's disabilities by failing to classify and house them in a way that is safe and appropriate for someone with their disabilities, and/or failing to modify its policies with respect to classification and housing. As a result, these FDC programs, services, and activities subject Plaintiffs and the disability subclass to a substantially increased risk of harm.

361.     Defendant FDC failed to adopt adequate policies to ensure appropriate screening of people with disabilities in housing to ensure it is safe for people with disabilities.

362.     Plaintiffs' and the disability subclass's need for an accommodation is obvious.

363.     Defendant FDC acted intentionally and/or with deliberate indifference to Plaintiffs' and the disability subclass's need for an accommodation and to their ADA rights. Defendant FDC knew that harm to a federally protected right was substantially likely yet failed to act on that likelihood.

364.     As a direct and proximate cause of FDC's actions and omissions, Plaintiffs and the disability subclass have been harmed, and will continue to sustain harm absent court intervention.

### COUNT III – REHABILITATION ACT - 29 U.S.C. § 701, et seq.; 29 U.S.C. § 794, et seq; 28 C.F.R. § 42.503, 42.520
**(All Plaintiffs and Disability Subclass against Defendant FDC)**

365.     Plaintiffs reallege and incorporate the allegations preceding the Causes of Action section as if set forth herein.

366.    This count is brought by all Plaintiffs and the disability subclass against Defendant FDC under Section 504 of the Rehabilitation Act, 29 U.S.C.§ 701, et seq. & 29 U.S.C. § 794, et seq., and their implementing regulations.

367.    Plaintiffs, as well as other similarly-situated prisoners, suffer from heat-sensitive disabilities.

368.    Defendant FDC is a program or activity receiving federal financial assistance.

369.    Plaintiffs and the disability subclass are qualified individuals with a disability.

370.    Defendant FDC excluded Plaintiffs and the disability subclass from participation in, and denied them the benefits of programs or activities, including but not limited to safe housing and classification, solely by reason of their disability.

371.    Defendants know that Plaintiffs, and other similarly situated prisoners with disabilities, suffer from heat-sensitive disabilities, and were prescribed medications to treat their disabilities. Despite their knowledge, FDC intentionally discriminated against them, under the meaning of the Rehabilitation Act, by failing and refusing to protect them from the extreme temperatures and insufficient ventilation.

372.    As alleged above, FDC fails and refuses to reasonably accommodate Plaintiffs and other similarly-situated prisoners with disabilities, while in custody, in violation of the Rehabilitation Act.

373.    Defendant FDC fails to properly accommodate Plaintiffs and the disability subclass's disability by failing to classify and house them in a manner that is safe and appropriate for someone with their disability, and/or failing to modify its policies with respect to classification, housing, and job placement. As a result, these FDC programs, services, and activities subjected Plaintiffs and the disability subclass to a substantially increased risk of harm,

thereby rendering them inaccessible and denying Plaintiffs and the disability subclass the benefits of such services.

374.    Defendant FDC subjected Plaintiffs and the disability subclass to discrimination by reason of their disability.

375.    Defendant FDC acted intentionally and/or with deliberate indifference to Plaintiffs and the disability subclass's need for an accommodation and to their rights under the Rehabilitation Act

376.    As a direct and proximate cause of FDC's actions and omissions, Plaintiffs and the disability subclass have been harmed, and will continue to sustain harm absent court intervention.

<u>**REQUEST FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs respectfully request and seek the following relief:

A.    An Order certifying this action as a class action, as described above;

B.    A judgment declaring that Defendants' actions and omissions have violated, and continue to violate, Plaintiffs' and the class members' rights under the Eighth Amendment, Americans with Disabilities Act, and Rehabilitation Act;

C.    A preliminary and permanent injunction requiring Defendants to develop and execute a plan that remedies and abates Plaintiffs' and the class members' serious risk of harm due to the heat index and lack of ventilation; this plan could include (but not be limited to) the installation of air conditioning or other measures that maintain the heat index in the Dade CI dormitories at safe levels;

D.      An order enjoining Defendants from taking any action to interfere with Plaintiffs'
right to maintain this action, or from retaliating in any way against Plaintiffs for
bringing this action;

E.      An order retaining jurisdiction over this matter to ensure that the terms of any
injunction are fully implemented;

F.      An award of Plaintiffs' attorneys' fees, costs, and litigation expenses under 42
U.S.C. § 12205, 29 U.S.C. § 794a, and 42 U.S.C. § 1988; and

G.      Such other and further relief as appears reasonable and just, to which Plaintiffs
may be entitled, separately or collectively.

Respectfully submitted,

Dante P. Trevisani
Florida Bar No. 72912
E-mail: *dtrevisani@floridajusticeinstitute.org*
Ray Taseff
Florida Bar No. 352500
E-mail: *rtaseff@FloridaJusticeInstitute.org*
Andrew Udelsman
Florida Bar No. 1051696
E-mail: *audelsman@FloridaJusticeInstitute.org*
Florida Justice Institute, Inc.
40 NW 3rd Street
Suite 200
Miami, Florida 33128
305-358-2081
305-358-0910 (Fax)

By:     *s/Andrew Udelsman*
        Andrew Udelsman


**Attorneys for the Plaintiffs**

63