**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 24-24253-CV-WILLIAMS**

DWAYNE WILSON, *et al.*,

      Plaintiffs,

v.

RICKY DIXON, *et al.*,

      Defendants.

_____/

<u>**ORDER**</u>

      **THIS MATTER** is before the Court on Defendants' Motion to Dismiss (DE 23) ("***Motion***"). The Motion is fully briefed and ripe for review.[1] For the reasons set forth below, the Motion (DE 23) is **DENIED**.

**I.    FACTUAL BACKGROUND**[2]

      Plaintiffs Dwayne Wilson ("***Mr. Wilson***"), Tyrone Harris ("***Mr. Harris***"), and Gary Wheeler ("***Mr. Wheeler***" or, collectively with Mr. Wilson and Mr. Harris, "***Plaintiffs***") filed this putative class action[3] on October 31, 2024. (DE 1, "***Compl.***".) Plaintiffs are currently incarcerated by the Florida Department of Corrections ("***FDC***") at Dade Correctional

---

[1] Plaintiffs filed a Response (DE 34), and Defendants filed a Reply (DE 38).

[2] The following facts are taken from Plaintiffs' Complaint (DE 1) and accepted as true. *See Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1305 (11th Cir. 2015) (at the motion to dismiss stage, courts "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff"). Plaintiffs' Complaint contains over fifty pages of detailed allegations. The Court summarizes those facts most relevant to disposition of the Motion but recognizes the seriousness of each allegation in the Complaint.

[3] Plaintiffs' Motion to Certify Class (DE 4) is pending before the Court.

Institution ("*Dade CI*") in Homestead, Florida in Miami-Dade County. (*Id.* ¶¶ 2, 8–10.) Plaintiffs filed this action against Defendants Ricky Dixon, the Secretary of FDC; Francisco Acosta, Warden of Dade CI; and FDC. (*Id.* ¶¶ 11–13.) The Complaint seeks injunctive and declaratory relief on three claims: violations of the Eighth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 (Count I); violations of the Americans with Disabilities Act ("*ADA*") (Count II); and violations of the Rehabilitation Act (Count III). (*Id.* ¶¶ 337–76.)

### A. Conditions at Dade CI

Dade CI typically operates at or near its capacity of 1,521 people. (*Id.* ¶ 38.) The facility is composed of roughly fifteen buildings: a medical unit, a law library, a dining hall, a programming building, administrative buildings, a mental health unit, and eight dormitories. (*Id.* ¶ 40.) The dormitories and dining hall are concrete structures with little to no insulation. (*Id.* ¶ 42.) Although the officers' control rooms near the entrances of the dormitories are air conditioned, none of the areas of the dormitories accessible to prisoners have air conditioning. (*Id.* ¶ 43.) Because the compound has few trees, the concrete dormitories and dining hall absorb heat from the sun throughout the day and retain the heat at night. (*Id.* ¶ 44.)

Scientists measure the combination of ambient temperature and relative humidity using a metric called the heat index. (*Id.* ¶ 17.) The heat index is a more accurate indicator of the impact of heat on the human body—compared to temperature alone—as high humidity decreases the body's ability to cool itself through sweating. (*Id.* ¶¶ 18, 16.) Notably, heat index measurements are taken in a shaded area, not in direct sunlight. (*Id.* ¶ 19.) Exposure to a heat index above eighty-eight degrees poses a danger to human life

and is particularly dangerous for the elderly and those with medical conditions such as heart disease, high blood pressure, asthma, and diabetes. (*Id.* ¶ 20.) The National Weather Service ("**NWS**") has released a chart of heat index ranges and the corresponding risk of danger to the body as follows:

| Classification | Heat Index | Effect on the body |
|---|---|---|
| Caution | 80°F - 90°F | Fatigue possible with prolonged exposure and/or physical activity |
| Extreme Caution | 90°F - 103°F | Heat stroke, heat cramps, or heat exhaustion possible with prolonged exposure and/or physical activity |
| Danger | 103°F - 124°F | Heat cramps or heat exhaustion likely, and heat stroke possible with prolonged exposure and/or physical activity |
| Extreme Danger | 125°F or higher | Heat stroke highly likely |

(*Id.* ¶ 56.)

Defendants do not record the temperatures or heat indexes in the dormitories at Dade CI, although at least one Florida Senator has urged FDC to record temperatures within FDC dormitories. (*Id.* ¶¶ 45–46.) In response to public record requests, FDC has maintained its position that it has no data regarding the temperature or heat index in Dade CI dormitories. (*Id.* ¶ 47.) However, temperature and humidity are regularly recorded at Homestead Air Force Base ("**Homestead AFB**"), Kendall-Tamiami Executive Airport ("**Kendall Airport**"), and Miami International Airport ("**Miami Airport**"), which are located between eight and twenty-nine miles from Dade CI. (*Id.* ¶¶ 48–49.) Data from Homestead AFB, Kendall Airport, and Miami Airport reveal that the heat index does not vary significantly between the three locations. (*Id.* ¶ 50.) Homestead AFB is located eight miles from Dade CI and provides the closest approximation of the heat index at the facility. (*Id.* ¶ 51.) Plaintiffs allege that it is likely that the combination of (1) the dormitories' concrete structures; (2) the additional heat added by showers, human bodies, lights and motors; (3) the increased humidity caused by showers, floods, and leaks; and (4) the inadequate

ventilation at the facility results in the heat index at Dade CI being higher than at Homestead AFB. (*Id.* ¶¶ 52–53.)

