**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:24-cv-24253**

DWAYNE WILSON, TYRONE HARRIS,
and GARY WHEELER, individually
and on behalf of those similarly situated,

      Plaintiffs,

vs.

RICKY DIXON, in his official capacity
as Secretary of the Department of Corrections,
FRANCISCO ACOSTA, in his official capacity
as Warden of Dade Correctional Institution, and
FLORIDA DEPARTMENT OF CORRECTIONS,
an agency of the State of Florida,

      Defendants.

_____

## JOINT MOTION FOR A DISCOVERY HEARING

Plaintiffs and Defendants, pursuant to this Court's Order Setting Discovery Procedures [D.E. 59], jointly move for a discovery hearing for the following reasons.[1] All attorneys who will be arguing are local. Proposed Orders are attached as Exhibit A.

On June 13, 2025 and August 19, 2025, Defendants produced 19,791 and 30,487 documents, respectively, which included approximately ninety-nine documents (emails and attachments), reflecting communications between Department employees, the Executive Office of the Governor, and/or legislative staff leading to Secretary Ricky Dixon's presentation to the Florida Senate Appropriations Committee on Criminal and Civil Justice on October 11, 2023.

---

[1] Should the Court elect to schedule a hearing on this matter, Plaintiffs would respectfully request that it be set after July 8, 2026, the date of the parties' class certification hearing. The parties are in the middle of briefing class certification, summary judgment, and Daubert issues, for which responses are due June 16 and 18, and replies are due June 26. Defendants do not oppose this request.

Later, Plaintiffs noticed the following 30(b)(6) deposition topic: "Secretary Dixon's October 2023 testimony at the Appropriations Committee on Criminal and Civil Justice of the Florida Senate, and any actions the FDC took in response regarding heat or humidity in prisoner dorms and/or measuring temperature or humidity at any FDC prison." Ex. H. On April 8, 2026, FDC produced Jonathan Rummel to testify on its behalf for this topic. During the deposition, FDC's counsel objected to questions, including questions such as "How did Secretary Dixon prepare for this hearing?" and whether Dixon "reviewed any heat data from FDC facilities to prepare for the hearing?", on the basis of legislative and deliberative process privilege, and instructed the witness not to answer.  Ex. C Rummel Dep. 19:3 – 20:6, 24:20 – 25:10.

On April 10, 2026, Defendants sent Plaintiffs a Clawback Notice under Federal Rule of Civil Procedure 26(b)(5)(B), retroactively asserting the legislative and deliberative process privileges for the ninety-nine documents at issue, and noting that a privilege log would be forthcoming.  Ex. B. at 1–7. Plaintiffs agreed to not review the documents while awaiting the privilege log, and on April 24, 2026, Defendants furnished a privilege log. *Id.* at 1, 10–33. Plaintiffs objected to the privilege assertions contained in the privilege log on May 8, 2026. *Id.* at 8.[2]

## PLAINTIFFS' POSITION

Plaintiffs' position is the privilege claims have been waived. "Legislative privilege (of the federal common-law variety) "may be asserted or waived as [the bearer] so chooses." *Fla. v. Byrd*, 674 F. Supp. 3d 1097, 1107 (N.D. Fla. 2023) (citations omitted).  The privilege was not raised in response to the Request for Production, and Defendants produced the documents to Plaintiffs in June and August of 2025. Then, on April 10—eight or ten months after the documents were

---

[2] On June 4, 2026, the Parties agreed to extend the deadline to file this joint motion for discovery hearing pursuant to Local Rule 26.1(g)(2)(C) by seven days.

produced, Defendants attempted to assert the privilege retroactively. This failure to timely assert the privilege waives it. *See* Local Rule 26.1(e)(2)(D) (privilege log required within 14 days); *Lockheed Martin Corp. v. L-3 Commc'ns Corp.*, No. 6:05CV1580 ORL31KRS, 2007 WL 2209250, at *5 (M.D. Fla. July 29, 2007) ("Finally, courts have held that a party who fails to assert the [attorney-client] privilege timely waives the privilege.").

