**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 24-24253-CV-WILLIAMS**

DWAYNE WILSON, *et al.*,

Plaintiffs,

v.

RICKY DIXON, *et al.*,

Defendants.
___________________________________/

**ORDER**

**THIS MATTER** is before the Court on Defendants' motions to disqualify the undersigned from presiding over this pending case. On August 13, 2026, after the close of evidence and before closing remarks at the hearing on class certification, Defendants *ore tenus* moved for disqualification. (DE 251 at 4:21–24). On August 18, 2026, Defendants supplemented their *ore tenus* motion with a written Motion for Disqualification Under 28 U.S.C. §§ 455(a) & (b)(1) (DE 255) ("***Motion to Disqualify***"). The Motion to Disqualify is fully briefed and ripe for review.[1] For the reasons set forth below, the Motion to Disqualify is **DENIED**.

## I. BACKGROUND

On October 31, 2024, three individuals incarcerated at Dade Correctional Institute ("***Dade CI***"), the named Plaintiffs, filed a class action Complaint (DE 1) challenging the conditions of their confinement. Plaintiffs claim that the facility's heat and lack of ventilation unconstitutionally subject them to a substantial risk of harm and that Dade CI

[1] On August 24, 2026, Plaintiffs filed their Response (DE 262), and on August 27, 2026, Defendants filed their Reply (DE 267).

does not make reasonable accommodations for those with disabilities. (DE 1 ¶¶ 1, 53, 361–63). Plaintiffs seek declaratory and injunctive relief on three claims: violations of the Eighth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 (Count I);[2] violations of the Americans with Disabilities Act (Count II); and violations of the Rehabilitation Act (Count III). (*Id.* at 57–62). On November 2, 2024, Plaintiffs moved for class certification, asking the Court to certify the class of incarcerated individuals at Dade CI and two subclasses: a heat sensitive subclass and a disability subclass. (DE 4 at 1–2). Defendants filed their Response (DE 22) on December 17, 2024, and Plaintiffs filed their Reply (DE 33) on January 17, 2025. No additional motions were filed related to class certification at that time.

On September 26, 2025, the Court issued an Order Granting Class Certification (DE 63) ("***Order***"). Defendants sought permission to appeal the Order, and Plaintiffs moved the Court to incorporate evidence adduced during discovery into the Order. (DE 82 at 1; DE 82-1 at 8). "The [P]arties then conferred and agreed that the best course of action was to defer consideration of the pending motion for clarification and allow the parties to separately brief issues relating to class certification at the close of discovery." (DE 156 at 2); *see* (DE 116 at 2). The Court held a status conference on the matter on January 16, 2026. (DE 124). Since then, Plaintiffs have sought a new class certification order incorporating additional evidence, and Defendants have sought to decertify the classes. (DE 156; DE 160).

In briefing the question of class certification, the Parties extensively cited *Yates v.*

---

[2] Plaintiffs allege that Defendants violated the Cruel and Unusual Punishment Clause as incorporated into and applied to the states through the Fourteenth Amendment's Due Process Clause. (DE 1 ¶ 346).

*Collier*, 868 F.3d 354 (5th Cir. 2017), a similar case where a class of incarcerated individuals challenged the conditions of their confinement due to excessive heat.[3] In affirming the trial court's ruling in *Yates*, the Fifth Circuit pointed out that the "district court personally toured" the unit in question. 868 F.3d at 363. Taking guidance from the case that the Parties brought to the Court's attention so consistently, the Court decided that a tour of Dade CI would be appropriate. On July 2, 2026, the Court held a status conference and requested that the Parties coordinate dates when the tour could be conducted. (DE 206). On August 6, 2026, the Court attended the tour, along with counsel for both Plaintiffs and Defendants, consistent with conditions imposed by the Parties.[4]

Then, on August 11 through August 13, 2026, the Court conducted a hearing on class certification. (DE 245; DE 247; DE 250). On August 12, 2026, Defendants called W. Lawrence Kenney, PhD to testify. Once both Parties had completed their examinations of Dr. Kenney, the Court inquired, "[d]o you know a gentleman at Harvard by the name of Barrak Alahmad?" (DE 261 at 89:5–8). Dr. Kenney answered that he did not, and the Court replied, "[o]kay. That was it. Thank you." (*Id.* at 89:9–10). No further questions were asked about Dr. Alahmad. *See* (*id.* at 89). The next day, immediately preceding closing argument, Defendants moved for the Court's disqualification. (DE 251 at 4:21–24).