In South Florida, where Dade CI is located,[4] the heat index regularly surpasses 100 degrees during the summer months. (*Id.* ¶ 21.) In 2020, South Florida recorded thirty-two consecutive days with a heat index over 100 degrees. (*Id.*) In the summer[5] of 2023, the heat index at Homestead AFB surpassed eighty degrees every day and reached eighty-eight degrees on all but eight days. (*Id.* ¶¶ 62–63.) That summer at Homestead AFB, the heat index exceeded 100 degrees for forty-six consecutive days, including five days where the heat index surpassed 115 degrees. (*Id.* ¶¶ 21, 63.) On June 13, 2023, the heat index reached 126.6 degrees. (*Id.* ¶ 63.) All in all, in summer 2023, the heat index at Homestead AFB surpassed eighty degrees seventy-four percent of the time; surpassed eighty-eight degrees forty-three percent of the time; surpassed ninety degrees thirty-five percent of the time; and surpassed 103 degrees two percent of the time. (*Id.* ¶ 64.)

In the summer of 2024, NWS issued dangerous heat advisories for Miami-Dade County for nearly half the days in July, over half the days in August, and over a third of the days in September. (*Id.* ¶ 26.) On nearly all of these days, the heat index reached 105 degrees and, on some days, reached 112 degrees. (*Id.*) Over summer 2024, the heat index at Homestead AFB surpassed eighty degrees ninety-two percent of the time; surpassed eighty-eight degrees sixty-one percent of the time; surpassed ninety degrees

---

[4] With Homestead Correctional Institution, Dade CI is part of the southernmost prison complex in the continental United States. (*Id.* ¶ 37.)

[5] Summer is defined as May 1 to September 30. (*Id.* ¶ 62.)

fifty-two percent of the time; and surpassed 103 degrees four percent of the time. (*Id.* ¶ 68.) In other words, individuals confined at Dade CI are regularly and consistently exposed to heat indexes within the NWS danger zone during the summer months.

Plaintiffs further allege that the issue of excessive heat at Dade CI is exacerbated by insufficient ventilation systems. Plaintiffs allege that the ventilation systems in the dormitories, which were installed decades ago, have not been adequately maintained and are missing critical components, such as fans and motors. (*Id.* ¶ 73.) Dormitories feature an array of different ventilation systems, described as follows:

- **Dorms A–E:** These dormitories have windows and exhaust fans that blow out air from inside the dormitory and internal fans that circulate air within the rooms but do not provide fresh air from outside. (*Id.* ¶ 76.) The exhaust fans regularly break down and are, at times, not fixed for months. (*Id.* ¶ 77.) Bathrooms and showers adjoin the dormitories, and the showers only have one knob to control the water, which is typically set to hot. (*Id.* ¶ 78.) Therefore, in order to take a cold shower, prisoners turn on all of the showers at once to deplete the system of hot water. (*Id.*) Many of the exhaust fans in these bathrooms are broken, so the hot air and humidity goes into the dormitories, where prisoners are locked in at night. (*Id.* ¶ 79.)

- **Dorms F–H:** These dormitories have small cells, roughly the size of an average parking space, and generally have a bunkbed, sink, and toilet. (*Id.* ¶ 80.) The primary exhaust systems in these dormitories are missing necessary components such as fans and motors. (*Id.* ¶ 81.) Furthermore, the exteriors of the vents are covered, resulting in a non-functioning primary exhaust system.

(*Id.* ¶ 81.) The exhaust fans in the dorm that do work are not equipped with the appropriate motors and therefore generate very little air flow. (*Id.* ¶ 82.) At times, Dade CI uses a heating system without a furnace to generate airflow, but since the system was not designed for ventilation, it provides little relief. (*Id.* ¶ 83.) Moreover, the system is in a state of disrepair with corroded, rusted metal and duct work full of holes. (*Id.* ¶ 84.) Dormitories F and G have large windows that open so narrowly, a hand can barely fit through. (*Id.* ¶ 86.) Some of the windows are broken and do not open at all. (*Id.*) By design, Dormitory H does not have any windows that open. (*Id.* ¶ 87.) Instead, there are metal slabs with small holes the size of a pencil, which offer little to no ventilation relief. (*Id.* ¶ 87.) Metal sheets are installed on the outside of Dormitory H, meaning that people cannot see outside or get fresh air in their cells. (*Id.*) Dormitory H is known as 'Hell Dorm' to those at Dade CI. (*Id.* ¶ 88.) The air in Dormitories F–H is contaminated with smoke, mold spores, and aerosolized sewage, and the dormitories' walls and ceilings are covered with black mold. (*Id.* ¶¶ 89, 93.) The drains in the dormitories are prone to clogging and even become backed up with sewage. (*Id.* ¶ 92.) To alleviate the heat, prisoners attempt to build tunnels out of carboard, plastic, or whatever materials they have on hand to place over the small windows and vents to try to generate airflow. (*Id.* ¶ 109.) However, such tunnels are considered contraband and are constantly confiscated. (*Id.*)

People at Dade CI spend most of their time in their dormitories, away from the few air-conditioned facilities at the complex, to which their access is strictly limited. (*Id.* ¶ 104.)

The dining hall is not air-conditioned, and people sweat profusely as they eat. (*Id.* ¶ 108.) The conditions are so uncomfortable that officers stationed in the dining hall rush prisoners to quickly finish eating, so that the officers can return to their air-conditioned spaces. (*Id.*) Those in confinement spend an average of 23 hours a day in their cells and are allowed a limited number of showers per week. (*Id.* ¶ 110.) At least one individual subjected to such confinement opted to bathe in toilet water at night because it was cooler than sink water. (*Id.* ¶ 111.) In some dormitories, officers will occasionally bring coolers full of ice in the summer. (*Id.* ¶ 115.) However, such provisions are not made in connection with the relative heat on any given day and are insufficient to provide cool water for all people in the dormitory; those who are unable to get in line quickly, such as the elderly and those who need wheelchairs or walkers, sometimes do not get any cool water. (*Id.* ¶¶ 115–16.)