Moreover, on January 28, 2026, an FDC representative—FDC's legislative affairs director, whose affidavit Defendants proffer here—gave deposition testimony about Secretary Dixon's preparation for the Senate hearing, and no objection was raised, either to the Rule 30(b)(6) topic or during the deposition itself. Ex. D Shea Dep. at 70-71. Ms. Shea provided details of the process surrounding how FDC's legislative priorities are developed and advanced. *Id.* at 17:1-10 ("Q. Who determines which FDC policies you advocate or lobby for with the legislature? A. It's a combined effort. The -- our executive leadership team sometimes will -- well, they will look at all of the policies from the different sections of the Department that the sections are presenting to Legislative Affairs for consideration."). She testified about legislative policies with respect to heat mitigation specifically. *See id.* at 19 ("In my experience, in the year that I've been in the role as Legislative Affairs Director, our office has not initiated any heat mitigation legislative policies."). She described the process of communicating with the Legislature, and the contents of their communications. *Id*. at 21 (". . . . after we've run everything through the Governor's office, we will draft a bill that contains the agency's legislative priorities for that session. And we will seek a sponsor in the Senate and the House."); *id*. at 30 ("Q. You responded to Representative Hart Lowman about heat mitigation and FDC facilities? A. To my knowledge."); *id*. at 33:15-22; *id*. at 43 (communications with Senator Bradley). And she answered questions about proposed legislative policies. *See id.* at 92:9-12 ("No, there are no current FDC legislative policy proposals

related to heat mitigation."); *id*. at 94:8-22 (describing FDC's "plan" to seek legislative funding). Critically, she described the contents of communications with legislators as part of the policy formation process—she was asked to describe what "input" FDC provided to Senator Rodriguez in a meeting about heat mitigation efforts, and described how FDC "asked that the senator be supportive of our legislative budget request funding." *Id*. at 83:19 – 84:5. No privilege objections were raised in response to any of these questions.

The failure to notice the disclosure of purportedly privileged documents, combined with the failure to object during the January deposition, indicates that Defendants had no real desire to keep these matters confidential.

On the merits, the privilege assertion also fails. The legislative privilege "protects the legislative process itself[,]" and therefore shields officials' "actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015). The documents at issue appear to be emails between various FDC officials gathering information and preparing for Secretary's Dixon's information presentation to the Senate Committee, at which the Secretary gave an informational presentation on the state of the FDC. Ex. G Hearing Transcript. Because Plaintiffs cannot view or use the documents pursuant to 26(b)(5)(B), it is difficult to convey their contents; thus an *in camera* inspection may be warranted. However, there is no indication that they involved the proposal, formulation, or passage of legislation. Dixon's testimony was simply providing information to the Legislature in a public forum. The emails appear to reflect the mere gathering of existing information to prepare for that testimony—not formulating policy. As far as Plaintiffs are aware, there was no pending legislation the FDC officials were discussing, nor were they deciding on a position to take on a pending bill.

Defendants' reliance on *Bogan v. Scott-Harris* does not disturb this conclusion. 523 U.S.

44 (1998).  *Bogan* was describing the contours of legislative immunity, holding that a mayor could not be sued for introducing a budget and signing an ordinance into law.  *Id*. at 55. But Plaintiffs are not suing Secretary Dixon for his actions taken in connection with a budget proposal, and Defendants are not claiming the privilege applies to his public testimony—the analogous action that was at issue in *Bogan*.

The affidavit supporting the privilege assertion does not meet the burden of proving the documents are covered by the privilege. *See Campero USA Corp. v. ADS Foodservice, LLC,* 916 F. Supp. 2d 1284, 1288 (S.D. Fla. 2012).  It merely states, without elaboration, that each document "reflect[s] internal deliberations, communications, drafts, and preparatory materials created by Department personnel…for the purpose of preparing Secretary Ricky Dixon's presentation" to the committee.  Shea Dec. ¶ 8. That does not explain whether and how the emails were related to the "proposal, formulation, [or] passage of legislation." *In re Hubbard*, 803 F.3d at 1308.

For similar reasons, the deliberative process privilege does not apply.  That privilege applies specifically to an exemption in the Freedom of Information Act (FOIA) that federal agencies can invoke when responding to a FOIA request.  *See Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp*., 376 F.3d 1270, 1277 (11th Cir. 2004). Moreover, the privilege "covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, (2001) (citation/quotation omitted).  *See also Fla. House of Representatives v. U.S. Dep't of Com*., 961 F.2d 941, 945 (11th Cir. 1992) (document must  be "(1) predecisional, i.e., prepared in order to assist an agency decisionmaker in arriving at his decision . . . and (2) deliberative, i.e., a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy

matters.") (citation/quotation omitted).  The documents at issue do not appear to contain any such opinions or recommendations about any particular policy decisions.  Again, they were simply gathering existing information for presentation to Legislature.