---

[3] *See* (DE 4 at 12, 13, 18–19; DE 22 at 5, 10, 13–14, 20; DE 33 at 5–7, 10; DE 89 at 7; DE 92 at 6, 8; DE 156 at 15–16, 18, 22; DE 160 at 6–7, 30; DE 181 at 3–6, 12, 15, 18–19, 28; DE 182 at 5, 15–16, 22–23; DE 195 at 2, 4, 6, 8, 11–12; DE 202 at 1–3, 11).

[4] The Joint Notice Regarding Site Visit filed by the Parties stated, "all the ordinary third-party, site-visit governing protocols and rules will apply." (DE 212 at 2). That included "prior screening and authorization of each individual entering the facility, no pictures taken, no speaking with inmates except for non-substantive greetings, no recording devices, and no firearms or other weapons on the premises." (*Id.*)

## II. LEGAL STANDARD

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "The test is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *Simmons v. Warden*, 589 F. App'x 919, 922 (11th Cir. 2014) (citation and quotation marks omitted).

A judge "shall also disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . ." 28 U.S.C. § 455(b).

> For bias to be sufficient to disqualify a judge, it generally must arise from extrajudicial sources. If instead, the alleged bias arises from the judge's remarks or opinions during the course of judicial proceedings (and not from extrajudicial sources), the party moving for disqualification must clear a much higher hurdle. The opinions formed by a judge on the basis of facts introduced or events occurring during judicial proceedings are not a basis for a bias or partiality challenge unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

*Klayman v. City Pages*, 650 F. App'x 744, 748 (11th Cir. 2016) (citations and quotation marks omitted).

For example:

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.

*Liteky v. United States*, 510 U.S. 540, 550–51 (1994). "Thus the only cases where courts have granted recusal motions based on in-trial conduct tend to involve singular and

startling facts." *Belue v. Leventhal*, 640 F.3d 567, 573 (4th Cir. 2011). "If it were otherwise—if strong views on a matter were disqualifying—then a judge would hardly have the freedom to be a judge." *Id.* at 573.

"[C]ourts will reject what appear to be strategic motions to recuse a judge whose rulings have gone against the party." *In re United States*, 441 F.3d 44, 65 (1st Cir. 2006). "[T]he disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." *Id.* at 68 (emphasis in original) (quoting *In re Allied–Signal Inc.*, 891 F.2d 967, 970 (1st Cir.1989)). The disqualification statute is not "intended to bestow a veto power over judges, or to permit 'judge-shopping.'" *Smartt v. United States*, 267 F. Supp. 2d 1173, 1177 (M.D. Fla. 2003) (citing *United States v. Greenspan,* 26 F.3d 1001, 1006 (10th Cir.1994)).

## III. DISCUSSION

First, Defendants argue that the undersigned must be disqualified because she read an article in *The New York Times* ("***The New York Times Article***"), which they contend establishes extrajudicial bias. This is the only claim of extrajudicial bias. Second, Defendants claim that the undersigned's impartiality might reasonably be questioned due to her decision to tour Dade CI. Lastly, Defendants argue that the undersigned's impartiality might reasonably be questioned due to the issuance of adverse rulings against them and the few questions the Court posed to witnesses during the class certification hearing. The Court finds each of these bases for disqualification unavailing and addresses them in turn.

### *A. The New York Times Article*

Defendants contend that disqualification is warranted under both 28 U.S.C. § 455(a) and (b)(1) because the undersigned read *The New York Times* Article. This argument is predicated on a single question posed to Dr. Kenney at the end of the Defendants' redirect examination: whether he knows "a gentleman at Harvard by the name of Barrak Alahmad." (DE 251 at 5:9–17; DE 261 at 89:7–8). Upon being presented with Defendants' *ore tenus* disqualification motion referencing the question, the undersigned directed the Parties to *The New York Times* Article published the previous morning, which the undersigned read with her morning coffee.[5] (DE 251 at 15:24–25, 16:1–2).