The American Society of Heating, Refrigerating and Air-Conditioning Engineers ("***ASHRAE***") develops national standards for indoor air quality and related HVAC systems. (*Id.* ¶ 96.) Per ASHRAE guidelines, the indoor air in a prison should not exceed seventy-seven degrees or fifty percent relative humidity. (*Id.* ¶ 102.) In October 2022, FDC contracted with consulting firm KPMG to develop a 20-year master plan for the department. (*Id.* ¶ 98.) The KPMG report (the "***Report***") was published in December 2023 and assessed FDC prisons according to ASHRAE standards. (*Id.* ¶¶ 98–99.) The Report concluded that most FDC dormitories, including those at Dade CI, require retrofitting to comply with current ventilation standards, and that over one-third of FDC facilities were assessed to be in 'critical' or 'poor' condition. (*Id.* ¶¶ 99–100.)

### B. Plaintiffs' Individual Experiences

Mr. Wilson has been incarcerated at Dade CI since March 2023. (*Id.* ¶ 8.) He is 66 years old and suffers from hypertension and an enlarged prostate, for which he takes medication. (*Id.*) Much of Mr. Wilson's body is covered by a large burn scar, which hinders his ability to sweat. (*Id.*) Where he is burned, Mr. Wilson is unable to sweat and the scarred skin becomes irritated and painful due to the heat. (*Id.* ¶ 218.) In the areas of his body where he is able to sweat, he does so constantly. (*Id.*) Due to his conditions and related medications, Mr. Wilson urinates frequently, which places him at a higher risk of dehydration. (*Id.* ¶¶ 216–17.) As a result of his various conditions, Mr. Wilson has difficulty breathing, sleeping, and exercising. (*Id.* ¶ 219.) He feels drowsy and dizzy when it is hot and, in August 2024, he fainted in his dormitory. (*Id.* ¶¶ 221–22.)

Mr. Harris, incarcerated at Dade CI since July 2022, is 54 years old and has hypertension and asthma. (*Id.* ¶ 9.) He takes medication for his hypertension as well as for depression and anxiety and receives breathing treatments for his asthma several times a week. (*Id.*) His medications increase his risk of suffering heat-related illness; directives attendant to his blood pressure medication specifically instruct that he stay out of the heat. (*Id.* ¶¶ 227–28.) The kitchen where Mr. Harris works does not have air conditioning or sufficient ventilation. (*Id.* ¶ 232.) In addition to impaired breathing due to his asthma, Mr. Harris often gets heat cramps, feels lightheaded, and suffers from a bad heat rash. (*Id.* ¶ 231.)

Mr. Wheeler has been incarcerated at Dade CI since July 2023. (*Id.* ¶ 10.) He is 65 years old and suffers from chronic obstructive pulmonary disease ("*COPD*") and sleep apnea, which require use of an inhaler and CPAP machine, respectively. (*Id.*)

Mr. Wheeler's COPD is worsened by the heat and lack of ventilation at Dade CI. (*Id.* ¶ 236.) He frequently sees lights flashing in his peripheral vision, which is indicative of a deficiency of oxygen to his brain and wakes up throughout the night gasping for air. (*Id.* ¶¶ 236–37.) Mr. Wheeler sweats all day and night at Dade CI and has heat rash on his hands, arms, private areas, waistline, and chest. (*Id.* ¶ 237.) He already suffers from heat exhaustion, is at a high risk of heat stroke and death and, in fact, is afraid of suffocating and dying in his sleep. (*Id.* ¶¶ 240–41.)

### C. Vulnerability to Heat

According to data from the Centers for Disease Control and Prevention ("***CDC***"), Florida has the most hospitalizations and emergency room visits for heat-related illnesses out of all fifty states. (*Id.* ¶ 119.) Decades of research have shown that "there is robust evidence that high temperatures in carceral facilities are associated with morbidity and mortality." (*Id.* ¶ 118.) High temperatures and humidity prevent the human body from regulating internal temperature and can result in a variety of heat-related illnesses such as heat rash, heat exhaustion, heat cramps, and heat stroke. (*Id.* ¶¶ 124–33.) In some cases, heat stroke can cause death or permanent disability. (*Id.* ¶ 133.) Prolonged exposure to extreme heat is linked to psychological distress, exacerbated mental illness, violence, and aggression. (*Id.* ¶¶ 135–36.)

Certain groups of people are at a heightened risk of heat-related illnesses, such as the elderly, those with certain medical conditions, and those who take certain medications. According to the CDC, the rate of heat stroke deaths doubles between ages thirty-five and fifty-five and those over sixty-five are more prone to heat stress. (*Id.* ¶ 144.) Dormitories A–D are designated 'Geriatric Dorms,' housing people over the age of fifty.

(*Id.* ¶ 139.) Roughly half of the people in those dorms are over sixty-five. (*Id.*) In Dormitories F–H, roughly eight percent of people are over sixty-five. (*Id.* ¶ 140.) In total, over fifty percent of all prisoners at Dade CI are over the age of fifty and roughly twenty-five percent are over the age of sixty-five. (*Id.* ¶ 142.)

Those with medical conditions such as hypertension, cardiovascular disease, asthma, diabetes, COPD, obesity, cystic fibrosis, thyroid dysfunction, sweat gland dysfunction, psychiatric diseases, and mental health disorders are at an increased risk of heat-related illness, injury, or death. (*Id.* ¶¶ 149–81.) Furthermore, the medications for many of the previously mentioned medical conditions—as well as medications for other medical conditions—increase a person's susceptibility to heat-related illness due to interference with the body's ability to cool itself, often by inhibiting sweating or reducing blood flow. (*Id.* ¶ 182.) Some medications cause sweat gland dysfunction, interfere with the hypothalamus, and/or lead to dehydration. (*Id.* ¶¶ 184–90.)