As described above, given that Plaintiffs cannot view the documents, combined with the limited evidence offered by Defendants, it is difficult to determine what the contents of the documents are, let whether they were related to legislation.  Rather than assess this based on hypothetical documents in a vacuum, Plaintiffs suggest that an *in camera* inspection would be appropriate.  *See United States v. Zolin,* 491 U.S. 554, 572, 109 S. Ct. 2619, 2631, 105 L. Ed. 2d 469 (1989) (in the attorney-client privilege context, noting that, if the appropriate factual basis is shown, "the decision whether to engage in in camera review rests in the sound discretion of the district court.").

## DEFENDANTS' POSITION

Defendants properly asserted the common-law legislative privilege and the deliberative process privilege over ninety-nine documents reflecting Secretary Dixon's preparation for his October 11, 2023 testimony before the Senate Appropriations Committee on Criminal and Civil Justice. *See generally* Ex. B. Defendants rely on the Declarations of Katherine Shea (Ex. E) and Robert Minchin, III, Esq. (Ex. F). The privileges are well established and squarely apply to the at-issue documents. Plaintiffs' three theories of non-applicability and waiver—that no privilege attaches, that the inadvertent production waived it, and that deposition testimony independently waived it—each fail.

### I.   The Legislative Privilege Applies

Federal courts have a "duty to recognize claims of privilege that are valid under federal common law." *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015); Fed. R. Evid. 501. Legislative

privilege is one such claim—being both "evidentiary" and "governed by federal common law, as applied through Rule 501 of the Federal Rules of Evidence." *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 235 (5th Cir. 2023) (cleaned up). The legislative privilege protects the "legislative process itself," including the "proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015). The privilege is "unqualified" and "insurmountable" in section 1983 cases. *Pernell v. Fla. Bd. of Governors*, 84 F.4th 1339, 1343–44 (11th Cir. 2023); *see also Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998).

"State lawmakers can invoke legislative privilege to protect actions that occurred within 'the sphere of legitimate legislative activity' or within 'the regular course of the legislative process.'" *La Union Del Pueblo Entero*, 68 F.4th at 235 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951); *United States v. Helstoski*, 442 U.S. 477, 489 (1979)). The test, however, is functional: "Whether an act is legislative turns on the nature of the act itself," not on formalities. *Bogan*, 523 U.S. at 54.

The Supreme Court has held that an act may be "formally legislative" even where performed by "officials outside the legislative branch" provided the officials are performing a "legislative function[]." *Bogan*, 523 U.S. at 55. And courts in this circuit have specifically recognized the application of the privilege to executive entities, officials, and even non-government third parties taking part in the legislative process. In *Florida v. Byrd*, 674 F. Supp. 3d 1097 (N.D. Fla. 2023), the court quashed deposition subpoenas served on the current anf former legislators, the Governor's General Counsel, and the Governor's Deputy Chief of Staff, holding that the privilege "is not limited to legislators" and that "Executive officials and staff may invoke legislative privilege as to their motives or actions in the proposal, formulation, and passage of legislation." *Fla. v. Byrd*, 674 F. Supp. 3d 1097, 1103 (N.D. Fla. 2023) (cleaned up). The court

even held that the privilege protects communication with non-government officials, such as third-party experts. *Id.* at 1106 ("The expert's third-party status does not deprive those interactions of their legislative function."). So, though the privilege protects lawmakers, it extends to anyone involved in "the proposal, formulation, and passage" of legislation, including to executive officials' preparatory acts and to communications with the Governor's Office and legislative staff that are part of the legislative process. *See id.* at 1103, 1105–07.

The privilege also extends to the budget appropriations process, which is "formally legislative." *Bogan*, 523 U.S. at 55. In *Bogan*, the Supreme Court unanimously held that a mayor's introduction of a budget and a council member's vote on a budgetary ordinance were "integral" steps in the legislative process since budgetary appropriations reflect "discretionary, policymaking decision[s] implicating the budgetary priorities of the city[.]" *Id.* at 55–56.