Starting with § 455(a), the Court's review of *The New York Times* Article could not reasonably call her impartiality into question. "Judges do not violate the Constitution by consulting their own funds of knowledge about the world, or by augmenting that knowledge. . . . No judge is required to approach a case in complete ignorance." *Dean v. Colvin*, 585 F. App'x 904, 904 (7th Cir. 2014). In fact, courts may take judicial notice of newspaper articles on topics directly pertaining to litigation, and doing so is not a ground for disqualification. *See Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1065 (N.D. Ill. 2004) ("To characterize taking judicial notice of a newspaper article on the front page of the Chicago tribune or a court filing as an 'investigation' simply is incorrect.").

---

[5] *The New York Times* Article discusses the effect of heat on outdoor workers. Kurtis Lee, *Heat Kills Hundreds of Workers Each Year. A Postal Carrier Was One.* N.Y. TIMES (Aug. 12, 2026), https://www.nytimes.com/2026/08/12/business/extreme-heat-worker-deaths.html. Defendants state, "The *New York Times* article contains a link to a separate article describing Dr. Alahmad's study along with its conclusions . . . ." (DE 255 at 7). The Court was unaware of any link, read no related article or study that morning, and has not done so since.

A judge's impartiality may not reasonably be in doubt even where they have read an article about the very incident at issue in a case. In *United States v. Carey*, 929 F.3d 1092, 1104 (9th Cir. 2019), the Ninth Circuit decided whether a magistrate judge who read an online article about the defendant, including his personal history and involvement in the pending criminal case, should have recused himself. The court declined to find recusal was warranted, reasoning:

> We agree that a reasonable person would not have questioned the magistrate judge's impartiality based solely on a reference to a potentially prejudicial article that had no other apparent impact on the verdict. We cannot expect judges to live as moles, roving about the limited underground landscape of the official record but never perceiving the illuminated world at the surface. In our modern, interconnected, endlessly broadcast world, complete blinders are impracticable, as a reasonable person would surely conclude. Moreover, courts have regularly held that outside knowledge does not on its own prejudice judicial proceedings.

*Id.* at 1105.

Here, the undersigned read an article, which was published by a prominent daily newspaper, that did not discuss any parties or issues to the proceedings. An objective observer would not reasonably question the undersigned's impartiality because she read *The New York Times* Article while drinking her morning coffee instead of "liv[ing] as [a] mole" and "never perceiving the illuminated world at the surface." *Id.* Moreover, if the undersigned had thought to inappropriately and surreptitiously rely on the contents of *The New York Times* Article, she would not have asked Dr. Kenney if he knew of his fellow academic mentioned in the piece and then dropped the matter altogether upon hearing that he did not.

Turning to § 455(b)(1), the Court also did not gain "personal knowledge of disputed evidentiary facts" by reading *The New York Times* Article. Defendants argue that the

phrase "personal knowledge of disputed evidentiary fact" must be interpreted broadly.[6] However, "information learned from published sources is not subject to the personal knowledge ban[.]" *In re Owens Corning*, 305 B.R. 175, 193 (D. Del. 2004); *see, e.g., Smith v. City of Chicago*, No. 21 CV 1159, 2024 WL 2722620, at *8 (N.D. Ill. May 28, 2024) ("Information that a judge obtains from the public record that is available to the general public 'is simply not the kind of *personal* knowledge of disputed evidentiary facts with which § 455(b)(1) is concerned.'") (emphasis in original) (quoting *Matter of Hatcher*, 150 F.3d 631, 635 (7th Cir. 1998)); *Matter of Hatcher*, 150 F.3d 631, 635 (7th Cir. 1998) (finding judge did not gain personal knowledge of disputed evidentiary facts because he "learned nothing about the Gangster Disciple conspiracy that any member of the public could not also have learned by attending the trial or reading a good newspaper account of its progress"). "[C]ases hold that knowledge of garden-variety facts that have not been