Although FDC does not record deaths caused by heat,[6] Plaintiffs allege that excessive heat was a contributing factor in the deaths of at least four individuals at Dade CI between August 2021 and September 2024. (*Id.* ¶¶ 195–214.) One individual died on a day where the heat index reached 104 degrees and exhaust fans in his dormitory were not functioning. (*Id.* ¶ 202.) For weeks prior to his death, he complained of difficulty breathing and others noticed that he gasped more in the hot, unventilated air of his dormitory in comparison to other areas of the facility. (*Id.* ¶ 196.) The three other individuals, who each had various combinations of the medical conditions described

---

[6] The only categories of causes of death recorded by FDC are homicide, suicide, accident, and natural. (*Id.* ¶ 194.) Plaintiffs allege that a death caused by heat stroke would most likely be categorized as a natural death. (*Id.*)

above, died on days where the heat index was 92.7, 92.2, and 97.3—all within the Extreme Caution zone designated by the NWS. (*Id.* ¶¶ 207, 210, 213.)

## II.   PROCEDURAL BACKGROUND

On December 17, 2024, Defendants filed the instant Motion seeking the dismissal of all counts in the Complaint. (DE 23, "***Mot.***") Defendants also allege that Mr. Harris failed to exhaust his administrative remedies prior to filing suit and filed additional records regarding exhaustion with their Motion: copies of Harris' grievances (DE 23-1, "***Harris Gr.***") and a sworn declaration by Alan McManus, the FDC Chief of the Bureau of Policy Management & Inmate Appeals, who is the custodian of records for the grievance appeals section (DE 23-2, "***McManus Dec.***").

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but legal conclusions without adequate factual support are entitled to no assumption of truth." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (citation omitted).

## IV.   DISCUSSION

### A.  Plaintiff Harris Adequately Exhausted Available Administrative Remedies

#### 1.  Legal Standard for Exhaustion & Florida Procedures

The Prison Litigation Reform Act ("**PLRA**") requires that prisoner plaintiffs "exhaust prison grievance procedures before filing suit." *Jones v. Bock*, 549 U.S. 199, 202 (2007) (citing 42 U.S.C. § 1997e(a)). "[D]eciding a motion to dismiss for failure to exhaust administrative remedies is a two-step process." *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008).

> First, the court looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true. If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed. If the complaint is not subject to dismissal at the first step, where the plaintiff's allegations are assumed to be true, the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion.

*Id.* Courts lack the discretion to waive the exhaustion requirement, as it is mandatory. *Booth v. Churner*, 523 U.S. 731, 741 (2001). The PLRA also requires proper exhaustion, meaning that an inmate must comply with the procedural rules and deadlines of the institution where they are housed in filing and appealing a grievance. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules . . . ."). In Florida, a prisoner must: (1) first, file an informal grievance with a designated prison staff member; (2) then file a formal grievance with the institution's warden; and finally (3) submit an appeal to the Secretary of FDC. *Dimanche v. Brown*, 783 F.3d 1204, 1211 (11th Cir. 2015); *see also* Fla. Admin. Code r. 33-103.005. Furthermore, "additional procedural requirements appl[y] to all formal grievances, administrative appeals, and direct grievances." *Pavao v. Sims*, 679 F. App'x

819, 824 (11th Cir. 2017). Of relevance here, Florida procedures require that each grievance "must address 'only one issue or complaint.'" *Id.* (quoting Fla. Admin. Code Ann. r. 33-103.006(20(f), .007(2)(f)).

Congress crafted the exhaustion requirement "to reduce the quantity and improve the quality of prisoner suits . . . [and to afford] corrections officials time and opportunity to address complaints internally before allowing [for] the initiation of a federal case . . . [such that] corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002) (citing *Booth*, 523 U.S. at 737). Even so, the PLRA "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 578 U.S. 632, 642 (2016). The Supreme Court has stated that:

> [u]nder [Section] 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones. . . . [First,] an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. . . . [Second], an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. . . . And [third], [exhaustion is not required] when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Id.* at 642–44; *see also Turner*, 541 F.3d at 1083–84; *Pavao*, 679 F. App'x at 823. "Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes and so are not available." *Turner*, 541 F.3d at 1084. In resolving the Parties' factual dispute over whether Mr. Harris properly exhausted available administrative remedies, the Court acts as a factfinder. *Bryant v. Rich*, 530 F.3d 1368, 1377 (11th Cir. 2008).

### 2. *Plaintiff Harris' Grievances*

It is undisputed that Mr. Harris filed grievances at all levels of the three-step process required in Florida. At the first stage, Mr. Harris, aware of the FDC policy against commingling issues, filed three separate grievances; one related to poor ventilation, one related to excess heat, and one requesting that FDC officials walk through the dorm with a thermometer. Harris Gr. at 7–9. However, FDC responded to these three initial grievances by denying one and returning with no action the other two, stating that "the filing of multiple grievances regarding the same issue will only impede the inmate grievance procedure." *Id.* at 7–8. Accordingly, Mr. Harris proceeded through the remaining two steps with the single grievance that was denied. Defendants denied Mr. Harris' grievance at the second level on the merits rather than returning it without action for any procedural issues. *See id.* at 6 ("In reviewing your formal, and the attached informal grievance, it has been determined that the response to the informal grievance 463-2407-0200 appropriately addresses your issues. Based on the foregoing information, your grievance is denied.").

Then, on August 20, 2024, Mr. Harris submitted a final appeal to the Secretary—the last step of the grievance process—which reads as follows:

> This grievance is about the heat and living condition here at Dade C.I. Maintance and the warden are aware of "E" dorm having no on living in it yet it has running fans. A [illegible] has broken fan between bunk 7 and 8. Also the motor on the exhaust fan barely works. Maintance has been asked to clean the exhaust fans from the outside on top of the dorm. However they still have not done it. There is no ice cooler for the dorm for drinking water. It's been missing over 3 weeks now. This matter with the heat and the dorms is causing numerous people with severe rashes in the growing area. And they are trying to cover it up by saying it's scabbies and it's not. It's the heat.

Harris Gr. at 3 (errors in original). The appeal was returned with no action for raising multiple issues in a single grievance. *Id.* at 9.