Section 216.011(1)(d), Florida Statutes, provides the operative definition of the "appropriations act" under Florida law:

> [T]he authorization of the Legislature, based upon legislative budgets or based upon legislative findings of the necessity for an authorization when no legislative budget is filed, for the expenditure of amounts of money by an agency. . . for stated purposes in the performance of the functions it is authorized by law to perform."

§ 216.011(1)(d), Fla. Stat. By defining an appropriations act as the "authorization of the Legislature," the statute affirmatively classifies the budget appropriation process as legislative. *Id.*; *see also Bogan*, 523 U.S. at 55 (budget appropriations are "formally legislative"). That process culminates in the Legislature's enactment of the General Appropriations Act—again, a legislative act—each year. And the statute also requires the Executive Office of the Governor and the appropriations committees to "jointly develop legislative budget instructions," § 216.023(3), Fla. Stat.; the cross-branch communications reflected on the privilege log are therefore statutorily

mandated. *See* Ex. B at 13–33.

Here, Secretary Dixon testified before the Senate Appropriations Committee on Criminal and Civil Justice—the sub-committee responsible for the criminal-justice portion of Florida's General Appropriations Act—at the invitation of Committee Chair Senator Bradley. Ex. E ¶¶ 3–6. Florida law expressly requires agency heads to submit "budget request[s] to the Legislature," § 216.023(1), Fla. Stat., and recognizes the subsequent testimony as part of the Legislature's review of the requests:

> The legislative budget request from each agency . . . shall be reviewed by the Legislature. The review may allow for the opportunity to have information or testimony by the agency . . . regarding the proper level of funding for the agency in order to carry out its mission.

§ 216.023(10), Fla. Stat.

The transcript from Secretary Dixon's testimony corroborates that his testimony was part of that legislative process. *See* Ex. G (transcript of the October 11, 2023 presentation to the Senate Appropriations Committee on Criminal and Civil Justice). At the outset, Secretary Dixon made clear what should be obvious, that he was presenting the Department's budgetary needs. He stated: "I know there's other places that compete for the for the [sic] dollars but investing in us as an investment in public safety. So, thank you." *Id.* at 1. He then began his presentation of the Department's budgetary needs, including, to name a few, "infrastructure," "fleet challenges," "information technology," and "physical plant." *Id.* at 1–2. That was followed by an express recognition of prior appropriations: "It's been the most impressive two years I've seen in our history in terms of legislative support and support from our Governor. You'll have provided historic pay raises[,] the largest pay increases that we've seen in any of our careers . . . ." *Id.* at 2. Thus, Plaintiffs' claim that Secretary Dixon was only "providing information to the Legislature" would require ignoring not only the name of the committee he was before—the Senate

*Appropriations* Committee on Criminal and Civil Justice—but also the substance of the presentation.[3]

Plaintiffs' second attack on the privilege claim—that there was "no pending legislation"—fares no better. In the legislative session immediately following Secretary Dixon's testimony, the Senate Appropriations Committee drafted SB 2510 and SB 2512, with SB 2512 expressly declaring: "[T]he Legislature recognizes the critical fixed capital outlay needs of the department." S.B. 2512, 2024 Leg., Reg. Sess. (Fla.); *see also* S.B. 2510, 2024 Leg., Reg. Sess. (Fla.). The substance of those bills was incorporated, at least in part, into Chapter 2024-231, Laws of Florida—the 2024 General Appropriations Act—which included specific Department fixed capital outlay appropriations. Again, Plaintiffs' arguments ignore the Legislature's budget-formation process and the Department's involvement. *See* Ex. E ¶¶ 2–8.

## II.     The Deliberative Process Privilege Independently Applies

The deliberative process privilege protects materials that are (1) pre-decisional and (2) deliberative. *Fla. House of Reps. v. U.S. Dep't of Commerce*, 961 F.2d 941, 945 (11th Cir. 1992). A document is "deliberative" if disclosure of its materials "would expose the agency's decision making process in a way that would discourage candid discussion and thus undermine the agency's ability to perform its functions." *Moye*, 376 F.3d at 1278. Contrary to Plaintiffs' suggestion, the privilege "may be applied independently of the FOIA and its exemptions." *In re Polypropylene Carpet Antitrust Litig.*, 181 F.R.D. 680, 695 n.10 (N.D. Ga. 1998) (collecting cases). Indeed, the Supreme Court has made clear that it is a "civil discovery privilege[]" that was *incorporated into*

---

[3] Nor can Plaintiffs argue that they are entitled to the factual information underlying Secretary Dixon's testimony. *Pernell* held that the distinction between "factual" and motivational materials "has no basis in our precedent." 84 F.4th at 1343–44 ("[T]he categorical distinction drawn by the district court between factual documents and other documents has no basis in our precedent.")