[6] To support their argument, Defendants cite *United States v. State of Ala.*, 828 F.2d 1532 (11th Cir. 1987). (DE 267 at 3, 5). In that case, the defendants, the state of Alabama and its institutions of higher learning, were accused of failing to take appropriate steps to remove the vestiges of racial segregation. *Id.* at 1534. The Eleventh Circuit disqualified the trial judge because he had "participated in the very events and shaped the very facts" at issue in the case. *Id.* at 1545. The trial judge had also served as counsel of record in another case in which the same defendants were sued for segregation and learned relevant information about the state's history of racially discriminatory employment practices against high school educators. *Id.* at 1546. However, the Eleventh Circuit cautioned, "[i]t would be a tragic day for the nation and the judiciary if a myopic vision of the judge's role should prevail, a vision that required judges to refrain from participating in their churches, in their non-political community affairs, in their universities." *Id.* at 1542 (quoting *Commonwealth of Pa. v. Local Union 542, Int'l Union of Operating Eng'rs*, 388 F. Supp. 155, 181 (E.D. Pa. 1974)). The trial judge's disqualification would not have been required solely "by virtue of his background as a civil rights lawyer" because "[a]ll judges come to the bench with a background of experiences, associations, and viewpoints." *Id.* at 1543. Here, undersigned has not been involved in litigation against the Parties, has not shaped the circumstances leading to the case, and has not gained any historical knowledge pertaining to the case. Therefore, the ruling of *United States v. State of Ala.* is inapposite, though its discussion regarding the role of the judiciary remains instructive.

published or otherwise disseminated will similarly not disqualify if the judge learned them merely as a member of the public." *In re Owens Corning*, 305 B.R. at 193.

Further, "cases have construed the 'disputed evidentiary fact' element narrowly[.]" *Id.* at 191; *see United States v. DeTemple*, 162 F.3d 279, 285 (4th Cir. 1998) (reasoning that knowledge of "single debt did not put [judge] on notice of [defendant's] dire financial condition" so as to warrant recusal for "personal knowledge of disputed evidentiary facts concerning the proceeding").

*The New York Times* Article was a publicly available publication that did not bestow upon the Court any personal knowledge. *The New York Times Article* also did not cover disputed evidentiary facts concerning this proceeding; it did not address the pending case, the witnesses, or the Parties. Likewise, *The New York Times* Article did not discuss at what temperature heat creates a substantial risk of serious harm, whether there is a temperature at which heat would cause a substantial risk of serious harm to all people, or, more to the point of this case, how heat affects the incarcerated population. Instead, it discussed, at a general level, the topic of how states across the country are addressing heat's effect on outdoor workers by telling the story of a postal carrier in Texas. *See* Kurtis Lee, *Heat Kills Hundreds of Workers Each Year. A Postal Carrier Was One.* N.Y. TIMES (Aug. 12, 2026), https://www.nytimes.com/2026/08/12/business/extreme-heat-worker-deaths.html. As such, disqualification is not warranted on the basis that the undersigned read the New York Times Article under either § 455(a) or (b).

***B. The Site Visit***

Defendants next contend that it was improper for the Court to conduct a visit to

Dade CI over their objection.[7] (DE 255 at 3, 11). Again, the Court notes that the Parties extensively briefed the importance of *Yates* to this case. *See supra* note 3. In fact, in Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification, Defendants argued that the Court should not yet decide the class certification question because "additional discovery may be necessary for purposes of class certification." (DE 22 at 5). To that end, they stated, "[i]ndeed, in the **blueprint case** for this class action, *Yates v. Collier*, the district court ruled on the motion for class certification only after '**[t]he district court personally toured the [facility]** and held a four day evidentiary hearing[.]'" (*Id.*) (emphasis added) (quoting *Yates*, 868 F.3d at 363).[8] Defendants cannot argue in

---

[7] Any objection that Defendants may have attempted to make to the site visit was waived. The Court first discussed the prospect of touring Dade CI at the status conference on January 16, 2026. (DE 126 at 18:20–21). It was not until the status conference on July 2, 2026 that Defendants made their alleged objection to the site visit. (DE 255 at 11 n.7). At that status conference, Defendants argued why a site visit would be unnecessary in this case and stated they would "reserve" an objection. The Court directed Defendants to consider whether they actually had a strenuous objection, determine whether the objection would be to using evidence from the site visit for the class certification question or only the merits question, and submit authority in support of any objection. Defendants did not file any pleading articulating their objection, stating what they objected to specifically, or providing the Court with authority supporting an objection. Therefore, any objection was waived. *Cf. Lexington Ins. v. Cooke's Seafood*, 835 F.2d 1364, 1368 (11th Cir. 1988) ("Given that the trial judge had required the parties to submit their objections in writing, the judge did not abuse his discretion by overruling the objection as waived."). Notably, the Parties filed a Joint Notice Regarding Site Visit, in which they outlined their availability and agreed to the scope of the site visit, but it did not set forth an objection to the visit. (DE 212).