### 3. *Turner Analysis*

At the first step of the *Turner* analysis, the Court finds that—accepting Plaintiffs' facts as true—dismissal is not warranted. Mr. Harris alleges that he filed grievances at all three levels and that his final appeal to the Secretary was returned with no action based on an alleged procedural infirmity that directly conflicted with FDC's prior position at the first level of the grievance process. This change in position, Plaintiffs argue, rendered the remedy unavailable to Mr. Harris. *See Dimanche*, 783 F.3d at 1210 (quoting *Turner*, 541 F.3d at 1084) (cleaned up) ("A remedy has to be available before it must be exhausted, and to be available a remedy must be capable of use for the accomplishment of its purpose."). Accordingly, the Court moves to the second step of the *Turner* analysis.

Although it is not clear from Defendants' Motion, a review of the supplemental records submitted with the Motion reveals that Mr. Harris' grievance was denied at the first two levels and was only returned without action at the third level—the appeal to the Secretary of FDC. McManus Dec. ¶¶ 3–5. Defendants now argue in their Motion that Harris raised multiple issues, in violation of the Florida grievance procedures, at various points in the three-step grievance process. However, as discussed *supra*, Defendants denied Mr. Harris' first two grievances on the merits and advised Mr. Harris that he must file a single grievance instead of separate ones addressing different facets of the excessive heat at Dade CI. The Court deems this a waiver of any procedural argument related to the grievances filed at the first two levels. *Whatley v. Warden*, 802 F.3d 1205, 1215 (11th Cir. 2015) ("[A] procedural flaw ignored by a prison cannot later be resurrected

by the District Court to defeat exhaustion.") For the Court to now review the first two grievances would be to ratify Defendants' dubious assertion that a plaintiff should somehow ascertain that a grievance was procedurally insufficient when two levels of FDC officials passed the grievance up the chain of command. This is the kind of behavior that "thwart[s] inmates from taking advantage of [the grievance process] through machination [and] misrepresentation." *Ross*, 578 U.S. at 633.

Nonetheless, "a prison does not waive a procedural defect unless and until it decides the procedurally flawed grievance on the merits at the last available stage of administrative review." *Whatley v. Smith*, 898 F.3d 1072, 1083 (11th Cir. 2018). Therefore, the Court focuses its inquiry on the appeal, which was returned with no action. Although Defendants argue that the appeal addressed different issues, the FDC records custodian summed up the contents of the grievance as follows: "The grievance appeal addressed the ventilation at Dade CI and the availability of an ice cooler for drinking water." McManus Dec. ¶ 5. Put simply, the grievance is about heat. To the extent that Defendants challenge Harris' reference to the lack of ventilation as a separate issue, the Eleventh Circuit has made clear that "in most excessive heat cases . . . [the] conditions [of cooling and ventilation] will be almost inseparable." *Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th Cir. 2004). To the extent that Defendants argue that Harris' discussion of ice water somehow comingled issues in violation of the grievance procedures, the Court finds that referencing the lack of ice water is simply a reference to one of many avenues available to FDC that would "alleviate rather than exacerbate the heat." *Id.* at 1298.

Under the PLRA, plaintiffs must exhaust *available* administrative remedies. "[T]he ordinary meaning of the word available is capable of use for the accomplishment of a purpose, and that which is accessible or may be obtained." *Ross*, 578 U.S. at 642. Here, Mr. Harris sought relief from excessive heat and pointed out factors closely related to the heat situation in his appeal. It seems some at FDC understood this as, at the first level, Mr. Harris was instructed to file a single grievance rather than separate grievances to address separate facets of excessive heat.

At its core, the purpose of the PLRA is to "permit[] corrections officials an opportunity to redress grievances before a lawsuit is initiated." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1324 (11th Cir. 2007). Mr. Harris' appeal raised the same issues sought to be remedied by this action, clearly giving FDC officials an opportunity to redress the issue of excessive heat and poor ventilation. To alter their stance on whether his grievances addressed a single issue at the third stage after instructing him to file a single grievance, is the type of "hide-and-seek" behavior disavowed by the Eleventh Circuit. *Id.* at 1323. In sum, the Court finds that a final stage of a grievance process that interprets heat, ventilation, and the provision of ice water as separate issues instead of multiple facets of a single issue related to excessive heat is not one a rational inmate would be able to navigate. Accordingly, the Court finds that Mr. Harris adequately exhausted the available administrative remedies.

**B. Plaintiffs Have Adequately Alleged an Eighth Amendment Claim**

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). "The [Eighth] Amendment also imposes duties on

[prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted). To articulate an Eighth Amendment violation,[7] two requirements must be met. "First, the deprivation alleged must be, objectively, sufficiently serious." *Farmer*, 511 U.S. at 834 (citations omitted). Second, "a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety." *Id.* (citations omitted). The Court addresses each element in turn.

### 1. Substantial Risk of Serious Harm

Federal courts across the country have found that "[s]ubjecting incarcerated persons to high heat conditions for sustained periods of time, with inadequate procedures to mitigate the risks inherent in such high heat, is a violation of the Eighth Amendment when prison officials are 'deliberately indifferent' to such risks." *Voice of the Experienced v. LeBlanc*, No. CV 23-01304, 2024 WL 3279899, at *23 (M.D. La. July 2, 2024) (collecting

---

[7] Defendants also argue that Plaintiffs failed to articulate a policy or custom that caused the alleged Eighth Amendment violations, which is required for a claim brought pursuant to 42 U.S.C. § 1983. The Court disagrees. Plaintiffs allege that "FDC has no policy to lower indoor temperatures or heat indexes in housing areas[,]" that Defendants "punish" prisoners who attempt to ventilate their cells in the face of Defendants' failure to do so, and do not have a policy to ensure that individuals with particular medical vulnerabilities are kept out of dormitories without air conditioning. Compl. ¶¶ 307–08, 311. The Supreme Court "has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). At the very least, the Court finds Plaintiffs have adequately alleged a widespread practice of Defendants failing to reasonably address excessive heat at Dade CI. At this stage, this is sufficient to state a claim.