FOIA Exemption 5. *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). And courts likewise note that the deliberative process privilege "is a species of executive privilege that applies broadly in litigation with government agencies as well as requests under FOIA." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 2020 WL 2732340, at *3 (S.D. Fla. May 26, 2020).

Here, production of the at-issue documents would reveal the Secretary's and Department's internal thought processes and consultative deliberations prior to presenting to the Legislature, which, by definition, were formed *before* the Secretary's public testimony on October 11, 2023. Ex. E ¶¶ 7–8. These communications are deliberative as they reflect the "advisory opinions, recommendations and deliberations" of the Department's staff in deciding what policy recommendations to present to the Legislature for purposes of the Department's budgetary needs. *Moye*, 376 F.3d at 1277. If not shielded, the result would be the "premature disclosure of proposed policies before they have been finally formulated or adopted"—exactly what the privilege is meant to protect. *Id.* (citation and quotation omitted).

## III.   No Waiver Has Occurred

Defendants did not waive either privilege. Courts in this circuit have not yet addressed the effects of an inadvertent disclosure on a party's ability to claim the legislative process privilege under Federal Rule of Evidence 501. Florida federal district courts otherwise evaluate whether inadvertent disclosure of attorney-client or work product privileged documents constitutes a waiver of privilege under the requirements of Federal Rule of Evidence 502 and a five-factor framework.[4] *See Absolute Activist Value Master Fund Ltd. v. Devine*, 262 F. Supp. 3d 1312, 1324

---

[4] The Eleventh Circuit has held that the government waives the deliberative process privilege when "an authorized disclosure is voluntarily made to a non-federal party[.]" *Fla. House of Representatives*, 961 F.2d at 946 (citing *Shell Oil Co. v. IRS*, 772 F.Supp. 202 (D. Del. 1991)).

(M.D. Fla. 2017). The five-factor framework considers: (1) the reasonableness of precautions taken to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness. *Id.* All factors favor Defendants.

***Defendants took reasonable precautions to prevent the inadvertent disclosure.*** Counsel's privilege review process in this case was calibrated to the privileges Plaintiffs' then-served requests for production put at issue. Ex. F ¶¶ 9–12. Specifically, prior to the inadvertent disclosure, Plaintiffs had served three requests for production (the "RFPs"). *Id.* ¶ 6. None of the eighty-eight (88) requests in the RFPs directly sought—or even referenced—Secretary Dixon's testimony-preparation materials. *Id.* ¶¶ 6–9. The at-issue documents likely were produced due to Plaintiffs' broad search terms, which included a request for all communications sent or received by "any FDC central office employee," "any FDC regional-level employee for Region 4," and/or "any FDC employee at Dade CI" "containing any of the following search terms: 'heat index', 'heat mitigation,' 'heat sensitive', 'heat-sensitive', 'heat rash', 'heat stroke', or 'heat exhaustion'." *Id.* ¶ 8.

Given the nature of the RFPs, Defendants' counsel performed a standard privilege review focusing on the attorney-client and work product privileges. *Id.* ¶¶ 5, 10–14. That process involved identifying over thirty attorneys that potentially could appear on documents, batching those documents out to reviewers to confirm whether they were or were not privileged, and ongoing internal discussion regarding the privilege-review process. *Id.* ¶¶ 5, 10–14. However, none of the

---

Defendants maintain that any disclosure was involuntary. Because the Eleventh Circuit has not articulated the waiver analysis applicable to the legislative process privilege, and to eliminate any doubt that no waiver occurred, Defendants proceed under Federal Rule of Evidence 502 and its five-factor framework—a more exacting standard.

at-issue documents contained any attorney participants and therefore were not flagged during the standard review process. *Id.* ¶ 15.