[8] Defendants appear to take issue with the Court interpreting their explicit reference to a site visit, in a case they argued was a "blueprint," as "inviting" the Court to visit Dade CI prior to deciding the issues in this case. (DE 255 at 3, 10–11). At the January 16, 2026 status conference, many months before the disqualification issue was raised, the Court explained that it interpreted the pleadings to be an invitation to tour Dade CI. (DE 126 at 10:4–6) ("In one of the pleadings you mentioned the case where in that instance not only had there been more discovery, but the judge had gone to see the facility."). Whether or not Defendants intended the Court to view their citation of the *Yates* case as an invitation,

one breathe that the Court may not properly decide the class certification question without conducting a site visit and then credibly argue in another that conducting a site visit mandates the Court's disqualification.

Even had Defendants not referenced language suggesting that the Court should conduct a site visit prior to making a class certification determination, a site visit would still have been proper. "[I]t is frequently said that even without express statutory authorization there is an inherent power in the trial judge to order a view by the jury, or, in a judge-tried case, to take a view personally." ROBERT P. MOSTELLER ET AL., MCCORMICK ON EVIDENCE § 219 (9th ed. 2025). This is a standard practice. *See, e.g.*, *Muhammad v. N.Y.C. Dep't. of Corrs.*, 126 F.3d 119, 122 (2d Cir. 1997) (noting that trial court conducted a site visit to prison during bench trial); *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1210 (M.D. Ala. 2017), *aff'd sub nom. Dunn v. Comm'r, Alabama Dep't of Corr.*, 179 F.4th 1277 (11th Cir. 2026) (court discussing observations from tour of prison in its judgment); *see also Kane Cty. v. United States*, No. 2:10-CV-1073, 2018 WL 4855267, at *3 (D. Utah Oct. 5, 2018) (deciding to conduct site visit over objection of intervenor-defendants because it would "produce relevant evidence and is an important part of the court's ability to understand and place in context the evidence presented at trial").

Defendants complain that they have been prejudiced by this commonly accepted practice because "the Court that serves as the factfinder in this case is now an eyewitness to the centrally disputed facts." (DE 255 at 3). As a result, "Defendants have no means to discover what impressions the Court formed at Dade CI or how the Court believes they

undersigned's characterization of the argument as such does not reasonably call her impartiality into question.

bear on the decisions before the Court." (*Id.*) A similar argument was rejected by the Eleventh Circuit in *Glassroth v. Moore*, 335 F.3d 1282, 1291 (11th Cir. 2003). In that case, attorneys sued the Chief Justice of the Alabama Supreme Court for installing a monument to the Ten Commandments in the Alabama State Judicial Building. *Id.* at 1284. The trial judge visited the monument site and the Chief Justice argued on appeal that this was error. *Id.* at 1289. However, the Eleventh Circuit found no "procedural irregularity" with the site visit "because the district court judge undertook the view only after fully discussing the matter with counsel for both sides and scheduling the time of the viewing with counsel in advance," as the Court did here. *Id.*

The defendant in *Glassroth* also complained that "the district court did not state its findings from the view into the record so that the parties would have had an opportunity to challenge them." *Id.* at 1290–91. The Eleventh Circuit found this argument unpersuasive, explaining that "factfinders traditionally do not state facts into the record before deciding the case" and that "if either side had wanted those findings stated into the record before a decision was made, it should have requested that extraordinary procedure." *Id.* at 1291. Neither Party has made such a request in this case. Thus, Defendants ignore precedent and procedure and instead proceed to request disqualification, a week after the site visit and at the conclusion of the class certification hearing. Their argument is unavailing.

### *C. Questioning and Rulings During Evidentiary Hearing*

Lastly, Defendants cobble together various instances where they contend the Court "unilaterally injected" itself into the proceedings or did not rule in their favor to argue that the undersigned is not impartial. (DE 255 at 3, 10). Contrary to their assertions and

consonant with the law, the Court acted within its discretion to manage the hearing and adduce relevant evidence. Such conduct does not create any reasonable question as to the undersigned's impartiality.