cases); *see also Hinojosa v. Livingston*, 807 F.3d 657, 670 (5th Cir. 2015) ("Our circuit has made very clear that inmates have a right, under the Eighth Amendment, not to be subjected to extreme temperatures without adequate remedial measures, and Defendants have not alerted us to any contrary authority."); *Tiede v. Collier*, No. 1:23-CV-1004, 2024 WL 3016562, at *6 (W.D. Tex. June 14, 2024) (denying motion to dismiss for failure to state a claim because plaintiffs alleged that "prisoners suffer from and are at risk of suffering from a number of heat-induced illnesses—including heat stroke, heat exhaustion, heat rash, nausea, and vomiting—due to unit temperatures that routinely exceed 100° Fahrenheit in the summer"). Therefore, excessive heat has regularly been found to pose a substantial risk of serious harm to prisoners. Nonetheless, Defendants advance two arguments for the proposition that Plaintiffs have failed to allege a substantial risk of serious harm. The Court addresses each in turn.

First, Defendants cite the Eleventh Circuit's opinion in *Chandler v. Crosby*[8] for the proposition that Plaintiffs have failed to allege a substantial risk of serious harm. But their argument misconstrues Plaintiffs' Complaint, which alleges that the combination of dangerous heat and the lack of an adequate ventilation system at Dade CI poses a substantial risk of serious harm to those incarcerated there. *Chandler* is inapposite:[9] In that case, the prison was "equipped with a ventilation system that effectively manage[d] air circulation and humidity" and "numerous conditions [that] alleviate[d] rather than

---

[8] 379 F.3d 1278 (11th Cir. 2004).

[9] It bears noting that *Chandler* was decided following a bench trial. At the motion to dismiss stage, the burden on Plaintiffs is simply to state a claim, not prove it. That plaintiffs in *Chandler* pursued claims **at trial** supports the position that high temperatures in prison settings can sufficiently state a claim for an Eighth Amendment violation.

exacerbate[d] the heat," including access to cold running water. *Chandler*, 379 F.3d at 1298. Here, Plaintiffs have alleged a dilapidated ventilation system that regularly breaks down and lack of access to cool air or water.

Furthermore, *Chandler* was decided over two decades ago. The Supreme Court has made clear that the objective inquiry under the Eighth Amendment includes "a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to" the complained of condition. *Helling*, 509 U.S. at 36. As Plaintiffs point out, society's scientific understanding of heat and heat-related dangers has evolved over the past two decades. In *Chandler*, the court examined only temperature, which averaged eighty degrees at night and eighty-five or eighty-six degrees during the day and—over the course of two summers—was only recorded at ninety-five degrees or higher on seven occasions. *Chandler*, 379 F.3d at 1297. In contrast, Plaintiffs put forth allegations related to the heat index—a scientific measure of the combination of temperature and humidity—to demonstrate the impact of heat on the human body. Compl. ¶ 17. In the summer of 2023, the heat index in South Florida surpassed 100 degrees forty-six days in a row. *Id.* ¶ 21. September 2024 set a record for the hottest September in Miami history, with an average peak heat index at 102.8 degrees.[10] *Id.* ¶ 25. Consequently, the difference in procedural posture, the disparate factual record and the presence of advanced scientific data

---

[10] Defendants question Plaintiffs' reliance on temperatures and heat indexes at nearby locations. However, Plaintiffs allege that "Defendants have made a conscious decision to not regularly record the temperatures or heat indexes in the dormitories at Dade CI." Compl. ¶ 45. Plaintiffs cannot be penalized for recordkeeping decisions made by Defendants.

regarding heat makes *Chandler* inapplicable and unpersuasive as to the issue before the Court.

Although the Eleventh Circuit has not recently addressed heat conditions in prisons in a way that would bear on this case, in 2017 the Court of Appeals for the Fifth Circuit held that it had "repeatedly recognized the serious risk of harm that excessive heat can pose in the prison context absent adequate mitigating measures, and [had] consistently found evidence sufficient in these cases to support an Eighth Amendment violation, even when certain mitigating measures were available." *Yates v. Collier*, 868 F.3d 354, 361 (5th Cir. 2017). Accordingly, the Fifth Circuit affirmed a prior ruling upholding "a permanent class-wide injunction based on the Eighth Amendment, which required the Mississippi Department of Corrections to provide fans, ice water, and daily showers when the heat index is 90 degrees or above, even though most of the inmates had the benefit of industrial sized fans as well as smaller personal fans." *Id.* at 360 (cleaned up). The Court finds the Fifth Circuit's reasoning in *Yates* to be extremely relevant to the facts at hand.

Second, Defendants argue that the injuries alleged by Plaintiffs are "mostly minor" and therefore do not pose a substantial risk of serious harm. Again, the Court finds that this misconstrues Plaintiffs' Complaint, which alleges a wide range of heat related injuries: heat exhaustion, heat cramps, heat stroke, and death. Plaintiffs also extensively detail how excessive heat can exacerbate underlying medical conditions, in a facility where over fifty percent of all prisoners are over the age of fifty. Finally, Plaintiffs allege that, since 2021, extreme heat has contributed to the deaths of at least four individuals at Dade CI. "An inmate does not need to await a tragic event before seeking relief, but he must show

that a condition of his confinement poses an unreasonable risk of serious damage to his future health or safety." *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *9 (11th Cir. Apr. 15, 2022) (cleaned up). The Court finds Plaintiffs have done so.[11]

### 2. Deliberate Indifference

"The second element of an Eighth Amendment claim—the defendants' deliberate indifference to a substantial risk of serious harm—has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Lane v. Philbin*, 835 F.3d 1302, 1308 (11th Cir. 2016) (citations omitted). While "deliberate indifference entails something more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. A plaintiff may succeed on an Eighth Amendment claim by demonstrating that an "official acted or failed to act despite his knowledge of a substantial risk of serious harm," and "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842.