This result is unsurprising. The legislative and deliberative process privileges are structurally different from attorney-client privilege: they protect communications between non-attorneys about legislative or policy formulation. A standard privilege review calibrated to attorney-client privilege—which identifies privileged material by looking for attorney involvement—will not, by design, capture such documents. Demanding a party to anticipate every possible privilege at the outset, even those that are not implicated on the face of the discovery requests, would "contract rather than expand, parties' ability to manage the ever-increasing cost of production and privilege review." *In re Zetia (Ezetimibe) Antitrust Litig.*, 2019 WL 6122012, at *10 (E.D. Va. July 16, 2019) ("Over-inclusive privilege screening would likely produce even more disputes for the courts to resolve, costing time and money and potentially frustrating the free exchange of information intended under the Federal Rules.").

***Defendants promptly rectified the error.*** The rectification clock runs from discovery of the inadvertent disclosure, not the initial production of the documents. *See Liles v. Stuart Weitzman, LLC*, 2010 WL 11505149, at *5 (S.D. Fla. June 15, 2010) (rejecting the plaintiff's contention that one year, three months, and ten days was an "inordinate amount of time" for the defendant to discover that it had inadvertently produced privileged documents because "the relevant time under subpart (b)(3) is how long it took the producing party to act after it learned that the privileged or protected document had been produced."). Counsel discovered the documents while preparing for the April 8, 2026, Rule 30(b)(6) deposition, Ex. B at 3, asserted the privilege over questions probing Secretary Dixon's preparation during that deposition, *see, e.g.*,

Ex. C at 19:3–25:10, 32:20–25, 38:1–10,[5] served the clawback notice two days later, Ex. B at 3–7, and produced the privilege log on April 24, 2026, *id.* at 11–33 (correspondence between counsel).

In addition, Plaintiffs' argument that Defendants waived the privileges by failing to provide a privilege log within 14 days of producing the documents would render Federal Rule of Evidence 502(b)(3) toothless. The Rule is meant to provide protection for inadvertently produced documents *after* they are discovered, and courts apply it as such. *See, e.g.*, *Liles*, 2010 WL 11505149, at *5; *see also Absolute Activist Value Master Fund Ltd.*, 262 F. Supp. 3d at 1325–26. "Rule 502(b)(3) does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake"—much less do so within 14 days of every production. *Liles*, 2010 WL 11505149, at *5.

***The scope of discovery in this case and the extent of the disclosure favor Defendants.*** Discovery in this litigation is substantial and was substantial at the time of the inadvertent disclosure. At the time, Plaintiffs had served eighty-eight requests for production across their three RFPs. Ex. F ¶ 9. Those RFPs resulted in the production of 19,791 documents on June 13, 2025, and 30,487 documents on August 19, 2025, which included the ninety-nine documents at issue. *Id.* ¶ 9. Those ninety-nine privileged documents were a fraction of the total produced documents at the time and represent approximately 0.19% of Defendants' over-53,000-document production in the matter. *Id.* ¶ 9 & n.1.

***Overriding issues of fairness also favor Defendants.*** Permitting Plaintiffs to retain

---

[5] Consistent with *Byrd*, Defendants did not object to questions relating to Secretary Dixon's public testimony or the Department's responsive actions, only to questions probing the basis and motivation. *See* 674 F. Supp. 3d at 1106 ("The memo itself is already in the public record; testimony about what motivated its drafting . . . is privileged.").

materials reflecting the internal deliberations and legislative efforts underlying Secretary Dixon's testimony would undermine the integrity of both privileges. This is particularly important with respect to the legislative privilege, which is "unqualified" and "insurmountable" in section 1983 cases. *Pernell*, 84 F.4th at 1343–44.

Thus, under Federal Rule of Evidence 502, Defendants are entitled to a protective order shielding from discovery the inadvertently produced documents.

*Lastly*, Plaintiffs' suggestion that an *in camera* inspection "may be warranted" should be rejected. *In camera* review is not automatic—the challenging party must articulate a specific basis to question the privilege claims, *see United States v. Zolin*, 491 U.S. 554, 572 (1989), and Plaintiffs offer none. Further, the Eleventh Circuit has squarely held that a legislative-privilege holder "need not . . . peruse the subpoenaed documents, specifically designate and describe which documents [are] covered by the legislative privilege, or . . . explain why the privilege applie[s]." *Pernell*, 84 F.4th at 1343 (quoting *Hubbard*, 803 F.3d at 1311). The Department nonetheless did so here, identifying and describing each document on a detailed privilege log. *See* Ex. B at 11–33.