First, Defendants question the undersigned's impartiality because she asked whether there might be separation of powers concerns attendant to Defendants' argument that plaintiffs must plead detailed, granular, and prescriptive injunctive relief against executive agencies, as opposed to pleading in a manner that allows for the exercise of agency discretion in implementing the relief. (DE 255 at 12). Defendants contend that this supplied Plaintiffs with an argument that they had not yet made. (*Id.*) They also question the undersigned's impartiality for asking whether it would be appropriate to reopen discovery as to whether Defendants purposely committed an act that mooted Plaintiff Harris's claims. (*Id.* at 12). But neither of these questions "display[ed] a deep-seated favoritism or antagonism that would make fair judgment impossible." *Klayman*, 650 F. App'x at 748. Instead, the Court was requesting the opinion of the Parties related to two legal issues presented by Defendants: the specificity with which Plaintiffs must plead the requested relief and whether Mr. Harris's claim has become moot. (DE 160 at 25; DE 202 at 13). Defendants' argument suggests that courts should refrain from asking the parties about the law and its application because doing so indicates agreement with one side over another. Adopting this position would completely preclude any court from fulfilling its core responsibility: understanding governing precedent and litigants' arguments to arrive at well-reasoned decisions.

Additionally, Defendants argue that the Court's questions of the witnesses and

rulings regarding their testimony suggest that the undersigned is not impartial.[9] "Trial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, confusion of the issues or interrogation that is repetitive or only marginally relevant." *Clotaire*, 963 F.3d at 1296 (citation and quotation marks omitted). Additionally, "[a] district judge is free to interject during a direct or cross-examination to clarify an issue, to require an attorney to lay a foundation, or to encourage an examining attorney to get to the point." *United States v. Washington*, 417 F.3d 780, 784 (7th Cir. 2005). That is because a trial judge "is more than a mere moderator and is under a duty to question witnesses and comment on evidence when it appears necessary." *United States v. Block*, 755 F.2d 770, 775 (11th Cir. 1985).

Even disproportionate exercise of a district court's authority, such as by interrupting one party more than another, may not create a reasonable question as to the

---

[9] During argument on their *ore tenus* motion to disqualify, Defendants complained that they did not get the exact same amount of time as Plaintiffs to examine Plaintiffs' witness, Dr. Vassallo. (DE 251 at 11:13–15) ("I requested for Dr. Vassallo the same amount of time that the plaintiffs had with her. They had an hour 45. I had an hour 25."). They do not appear to still be pursuing this argument, as it is absent from their written Motion and Reply. *See* (DE 255; DE 267). Either way, the Court finds this argument unpersuasive. Defendants requested "maybe an hour, hour 30 minutes" to cross-examine Dr. Vassallo and agreed to finish the day at 2:00pm. (DE 260 at 109:3–14). Further, they were neither time efficient nor rule compliant. During Defendants' cross-examination, they repeatedly read excerpts from the deposition of Dr. Vassallo and asked her if she still agreed with her prior testimony. *See* (DE 260 at 131–135, 147–149). This was done neither to refresh her recollection nor to impeach her. (*Id.*) As Dr. Vassallo's deposition had already been entered into evidence, Defendants' questions had no particular probative value. The Court's decision to limit this practice and the examination itself was neither erroneous nor a basis for disqualification. *See United States v. Clotaire*, 963 F.3d 1288, 1296 (11th Cir. 2020) (affirming trial court's limitations on cross-examination and the introduction of evidence about "[t]he professional background of Broadhurst's supervisor, the number of people on the grand jury, and Yvenel's original arrest warrant" because they were "only marginally relevant and could have confused the real issues").

judge's impartiality.[10] *See United States v. Landerman*, 109 F.3d 1053, 1066 (5th Cir.), *opinion modified on reh'g*, 116 F.3d 119 (5th Cir. 1997) ("A careful review of the record indicates that Judge McBryde did allow the Government more leeway during its questioning and did interrupt defense counsel's questioning more often than the Government's questioning. Nevertheless, we are not convinced that the judge's remarks and actions were such that a reasonable person would harbor doubts about the judge's partiality."). That is particularly the case where, as here, the trial court needed to clarify the testimony being elicited.[11] *See Block*, 755 F.2d at 775–76 (noting that "the trial court