---

[11] Plaintiffs also argue that "[c]ontemporary standards of decency must be brought to bear in determining whether a punishment is cruel and unusual." *Bass v. Perrin*, 170 F.3d 1312, 1316 (11th Cir. 1999). Plaintiffs point to a nursing home in Broward County that was left without air conditioning for three days following Hurricane Irma. Compl. ¶ 192. In those three days, where temperatures were in the eighties, twelve patients died of heatstroke. *Id.* The nursing home administrators were criminally prosecuted for failing to protect the patients from the heat. *Id.* This litigation makes clear that the State will hold institutions liable for failing to protect people from excessive heat and represents the evolving contemporary standards of decency recognized in Florida. Consistent with these standards, Plaintiffs maintain that they have alleged a substantial risk of serious harm.

*a. Defendants had subjective knowledge of a risk of serious harm due to excessive heat issues at Dade CI.*

The Supreme Court has made clear that

[i]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Farmer*, 511 U.S. at 842–43. In the Complaint, Plaintiffs dedicate several pages to detailing allegations regarding Defendants' awareness of the conditions at Dade CI. Among these allegations are the following:

- "Defendants incorporate a version of the NWS chart into their policies and training materials." Compl. ¶ 285.

- "The Florida Legislature has warned FDC that it urgently must address the intolerably hot conditions in its prisons." *Id.* ¶ 286.

- Defendant Dixon testified before the Florida Senate Appropriations Committee on Criminal and Civil Justice that although "75% of FDC housing units statewide are not air-conditioned[,]" those that are air-conditioned "are prioritized for the elderly and the infirm." *Id.* ¶ 287.

- When discussing how other states' correctional departments have responded to rising heat, Defendant Dixon "explained that Texas has been following court orders to reduce the heat in that state's prisons, Tennessee has achieved 100% air-conditioned dormitories, and Alabama, Georgia, and Arkansas are building new prisons with improved climate control." *Id.* ¶ 289.

- Prisoners at Dade CI have submitted "dozens—if not hundreds—of grievances to the Warden of Dade CI and the Secretary of the Department of Corrections, in which prisoners describe the excessively hot and unventilated conditions at Dade CI and beg for relief." *Id.* ¶ 299.

- "At Dade CI, there are postings throughout the staffing area warning about the dangers of excessive heat, and signs of heat-related illness." *Id.* ¶ 300.

Additionally, Plaintiffs allege that in September 2023—a full year before the Complaint was filed—Plaintiffs' counsel wrote to Warden Acosta detailing concerns about the extreme heat, lack of ventilation, and the serious threat of medical harm posted to the inmates based on those conditions. *Id.* ¶ 306. The Court finds that the allegations Plaintiffs raise about the ongoing excessive heat issues at Dade CI easily support the plausible inference that Defendants were subjectively aware of the risks of heat-related harms. *See, e.g., Brown v. Dunn*, No. 2:21CV440-MHT, 2024 WL 5168637, at *6 (M.D. Ala. Dec. 19, 2024) ("[D]efendants were notified of the history of widespread abuse at Bullock by the DOJ reports, both of which were sent to the officials.")

Defendants argue that even if they were aware of generalized risks of heat-related harms at Dade CI, Plaintiffs have failed to allege that Defendants were on notice of Plaintiffs' specific medical conditions that make them especially vulnerable to harm. This argument represents a fundamental misunderstanding of Eighth Amendment jurisprudence. The Supreme Court has held that a prison may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely" to be injured. *Farmer*, 511 U.S. at 843. Instead, the Supreme Court has made clear that "it does

not matter whether . . . a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.*

      *b.  Defendants acted with deliberate indifference.*

The Court must next consider whether, in light of their knowledge regarding excessive heat at Dade CI, Defendants acted with deliberate indifference to the risks posed to Plaintiffs. Again, the Court finds the Fifth Circuit's relatively recent decisions addressing excessive heat in prisons to be persuasive. In *Hinojosa*, the Fifth Circuit found that "the open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference." 807 F.3d at 667; *see also Farmer*, 511 U.S. at 837 (deliberate indifference can be inferred from the obviousness of the risk); *Ball v. LeBlanc*, 792 F.3d 584, 594–95 (5th Cir. 2015) (finding that defendants were aware of the risk posed by high temperatures in prison even though no inmate had ever suffered a heat-related incident at the subject facility). In combination with the facts recited above, Plaintiffs allege that excessive heat and poor ventilation contributed to the deaths of at least four individuals incarcerated at Dade CI between August 2021 and September 2024. Therefore, the Court finds that Plaintiffs have adequately alleged that Defendants acted with deliberate indifference.

      *c.  Defendants are not responding reasonably to the substantial risk of serious harm posed by excessive heat.*

Finally, Defendants argue that even if they were aware of the substantial risk of serious harm posed to Plaintiffs, they have acted reasonably in responding to the conditions at Dade CI. An "official may escape liability for known risks 'if he responded reasonably to the risk, even if the harm ultimately was not averted.'" *Chandler*, 379 F.3d

at 1290 (quoting *Farmer*, 511 U.S. at 844). Once again, Defendants' arguments[12] misinterpret Plaintiffs' allegations. For example, Defendants point to FDC's enlistment of KPMG to assess its facilities as a reasonable response. Mot. at 13. However, nothing in the Complaint indicates that any of KPMG's recommendations were actually implemented. Similarly, Defendants argue that "inmates who feel dehydrated or may pass out are typically allowed to go to the [i]nfirmary" but a review of the cited passage in the Complaint says nothing about what is "typically" permitted; it is instead an allegation about a single instance where one individual who felt dehydrated went to the infirmary. *Compare* Mot. at 14 *with* Compl. ¶ 270. In another instance, Defendants argue that Mr. Harris was brought to the medical unit "whenever he has breathing difficulties" yet the cited passage of the Complaint only says that Mr. Harris frequently has to declare a medical emergency because of breathing difficulties and does not address each and every time he experiences breathing difficulties. *Compare* Mot. at 14 *with* Compl. ¶ 230. Defendants' contentions about their allegedly reasonable response are rife with such liberal paraphrasing and the Court finds these arguments unavailing. Accordingly, the Court finds that, based on the allegations pled in the Complaint, Defendants are not responding reasonably to the substantial risk of serious harm posed by excessive heat at Dade CI.