*   *   *   *   *

Plaintiffs' additional waiver arguments also should be rejected.

*First*, Plaintiffs' argument that Defendants failed to object to the RFPs is specious. As explained above, Plaintiffs' first three RFPs, to which Defendants were responding, did not specifically request any internal communications or deliberations related to Secretary Dixon's testimony. Ex. F ¶¶ 6–7. Those RFPs did not even reference the testimony. *Id.* at Exs. 1, 2, 3. It would have been impossible for Defendants to object to a non-existent request.

*Second*, Plaintiffs' Shea-deposition theory also fails. Ms. Shea described only the general institutional process—that Senator Bradley initiated the request and the Legislative Affairs team

-15-

assists with preparing and coordinating presentations. *See generally* Ex. D, Katherine Shea Jan. 28, 2026 Dep. Tr. at 68:21–71:11. Ms. Shea did not disclose any deliberative or privileged content. *See id.* General process descriptions are not the "purposeful, substantive disclosures" required for waiver. *Preferred Care Partners Holding Corp. v. Humana, Inc.*, 258 F.R.D. 684, 695 (S.D. Fla. 2009). To the point, at the time of her deposition, Defendants had not yet discovered the inadvertent production; waiver requires the "voluntary relinquishment of a known right." *Fla. House of Reps.*, 961 F.2d at 946. And to the extent any waiver occurred (it did not), it would only apply to Ms. Shea's responses, not the documents at issue, which were not introduced or presented at her deposition.

*Finally*, though Mr. Rummel's deposition covered questions about Secretary Dixon's actual public presentation to the Senate Appropriations Committee, Mr. Rummel did not waive any privilege claim. Defendants do not claim privilege over Secretary Dixon's public testimony or public PowerPoint presentation. Rather, and consistent with their objections at Mr. Rummel's deposition, they seek only to protect the Department's internal preparatory efforts *before* Secretary Dixon's testimony. *See Byrd,* 674 F. Supp. 3d at 1106 ("The memo itself is already in the public record; testimony about what motivated its drafting . . . is privileged."); *see* Ex. C at 19:3–25:10, 32:20–25, 38:1–10.

WHEREFORE, the Parties respectfully request that the Court schedule a discovery hearing to resolve the above-mentioned matters.

### Certificate of Conferral

Pursuant to Local Rule 7.1(a)(3), the undersigned parties hereby certify that they conferred about the relief sought in this motion in a good faith effort to resolve the issues raised in the motion and have been unable to do so.

Respectfully submitted,


Dante P. Trevisani
Florida Bar No. 72912
E-mail: dtrevisani@fji.law
Ray Taseff
Florida Bar No. 352500
E-mail: rtaseff@fji.law
Erica Downs
Florida Bar No. 120581
Email: edowns@fji.law
Florida Justice Institute, Inc.
40 NW 3rd Street Suite 200
Miami, Florida 33128
305-358-2081
305-358-0910 (Fax)


Andrew Udelsman
Florida Bar No. 1051696
Email: andy@udelsman.law


By:   *s/Dante P. Trevisani*
        Dante P. Trevisani

***Attorneys for the Plaintiff***

*s/ Carlos Haag*
Paul C. Huck Jr. (FBN: 968358)
Mathew D. Gutierrez (FBN: 94014)
Carlos Haag (FBN: 1018828)
**LAWSON HUCK GONZALEZ, PLLC**
121 Alhambra Plaza, PH1 Floor, Suite 1604
Coral Gables, FL 33134
850-825-4334
paul@lawsonhuckgonzalez.com
mathew@lawsonhuckgonzalez.com
carlos@lawsonhuckgonzalez.com
michelle@lawsonhuckgonzalez.com
anelis@lawsonhuckgonzalez.com

*Counsel for Defendants*


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 12, 2026, I electronically filed the foregoing

-17-

-18-

document with the Clerk of the Court using CM/ECF, which will electronically serve a copy on all parties who have appeared and are authorized to received Notices of Electronic Filing.

BY:   s/ *Dante P. Trevisani*
          Dante P. Trevisani