[10] Defendants argue, "the Court's own questioning of the witnesses followed the same one-directional pattern—no questions for Plaintiffs' expert, repeated examination of Defendants' experts." (DE 255 at 14). Even though this would not be a basis itself for disqualification, the Court disagrees with this characterization. The Court asked very few substantive questions during the two days of witness testimony, none of which amounted to "repeated examination" of Defendants' two experts. The Court asked Dr. Kenney only one "substantive" question at the end of his testimony, whether he knew Dr. Barrak Alahmad. (DE 261 at 89:5–12). The only other questions the Court asked Dr. Kenney were whether he would like coffee, (*id.* at 20:3–6), whether he reviewed articles in coming to his conclusions (the answers to which led the Court to overrule Plaintiffs' objections to Dr. Kenney's testimony), (*id.* at 33:10–18, 63:6–8, 63:19–23), clarification on what was represented on the graph about which Dr. Kenney was testifying, (*id.* at 58:9–12, 58:24–25), and clarification on the article to which Dr. Kenney was referring in his testimony, (*id.* at 87:11–12). Similarly, by the Court's count, it only asked Dr. Chaudhuri six arguably substantive questions. Three of these questions were to clarify whether he was given the underlying data and records behind the Correctional Medical Authority audit about which he was testifying (a document that Plaintiffs claim had not been provided to them and that was not on Defendants' exhibit list), (*id.* at 102:3–5, 103:5–25, 181:4–5), another was about whether diet is something that helps with diabetes management, (*id.* at 111:4), and the last two were about whether he knew if Dade CI has an endocrinologist on staff, (*id.* at 197:18–21, 198:5–6). The remaining questions were whether he had or needed water, (*id.* at 99:1–2), whether he was okay, (*id.* at 132:12–13), clarification of what type of temperature data he was trying to explain a certain study was missing, (*id.* at 136:1–18), whether he could speak into the microphone, (*id.* at 162:23–24), and clarification of his testimony as to whether he completed the qualifications necessary to be board certified in pulmonology and correctional medicine, (*id.* at 163:12–18, 164:14–16).

[11] A vast majority of the Court's limited questioning of the witnesses was to clarify the testimony of Defendants' experts. *See supra* note 10.

may interrogate a witness to clarify his testimony" in affirming conviction after trial judge asked defendant "12 questions during his direct testimony and 33 questions during cross-examination"); *United States v. Butler*, 275 F. App'x 816, 818 (11th Cir. 2008) (finding "no abuse of discretion" in case where trial "court asked questions of appellants, other defense witnesses, and witnesses for the prosecution to elicit further facts and to clarify evidence already presented").

Though a judge's adverse rulings alone do not create a basis for their disqualification, even when erroneous, the Court briefly addresses the conduct that Defendants challenge. First, Defendants complain that the Court "rehabilitated" Dr. Vassallo when Defendants were attempting to impeach her. (DE 255 at 14–15). However, Defendants were misquoting Dr. Vassallo's prior testimony in an improper attempt at impeachment.[12] The Court neither rehabilitated the witness nor indicated any impartiality by curbing this questioning. Defendants also complain that the Court prevented them from questioning their expert, Dr. Chaudhuri, about the topic of Center for Disease Control ("***CDC***") recommendations. (DE 255 at 16–17). The Court prevented questioning

---

[12] Defendants asked Dr. Vassallo about "whether electric fans can be used safely even if the indoor dry-bulb temperature exceeds 35 degrees Celsius." (DE 260 at 167:8–12). Dr. Vassallo did not answer directly about that temperature but stated, "I think the use of electric fans **in most circumstances** is safe." (*Id.* at 167:17–18) (emphasis added). Defendants then informed Dr. Vassallo that the same question had been asked during her deposition. (*Id.* at 168:5–10). Dr. Vassallo responded that she still disagrees with the assertion that "[e]lectric fans can be used safely even if the indoor dry-bulb temperature exceeds 35 degrees Celsius since they significantly increase the amount of sweat that evaporates from the skin." (*Id.* at 168:5–14). In response, Defendants told Dr. Vassallo, "[y]ou just testified when I asked you that you agree with it." (*Id.* at 168:16–17). The Court observed that she did not contradict herself, as she initially made the uncontroversial statement that "electric fans can be used safely." (*Id.* at 168:18–19). This was an accurate correction of Defendants' misquotation of the prior testimony and an effort by the Court to move the questioning forward.