### C. Plaintiffs Have Adequately Alleged ADA and Rehabilitation Act Claims

"Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

---

[12] To the extent that Defendants attempt to argue matters from beyond the Complaint, the Court disregards such facts, as the Court's review on a motion to dismiss is generally limited to the "four corners" of the complaint. *St. George v. Pinellas Cnty.*, 285 F.3d 1334 (11th Cir. 2002).

Therefore, the Court evaluates Defendants' arguments related to Counts II and III of the Complaint together. To state a claim under the ADA or Rehabilitation Act, Plaintiffs must allege: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007). Defendants challenge all three elements.

### 1. Qualified Individual with a Disability

A disability is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). Defendants argue that Plaintiffs are not qualified individuals with disabilities because "thermal regulation is not listed among the major bodily functions covered by statute." Mot. at 15. However, in listing major life activities, the statute specifically states that the "major life activities include, but are not limited to," the enumerated activities. 42 U.S.C. § 12102(2)(A). Furthermore, a disability can also relate to the impairment of major bodily functions such as functions of the respiratory, circulatory, and endocrine systems. 42 U.S.C. § 12102(2)(B). Therefore, to the extent that thermal regulation is the major bodily function Plaintiffs argue is limited by their conditions, the Court finds they have adequately alleged a disability. However, Plaintiffs have alleged more, including breathing and sleeping difficulties, which are explicitly listed in the statute, and impairment of functions of

circulatory systems. Compl. ¶¶ 219, 233, 238; 42 U.S.C. § 12102(2). At this stage, the Court finds that Plaintiffs are qualified individuals with a disability.

### 2. *Exclusion, Denial of Benefits, and Other Discrimination*

Defendants first argue that Plaintiffs have failed to identify a service, program, or activity to which they were denied access. However, Defendants acknowledge that Plaintiffs have alleged a denial of safe housing. "Failing to accommodate a person's known disability, which thereby impacts that person's access to safe housing and living conditions, may constitute a denial of access to services." *Walton for Est. of Smith v. Fla. Dep't of Corr.*, No. 3:16-CV-1130-J-39JRK, 2019 WL 2103024, at \*12 (M.D. Fla. May 14, 2019) (collecting cases); *see also* 28 C.F.R. § 35.152 (the ADA provides that "[p]ublic entities shall implement reasonable policies . . . so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing"). Moreover, Plaintiffs need not tie their claim of discrimination to any specific service, program, or entity. The ADA and Rehabilitation Act's statutory schemes "protect[] qualified individuals with a disability from being subjected to discrimination by any [public] entity, and [are] not tied directly to the services, programs, or activities of the public entity." *Bircoll*, 480 F.3d at 1085 (citations omitted).

Next, Defendants argue that Plaintiff fail to allege exclusion because everyone incarcerated at Dade CI experiences the same heat and air. The Supreme Court has made clear that "Congress had a more comprehensive view of the concept of discrimination advanced in the ADA" than requiring plaintiffs to identify a comparison class. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 (1999); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003) (holding that plaintiffs need not rely on a

theory of disparate impact to state an ADA claim) (citing *Olmstead*, 527 U.S. at 598). Therefore, the Court finds that Plaintiffs have adequately pled the second element of an ADA or Rehabilitation Act claim.

### 3. Causation

Finally, Defendants try to import a discriminatory intent requirement into the ADA and Rehabilitation Act. However, "a failure to make reasonable accommodation claim requires no animus or discriminatory motivation." *Dudley v. Singleton*, 508 F. Supp. 3d 1118, 1142 (N.D. Ala. 2020) (citation omitted). It appears that Defendants have failed to distinguish between ADA and Rehabilitation Act claims seeking compensatory damages and those seeking injunctive relief, as is the case here. "Where a plaintiff is not seeking compensatory damages, discriminatory intent is not required." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014). Instead, in cases seeking injunctive relief, "a showing that the [accommodations provided] were not sufficient to provide [the plaintiff] with an equal opportunity to benefit . . . is enough by itself to establish a violation of both the [Rehabilitation Act] and ADA." *Id.* The Complaint advances numerous allegations that the current practices, or lack thereof, at Dade CI to mitigate excessive heat are not sufficient to provide Plaintiffs the safe housing to which they are statutorily entitled. The Court finds that Plaintiffs have adequately alleged causation.[13]

---

[13] The Court finds Defendants' argument requiring Plaintiffs to make a specific demand for accommodation to be perplexing. The argument appears to be a repackaging of their comparison class argument, already addressed *supra.* Nonetheless, if the argument is a distinct one, it is equally unavailing. *See Nattiel v. Fla. Dep't of Corr.*, No. 115CV00150WTHGRJ, 2017 WL 5774143, at *1 (N.D. Fla. Nov. 28, 2017) ("A disabled person's failure to expressly request an accommodation is not fatal to an ADA claim where the defendant otherwise had knowledge of an individual's disability and needs but took no action."); *see also Levy v. La. Dep't of Pub. Safety & Corr.*, 371 F. Supp. 3d 274, 285 (M.D. La. 2019) ([I]t is axiomatic that the ADA and [Rehabilitation Act] do not require

V.    **CONCLUSION**

For the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1.  Defendants' Motion to Dismiss (DE 23) is **DENIED**.

2.  **Within fourteen (14) days from the date of this Order,** Defendants shall
    file an answer to the Complaint.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this <u>28th</u> day of May,
2025.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

---

a plaintiff to specifically request a certain accommodation in order to prevail on a claim of
disability discrimination.").