regarding how one should interpret CDC guidelines that are based on epidemiological studies. (DE 261 at 157:18–25, 158:1–14). But the Court allowed both Plaintiffs on cross-examination and Defendants on redirect examination to question Dr. Chaudhuri regarding his opinions on the CDC's specific recommendations as to how people with diabetes can manage the heat. (*Id.* at 166:18–20) ("If you want to ask the doctor specific questions on the CDC document and his opinion, you can do so in redirect."). Defendants' argument that the Court indicated bias by *sua sponte* objecting to their questioning is likewise unavailing. *United States v. Smith*, 452 F.3d 323, 333 (4th Cir. 2006) ("The district court's sua sponte objections to particular questions were similarly permissible."). The Court's admonishment was directed to Counsel leading during their redirect examination of their own expert. *See* (DE 261 at 196:16–21, 197:3–5).

These rulings do not amount to "singular and startling facts," *Belue*, 640 F.3d at 573, or clear the "high[] hurdle" required for disqualification due to a judge's actions during the course of judicial proceedings, *Klayman*, 650 F. App'x at 748. Case law demonstrates the type of exceptional conduct that is necessary to mandate disqualification stemming from judicial acts, which is not present in this record. *Compare Liteky v. United States*, 510 U.S. 540, 556 (1994) (finding disqualification not warranted despite judge's repeated admonishment of counsel in front of the jury, "the questions he put to certain witnesses, his alleged 'anti-defendant tone,' his cutting off of testimony said to be relevant to defendants' state of mind, and his post-trial refusal to allow petitioners to appeal in forma pauperis"); *United States v. Barr*, 960 F.3d 906, 921 (7th Cir. 2020) (holding that judge's interruption of counsel at sentencing and comments "that could be perceived as hostile" did not require recusal); *Burley v. Gagacki*, 834 F.3d 606, 616–17 (6th Cir. 2016)

(affirming district court's denial of disqualification motion premised on the judge's conduct interrupting counsel, "instructing plaintiffs' counsel to use the question and answer format during cross-examination, reminding a witness to testify truthfully, . . . and questioning the merits of plaintiffs' case-in-chief"); *United States v. Harris*, 720 F.2d 1259, 1261 (11th Cir. 1983) (finding trial judge did not "did not impermissibly stray from neutrality" despite "concern[ing]" statement to the jury that attorney "intentionally attempted to mislead you"), *with United States v. Craven*, 239 F.3d 91, 103 (1st Cir. 2001) (concluding disqualification required where judge ex parte consulted with court-appointed experts about the case and then based its decision on those conversations); *Lyell v. Renico*, 470 F.3d 1177, 1187 (6th Cir. 2006) (finding disqualification warranted due to judge's "derogatory tone," "implicit disapproval of defense counsel's theory of the case" in front of the jury, and encouragement that the prosecutor "ask a question even after the prosecutor explained that it would elicit inadmissible hearsay").

Even if erroneous and no matter how much Defendants misapprehend or disagree, the Court's conduct does not come close to resembling the extraordinary level requiring disqualification. *See Carter v. W. Publ'g Co.*, No. 99-11959, 1999 WL 994997, at *2 (11th Cir. Nov. 1, 1999) ("Congress required that a judge's impartiality must '*reasonably* be questioned' in order for the judge to recuse, because 'there is the need to prevent parties from ... manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking.'") (quoting *Fed. Deposit Ins. Corp. v. Sweeney* 136 F.3d 216, 220 (1st Cir.1998) (internal quotation marks omitted)).

## IV. CONCLUSION

The undersigned has not acquired personal knowledge of disputed evidentiary

facts concerning this proceeding. Additionally, for the reasons set forth above, none of Defendants' claims regarding the Court's handling of the site visit or class certification hearing are meritorious. Therefore, when considered both individually and collectively, Defendants' arguments would not reasonably cause an objective observer to question the undersigned's impartiality. Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion to Disqualify (DE 255) is **DENIED**.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 4th day of September, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE