**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 24-24253-CV-WILLIAMS**

DWAYNE WILSON, *et al.*,

Plaintiffs,

v.

RICKY DIXON, *et al.*,

Defendants.

_________________________________/

**ORDER**

**THIS MATTER** is before the Court on Plaintiffs' Renewed Motion for Class Certification (DE 156) ("***Renewed Motion to Certify***"), and the Defendants' Motion to Decertify the Classes (DE 160) ("***Motion to Decertify***" or, together with the Renewed Motion to Certify, "***Certification Motions***"). The Certification Motions are fully briefed and ripe for review.[1] For the reasons set forth below, the Renewed Motion to Certify is **GRANTED** and the Motion to Decertify is **DENIED**.[2]

## I. BACKGROUND

On October 31, 2024, Dwayne Wilson ("***Mr. Wilson***"), Tyrone Harris ("***Mr. Harris***"), and Gary Wheeler ("***Mr. Wheeler***," or collectively with Mr. Wilson and Mr. Harris, "***Named Plaintiffs***") filed suit against Dade Correctional Institute ("***Dade CI***"), its warden, Francisco Acosta, and the Secretary of the Florida Department of Corrections ("***FDC***"),

[1] On June 22, 2026, Plaintiffs responded to the Motion to Decertify and Defendants responded to the Renewed Motion to Certify. (DE 181; DE 182). On June 29, 2026, the Parties filed their respective Replies. (DE 195; DE 202).

[2] The Court uses the CM/ECF pagination throughout this Order, rather than the document pagination.

Ricky Dixon (collectively, "***Defendants***"). (DE 1). At the time the Complaint (DE 1) was filed, all three Named Plaintiffs were incarcerated at Dade CI. (DE 1 ¶¶ 8-10). Plaintiffs allege that the conditions at Dade CI, namely the heat and lack of ventilation, subject them to a substantial risk of serious harm. (DE 1 ¶¶ 1, 5). They seek declaratory and injunctive relief on three claims: violations of the Eighth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 (Count I);[3] violations of the Americans with Disabilities Act ("***ADA***") (Count II); and violations of the Rehabilitation Act (Count III). (*Id.* at 57–62).

On November 2, 2024, Named Plaintiffs filed their initial Motion for Class Certification (DE 4), seeking to represent the current and future incarcerated population at Dade CI as well as two subclasses: a heat sensitive subclass and a disability subclass. Plaintiffs alleged that Dade CI's "extreme conditions cause heat exhaustion and heat stroke, and exacerbate serious medical conditions, putting everyone at risk of serious medical complications, including heart attacks, strokes, and death." (DE 4 at 1). However, the "conditions put those with certain medical conditions and disabilities at a particularly high risk." (*Id.* at 2). The heat sensitive subclass is defined as:

> [M]embers of the general class who either: 1) have a physiological condition that places them at increased risk of heat-related illness, injury, or death (including, but not limited to, obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, chronic obstructive pulmonary disease, cystic fibrosis, asthma, sweat gland dysfunction, and thyroid dysfunction); or 2) are prescribed an anticonvulsant, anticholinergic, antipsychotic, antihistamine, antidepressant, beta blocker, or diuretic; or 3) are over age 65.

(*Id.*) The disability subclass includes "members of the general class who have a disability

[3] Plaintiffs allege that Defendants are violating the Cruel and Unusual Punishment Clause as incorporated into and applied to the states through the Fourteenth Amendment's Due Process Clause. (DE 1 ¶ 346).

that substantially limits one or more of their major life activities and who are at increased risk of heat-related illness, injury, or death due to their disability or any medical treatment necessary to treat their disability." (*Id.*) Plaintiffs allege that Dade CI has failed to make reasonable accommodations, such as screening those with disabilities for appropriate housing. (DE 1 ¶¶ 361, 363).

On December 17, 2024, Defendants filed their Response to Plaintiffs' Motion for Class Certification (DE 22), and on January 17, 2025, Plaintiffs filed their Reply (DE 33). On September 26, 2025, the Court issued an Order Granting Class Certification (DE 63) ("***Certification Order***").[4] Notably, on June 11, 2025 – after Named Plaintiffs filed their Motion to Certify on November 2, 2024 but before the Court ruled on it on September 26, 2025 – Defendants transferred Mr. Harris from Dade CI to another correctional facility. (DE 160 at 26). However, the Court was not notified of Mr. Harris's transfer until May 26, 2026, when Defendants filed their Motion to Decertify. (*Id.*)

Following issuance of the Certification Order, Defendants sought permission to appeal the Order, and Plaintiffs moved the Court to incorporate evidence adduced during discovery into the Order (DE 82) ("***Motion to Supplement***"). "The [P]arties then conferred and agreed that the best course of action was to defer consideration of the pending [Motion to Supplement] and allow the parties to separately brief issues relating to class certification at the close of discovery." (DE 156 at 2); *see* (DE 116 at 2). The Court held a status conference on January 16, 2026 and decided to defer ruling on Plaintiffs' Motion to Supplement until the Parties filed their Certification Motions upon the close of

[4] The Court certified the general class and subclasses, as defined in Plaintiffs' initial Motion for Class Certification. (DE 63 at 22).

discovery. (DE 126 at 9:15–25, 20:23–25, 21:1–9).

Then, on May 25, 2026, Plaintiffs filed their Renewed Motion to Certify (DE 156). The following day, Defendants filed their Motion to Decertify (DE 160). Both Parties attached a lengthy set of exhibits to the Certification Motions. *See* (DE 156; DE 160). On August 11 through 13, 2026, the Court held an evidentiary hearing on the class certification issue ("***Hearing***"). For the Court's consideration at the Hearing, the Parties submitted exhibit and witness lists. (DE 235–238). The Court has fully reviewed the Certification Motions, the exhibits submitted by the Parties, the testimony adduced at the Hearing, and the arguments of counsel.

## II. EVIDENCE ADDUCED

The Parties filed an extensive list of exhibits, including deposition transcripts, expert reports, peer-reviewed articles, email correspondence between Dade CI personnel, and Dade CI records.[5] *See* (DE 156, DE 160; DE 236; DE 238). At the Hearing, the Parties called experts to supplement their written reports. Plaintiffs called Dr. Susi Vassallo, and Defendants called William Lawrence Kenney, PhD and Dr. Ajay Chaudhuri. The Court reviewed all evidence presented by the Parties and will briefly recount facts pertinent to its ruling, starting with the information contained in the exhibits.

### *A. Exhibits*

[5] In their Joint Motion for Status Conference and/or Clarification (DE 188), the Parties stated they "wish to stipulate that all documents, depositions, and other exhibits that have been or will be filed in conjunction with the class certification briefing will be considered part of the class certification record, without having to introduce such materials at the hearing, without waiving any objections or arguments they may have to the use of such documents for class certification purposes. The Parties also wish to stipulate that any document that will be specifically referenced or relied upon at the hearing will be disclosed on an exhibit list at least 14 days before the hearing." (DE 188 at 4). The Parties reiterated this joint stipulation at the Hearing. (DE 260 at 11:5–15, 17:4–13).

The exhibits filed by the Parties address three main issues: 1) the conditions at Dade CI; 2) how these conditions affect the general population incarcerated at Dade CI; and 3) how these conditions affect members of the subclasses incarcerated at Dade CI.

**1. The heat and ventilation at Dade CI**

FDC does not record the temperature at its facilities. (DE 156-35 at 5). Therefore, when ruling on Named Plaintiffs' original Motion to Certify, the Court relied on the temperature measurements at three nearby facilities to estimate the temperature at Dade CI. (DE 63 at 2). Since that time, Plaintiffs were allowed to install sensors in the Dade CI dormitories, which measured temperature and relative humidity in five-minute intervals from May 23, 2025 through October 3, 2025. (DE 160 at 11–12; DE 160-23 ¶ 50). One of Plaintiffs' experts, Stefano Schiavon, Ph.D.,[6] analyzed the data. (160-23 ¶ 23). "Heat stress conditions were aggregated and summarized by location across the study period." (*Id.* ¶ 54). Dr. Schiavon found:

> The overall median heat index was 98.3°F, with an overall maximum of 119.4°F. **Across all locations**, the threshold of 88° was surpassed 97% of the time, the threshold of 93°F was surpassed 85% of the time, the threshold of 98°F was exceeded 52% of the time, the threshold of 103°F was exceeded 15% of the time, and the threshold of 108°F was exceeded 1% of the time.

(*Id.* ¶ 55) (emphasis added). Dr. Schiavon's expressed his findings in the form of numerous charts, including the following:

[6] Dr. Schiavon is a Professor of Architecture and a Professor of Civil and Environmental Engineering at the University of California, Berkeley. (DE 160-23 ¶ 1).




(*Id.* ¶ 61).

Dr. Schiavon further concluded:

> In general, across the prison, the indoor heat index is **higher** than the outdoor heat index about 80% of the time. . . . If outdoor heat index values must be used, a less accurate approach, adding 14°F to the outdoor value would approximate the indoor heat index and capture about 75% of the observed difference between indoor and outdoor conditions.

(*Id.* ¶ 84) (emphasis added). Dr. Schiavon ultimately opined, "[a]ll of the data demonstrate the heat index levels are dangerously high." (*Id.* ¶ 87).

**2. Heat's effect on the general incarcerated population**

The Parties and their experts do not appear to dispute whether heat can, directly

or indirectly, cause serious health issues.[7] This determination is aligned with the National Commission on Correctional Health Care's position that "[h]igh temperatures impose physiological stress on the human body, putting older people, those with mental disorders, those who take medications that affect body temperature regulation, and those who have certain comorbidities at risk for hospitalization or death." (DE 156-4 at 1).

Instead, the Parties and their experts disagree whether the conditions at Dade CI rise to a level that creates a substantial risk of serious harm for any or all class members. The Second Declaration of Dr. Susi Vassallo, one of Plaintiffs' experts, addressed this issue by analyzing the heat sensor data. (DE 160-25 ¶¶ 108, 112). Dr. Vassallo is a physician on the faculty of the New York University School of Medicine. (*Id.* ¶ 1). She is board certified in Emergency Medicine and Medical Toxicology. (*Id.*) Dr. Vassallo specializes in thermoregulation, (*Id.* ¶ 3), having studied the subject during her fellowship. (DE 260 at 45:2–9). Dr. Vassallo has also published peer-reviewed articles on thermoregulation, treated patients suffering from heat-related illnesses, and wrote the thermoregulation chapter of Goldfrank's Toxicologic Emergencies textbook. (*Id.* at 45:10–21, 46:16–23). Dr. Vassallo concluded, "the risk for heat stroke and other heat-related harm increases sharply when the heat index exceeds 88° Fahrenheit." (DE 160-25 ¶ 45). Therefore, "all people assigned to the unairconditioned dormitories at Dade CI are at

---

[7] All experts who testified at the Hearing agreed that heat can, directly or indirectly, cause serious health issues. *See* (DE 260 at 63:12–22, 72:4–7; DE 261 at 81:15–22; 153:8–12, 165:4–14). FDC personnel have also acknowledged this through email correspondence and memoranda. *See* (DE 156-27 at 1) (FDC seasonal preparedness memo acknowledging, "[i]n extreme heat[,] the body works extra hard to maintain a normal temperature, which can lead to death[]"); (DE 156-32) (email correspondence in which Dade CI psychologists alerted facilities maintenance that a patient "had a heat stroke as it is very hot in J4" and that the lack of air conditioning "has begun to affect a few of the patients[]").

substantial risk of serious harm due to their prolonged exposure to heat indexes above 88° Fahrenheit.” (*Id.* ¶ 20). As will be described more fully *infra* Section II(B), Dr. Vassallo testified in support of her conclusions at the Hearing.

Indeed, FDC’s 2024 Security Advisory on Heat Awareness (“***Security Advisory***”) warns corrections personnel to take precautions to combat the dangers of heat exposure. (DE 156-2 at 1–3). The Security Advisory includes the National Weather Service’s (“***NWS***”) Heat Index Table, which maps out the “[l]ikelihood of [h]eat [d]isorders with [p]rolonged or [s]trenuous [a]ctivity.” (DE 156-3 at 4). Dr. Vassallo included the NWS Heat Index Table in her Second Declaration as well:

**NWS Heat Index** — Temperature (°F)

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity

Caution — Extreme Caution — Danger — Extreme Danger

(DE 160-25 ¶ 41).

The NWS uses a metric called the "heat index," which "quantif[ies] the combined effect of temperature and humidity on the human body." (*Id.* ¶ 39). The Heat Index Table classifies the levels of heat risk as follows:

| Classification | Heat Index | Effect on the body |
|---|---|---|
| Caution | 80°F - 90°F | Fatigue possible with prolonged exposure and/or physical activity |
| Extreme Caution | 90°F - 103°F | Heat stroke, heat cramps, or heat exhaustion possible with prolonged exposure and/or physical activity |
| Danger | 103°F - 124°F | Heat cramps or heat exhaustion likely, and heat stroke possible with prolonged exposure and/or physical activity |
| Extreme Danger | 125°F or higher | Heat stroke highly likely |

(*Id.* ¶ 42). Those incarcerated at Dade CI *across all locations* were exposed to heat index values in the extreme caution, danger, and extreme danger zones a vast majority of the time during the months in which temperatures were measured. *See* (160-23 ¶ 55). They were exposed to heat index values above 103 degrees, placing them in the danger or extreme danger zone, 15% of the time during the months in which temperatures were measured. (*Id.*)

The NWS describes the direct effect that heat exposure may have on the body, such as by inducing heat stroke and heat cramps. (DE 160-25 ¶ 43). But heat can also exacerbate other conditions. (*Id.*) "[I]t is the worsening of underlying conditions that leads to the large increase in hospitalization when the heat index is above 88° Fahrenheit." (*Id.* ¶ 66). "[E]xtreme heat can affect otherwise healthy people's kidneys, liver, heart, brain, and lungs, putting them at substantial risk of renal failure, heart attack, and stroke." (*Id.* ¶ 68). Heat exposure may also exacerbate mental health issues. (*Id.* ¶ 11). Studies find a positive correlation between heat exposure, both in and outside carceral settings, and suicide rates. (*Id.* ¶ 60).

Defendants submitted declarations from multiple experts to counter Plaintiffs' allegations and Dr. Vassallo's opinion. Their medical experts include Dr. James Pearle,

a pulmonologist, Dr. Ajay Chaudhuri, an endocrinologist, Dr. Christopher Wenger, a cardiologist, Dr. Jessica Chaudhary, a psychiatrist, and Dr. Mark Serota, a dermatologist, all of whom opine that the specific risk of harm to any particular person requires an individualized evaluation. (DE 160-2 at 15; 160-4 at 3–4; DE 160-6 at 6; DE 160-8 at 4; 160-10 at 3). Defendants' experts also describe that there may be multiple factors, not just heat, that contribute to a given adverse health outcome, such as respiratory distress or suicide. *See* (DE 160 at 2; DE 160-9 at 2). Another one of Defendants' medical experts, Dr. Emil Dameff, had some agreement and some disagreement with Dr. Vassallo.[8] Dr. Dameff opines, "[p]opulation-level statistics do not equal individual-level risk[,]" and an individual's risk due to heat exposure cannot be generalized by age or whether they take anticonvulsants or anticholinergic medication. (160-12 at 6–8). However, he agrees with Dr. Vassallo that "[t]he epidemiologic observation that older adults have higher heat-related mortality is generally true at the population level[]" and that "Dr. Vassallo's physiological point–anticholinergic medications can impair sweating–is broadly correct." (*Id.* at 6, 8).

In addition to the data and expert testimony presented, Plaintiffs presented declarations from twenty-one incarcerated individuals who are housed across the dormitories at Dade CI. (DE 156-5–DE 156-25). They describe poor ventilation across the dormitories that fails to mitigate the effects of the heat. (DE 156-5 ¶¶ 21–22; DE 160-6 ¶ 6; DE 160-7 ¶ 5; DE 156-8 ¶ 4; DE 156-9 ¶ 5; DE 156-10 ¶ 15; DE 156-11 ¶¶ 3–5; DE 156-12 ¶ 9; DE 156-13 ¶¶ 11–12; DE 156-15 ¶ 10; DE 156-16 ¶ 4; DE 156-17 ¶ 4; DE

---

[8] Dr. Emil Dameff is a physician whose experience includes serving as Chief Health Officer and Director of Regional health Care for FDC. (DE 160-12 at 1).

156-19 ¶ 5; 156-22 ¶ 4; DE 156-23 ¶ 5; DE 156-24 ¶ 10). One incarcerated individual, Mr. Marc Silvis, describes, "[e]ven when I go in front of a fan, I feel that I am just getting hot air blown into my face. It feels like we are getting cooked in a convection oven." (DE 156-9 ¶ 8). Another, Mr. Derek Peete, states, "[i]t is extremely hot in all the dorms I've been in at Dade CI. Being in a cell feels like being in a brick oven because the heat is just blasting all the time." (DE 156-13 ¶ 6).

Some symptoms of the heat are nearly universally described across the declarations. The Declarants state that it is difficult to impossible to sleep at night. (DE 156-5 ¶¶ 15–16; DE 156- 6 ¶¶ 9–10; 156-7 ¶ 8; 156-8 ¶ 4; 156-9 ¶ 16; 156-10 ¶ 27; DE 156-13 ¶ 8; DE 156-15 ¶ 7; DE 156-16 ¶ 9; DE 156-17 ¶ 10; DE 156-18 ¶ 6; DE 156-19 ¶ 7; DE 156-22 ¶ 5; DE 156-25 ¶ 21). They sweat profusely, and heat rashes are endemic. (DE 150-6 ¶ 12; DE 156-7 ¶ 10; DE 156-9 ¶ 12; DE 156-10 ¶ 14; DE 156-13 ¶ 10; DE 156-14 ¶ 15; DE 156-16 ¶ 8; DE 156-17 ¶ 16; DE 156-20 ¶ 8; DE 156-23 ¶ 11; DE 156-24 ¶ 3; DE 156-25 ¶ 22). The rashes cause more than minor discomfort. According to Mr. Silvis, the heat rash "always begins as small, red, painful pustules" that pop and sometimes leave open wounds. (DE 156-9 ¶ 12). The rash is painful and itchy. (*Id.*) When Mr. Silvis lays "in bed, "it feels like [he is] on top of a bed of red fire ants." (*Id.* ¶ 13). Due to the heat, his itching, and his difficulty breathing,[9] Mr. Silvis barely sleeps. (*Id.* ¶ 16). He feels exhausted and "braindead" all the time. (*Id.*)

Mr. James Beaver is an incarcerated veteran who was previously stationed in Southwest Texas. (156-7 ¶ 12). He states that Dade CI is hotter than Southwest Texas

[9] Mr. Silvis has difficulty breathing at night because his Continuous Positive Airway Pressure machine functions poorly in the heat. (*Id.* ¶¶ 9, 11).

and that the humidity makes the conditions particularly unbearable. (*Id.*) Mr. Beaver describes how the dormitory to which he was assigned "feels like an oven." (*Id.* ¶ 6). He "would lay in bed in a pool of sweat; sleeping was impossible." (*Id.* ¶ 8). He would think to himself, "[o]h my God, I'm gonna die here." (*Id.*)

Further, some individuals at Dade CI have observed how heat affects the mood and behavior of the incarcerated population. Mr. Silvis describes, "I notice that the heat makes everyone angrier and more anxious. There is more arguing and fighting when it's hot like it is in the summer." (DE 156-9 ¶ 24). Mr. James Powell corroborates that "people get short-tempered because of the heat. I would guess that three quarters of the fights that happen here occur during the hot months." (DE 156-11 ¶ 11).

The declarations also illustrate the widespread and extreme measures taken by those incarcerated at Dade CI to try and manage the heat. In an attempt to facilitate some degree of air flow, many housed in the H dormitory build tunnels out of cardboard and other materials from the tiny metal holes in the window to their bed. (*Id.* ¶ 6; DE 156-20 ¶ 7; DE 156-22 ¶ 14; DE 156-25 ¶ 6). One individual explained that the heat makes it difficult for him to breathe, and he washes himself in toilet water to try and cool down. (DE 156-18 ¶¶ 6, 8). He does his best to clean the toilet beforehand. (*Id.* ¶ 8).

**3. Heat's effect on the subclasses**

The risk of serious harm due to heat exposure is even greater for the subclasses. Dr. Vassallo opines, "[a]lthough everyone [incarcerated at Dade CI] faces a substantial risk of serious harm, the following individuals are at heightened risk: individuals above the age of 65, those who have certain medical or mental health conditions that make them heat-sensitive, and those who take certain medications that make them heat-sensitive."

(DE 160-25 ¶ 19). Plaintiffs and FDC agree that individuals with various medical conditions may face a heightened risk of harm from heat and humidity, including those with obesity, diabetes, thyroid disorders, hypertension, cardiovascular disease, psychiatric conditions, chronic obstructive pulmonary disease, and asthma. (DE 156-30 at 23:24–25, 24:1–14, 25:1–5, 29:7–18, 30:8–12, 32:22–25, 34:2–5).[10] Additionally, heat may pose a greater risk of harm to those aged sixty-five years and above and those taking certain medications, such as calcium channel blockers and diuretics. (*Id.* at 29:15–21, 43:9–13).

In her Second Declaration, Dr. Vassallo more fully described the categories of people especially susceptible to heat-related illness and the mechanisms by which heat can exacerbate certain medical conditions. (DE 160-25 ¶¶ 70–107). The Assistant Chief of Mental Health Services for FDC, Dr. Stephanie Crawford, has also raised concern over the risk to those with chronic mental illness due to heat exposure, stressing that "psychotropic medications . . . can impair your response to heat." (DE 156-31 at 2–4).

The declarations of incarcerated individuals at Dade CI demonstrate exactly how the heat exacerbates a variety of medical issues. For asthmatic individuals, heat induces difficulty breathing, which sometimes necessitates emergency care. (DE 156-12 ¶¶ 7–8; DE 156-14 ¶ 7; DE 156-22 ¶ 6; DE 156-23 ¶¶ 7–9; DE 156-24 ¶¶ 7–8; DE 156-25 ¶¶ 14–15). Yet, according to one Declarant, the officers at Dade CI withhold asthma treatment if they suspect it is being requested too frequently in order to gain access to air conditioning. (DE 156-24 ¶ 8). Those with cardiac issues describe how the heat elevates

[10] FDC's Chief Clinical Advisor, Kalem Santiago, was designated as a representative of FDC for this deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). *See* (DE 156-30 at 8:9–16, 11:2–4).

their heart rate to a concerning degree. (DE 156-15 ¶¶ 3, 8; DE 156-19 ¶ 10). One individual with multiple sclerosis described how the heat exacerbates his symptoms, causing his eyes to twitch and his mobility to deteriorate. (DE 156-21 ¶ 16).

Further, some individuals at Dade CI require Continuous Positive Airway Pressure ("***CPAP***") machines to breathe at night. (DE 156-9 ¶ 9; DE 156-16 ¶ 6) However, incessant sweating prevents the machines' masks from sealing over the individuals' noses and mouths as required. (DE 156-9 ¶ 9; DE 156-16 ¶ 6). One Declarant described how water accumulates in his mouth as a result, which makes him feel like he is being waterboarded. (DE 156-9 ¶ 9). Another stated that he wakes up "choking and spitting up fluid" due to the improper functioning of the CPAP machine. (DE 156-16 ¶ 6).

Dade CI has already determined which residents have disabilities that make them particularly susceptible to heat risk. Everyone incarcerated at Dade CI is evaluated and given a physical assessment to determine what medical conditions they have. (DE 156-30 at 39:10–25). During their initial intake and at various points thereafter, individuals are classified as having one of five medical grades and assigned an ADA designation.[11] (DE 156-33 at 1–2, 5). Nonetheless, apart from assigning a general medical grade, an incarcerated individual's heat sensitivity is not considered in making housing assignments. (DE 156-36 at 53:5–11). The only individuals incarcerated at Dade CI who are housed in air-conditioned areas are those in the Mental Health Unit or infirmary. (DE 156-35 at 4). According to some incarcerated Declarants, healthcare providers instruct patients with heat sensitivity and certain disabilities, such as high blood pressure, to avoid

[11] There is also a sixth medical grade, referred to as M9, for those who are pregnant. (DE 156-33 at 2). This is not applicable to Dade CI.

the heat, but the advice is impossible to follow. (DE 156-10 ¶ 12; DE 156-11 ¶ 10).

### *B. Testimony of Dr. Susi Vassallo*

At the Hearing, Dr. Vassallo explained more in depth how she derived the eighty-eight-degree heat index threshold above which heat poses a substantial risk of serious harm to the general population. (DE 260 at 72:4–9).[12] She based this finding on numerous studies, some of which she reviewed with the Court at the Hearing. (*Id.* at 72:10–17). In one study of note, the mortality rate in Texas prisons increased by a couple percentage points above the baseline – the mortality rate at a heat index of eighty-five degrees – when the heat index was increased by three degrees to eighty-eight degrees. Julianne Skarha et al., *Provision of Air Conditioning and Heat-Related Mortality in Texas Prisons*, JAMA NETWORK OPEN (Nov. 2, 2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2798097.

---

[12] In challenging the reliability of Dr. Vassallo's opinion under *Daubert*, Defendants represented that they "have only been able to find a single Daubert challenge to her qualifications. And that one Daubert challenge was two paragraphs long." (DE 260 at 19:9–17). A review of the docket of *Cole v. Livingston*, a case cited by both Parties in their briefings, *see* (DE 22 at 5; DE 181 at 6; DE 202 at 16), belies this assertion. *See* Defendants' Motion Asserting *Daubert* and FRE 702 Challenges to Plaintiffs' Class-Action Certification Expert Testimony Under the Guidelines Established in *Tyson Foods, Inc. v. Bouaphakeo, et al.*, 136 S.Ct. 1036 (2016), *Cole v. Livingston*, 4:14-cv-01698 (Apr. 29, 2016), DE 399 (twelve-page *Daubert* motion that references Dr. Vassallo throughout).




(*Id.*)

There is a range of "statistical numbers," or heat index thresholds, above which "more people are dying and . . . are getting sick." (DE 260 at 86:7–15). Large population-level studies found that heat index values in the mid- to upper eighties were correlated with negative health outcomes.[13] Dr. Vassallo chose a threshold value of eighty-eight

[13] Dr. Vassallo focused on two studies in particular, the "Petitti" and "Davis" studies. (DE 260 at 74:4–25, 80:2–16). The Petitti study explores the heat index value at which there is an increasing risk temperature, or "the lowest temperature at which there is a larger impact on the health event than what is expected under optimal weather conditions." Diana B. Petitti et al., *Multiple Trigger Points for Quantifying Heat–Health Impacts: New Evidence from a Hot Climate*, 124 ENVTL. HEALTH PERSPECTIVES 176, 178 (2016). The increasing risk temperature for hospitalization was found to be a heat index of thirty-two degrees Celsius. *Id.* at 181. The increasing risk temperature for all-cause mortality was found to be thirty-three degrees Celsius, and the increasing risk temperature for heat-related mortality was found to be twenty-seven degrees Celsius. *Id.*

The Davis study found that, based on data from Chicago from 1973–1979, "the threshold AT is 30°C—the average AT within the lowest AT class above which mortality is statistically significantly elevated." Robert E. Davis et al., *Changing Heat-Related Mortality in the United States*, 111 ENVTL. HEALTH PERSPECTIVES 1712, 1714 (2003).

degrees, which corresponds to all-cause mortality and is at the higher end of that range. (DE 260 at 86:10–11).

In forming her opinion, Dr. Vassallo evaluated the conditions at Dade CI relative to this threshold heat index value. She reviewed Dr. Schiavon's Second Declaration, interviewed some of the incarcerated individuals at Dade CI, conducted a site visit of the facility, and reviewed literature on the risks associated with exposure to heat, particularly on the incarcerated population. (DE 260 at 89:6–25, 90:1; DE 160-25 ¶¶ 12–13). She concluded, "all people assigned to the unairconditioned dormitories at Dade CI are at substantial risk of serious harm due to their prolonged exposure to heat indexes above 88° Fahrenheit."[14] (DE 160-25 ¶ 20); *accord* (DE 260 at 92:18–25).

---

Dr. Vassallo testified that the term "apparent temperature," or AT, is interchangeable with heat index. (DE 260 at 81:1–2).

[14] The Court agrees with the analysis and conclusion that United States Magistrate Judge Lett reached in her October 9, 2026 Order (DE 300), in which she ruled that Dr. Vassallo's expert opinion satisfies the *Daubert* standard. Numerous courts, including the Fifth Circuit, have uniformly made the same determination. *See e.g.*, *Yates*, 868 F.3d 354, 363–64 (5th Cir. 2017) ("Dr. Vassallo is . . . a recognized expert in the field of thermoregulation and hyperthermia . . . . Dr. Vassallo has previously served as an expert witness in lawsuits challenging prison conditions, and this court has (at least) twice upheld district court findings that relied heavily on Dr. Vassallo's testimony.") (citation omitted); *Ball v. LeBlanc*, 792 F.3d 584, at *593 (5th Cir. 2015) (finding that district court did not err by relying on Dr. Vassallo's testimony); *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *14 (S.D. Tex. July 19, 2017) ("The Court finds that Dr. Vassallo's expert report and testimony regarding the effects of heat on the human body were extremely thorough, and that she has extensive knowledge on this subject."); *Tiede v. Collier*, 796 F. Supp. 3d 275, 289 (W.D. Tex. 2025) ("Dr. Vassallo credibly testified that a heat index of 88° or higher poses a substantial risk of adverse health outcomes in all inmates—even those who are young and healthy."); *Voice of the Experienced v. LeBlanc*, No. CV 23-01304, 2024 WL 3279899, at *3 n.4 (M.D. La. July 2, 2024), *vacated on other grounds sub nom. Voice of the Experienced v. Westcott*, No. 24-30420, 2025 WL 2222990 (5th Cir. Aug. 5, 2025) ("Dr. Vassallo has been admitted as an expert on thermoregulation, or the process by which the human body regulates internal temperatures, on numerous occasions."); *see also Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 370 (W.D. Va. 2020) ("The court finds Dr. Vassallo abundantly qualified to provide expert medical testimony regarding the nature of Kovari's underlying conditions, the information

### ***C. Testimony of W. Lawrence Kenney, PhD***

The first of the two experts called by Defendants at the Hearing was W. Lawrence Kenney, PhD. Dr. Kenney is a professor of biology and kinesiology at Pennsylvania State University who focuses on sports medicine and athletic performance. *See* (DE 160-7 at 1). He trained under a founder of the American College of Sports Medicine, previously served as President of the American College of Sports Medicine, and is associated with companies like Nike, Gatorade, and GoodSport. (DE 261 at 6:14–17; DE 160-7 at 15, 17). Additionally, Dr. Kenney authored a textbook on exercise physiology and consults on heat stress. (DE 160-7 at 1). Dr. Kenney is not a medical doctor, has no medical training, and therefore has refrained from making health recommendations. (DE 261 at 84:11–19). He is involved in a series of experiments called the PSU Heat Project, in which subjects' core body temperatures are monitored as they are exposed to high temperatures for a period of roughly two hours or less. (*Id.* at 80:3–20).

Dr. Kenney's testimony did not effectively refute the assertion that the high heat at Dade CI pose a substantial risk of serious harm to the general class and the subclasses. First, he contradicted himself as to whether there is a substantial risk of serious harm to anyone at Dade CI due to the heat. *Compare* (DE 261 at 69:17–20) (answering, "[n]o, that's not correct" to the question, "you have concluded that there is no substantial risk of harm to any of the inmates at Dade Correctional Institution; is that right?"), *with* (*id.* at 70:2–14) ("In my opinion, there is no substantial risk of harm to the inmates at Dade

---

in Kovari's medical records, the interpretation of blood pressure readings, and the conditions that may exacerbate Kovari's underlying conditions.").

.

County.") (quoting DE 160-30 at 149:6–8).

Second, Dr. Kenney's main area of research is not about the effects of long-term heat exposure on the human body. Instead, it focuses on short term exposure to heat and the impact of that exposure on core body temperature specifically; his experiments do not examine the danger to the human body of exposure to heat day after day.[15] (DE 261 at 80:3–20, 81:3–13). As a result, Dr. Kenney's opinion is about whether the temperatures at Dade CI "exceed the limits for compensable versus uncompensable heat stress." (*Id.* at 72:6–13). But the key question in this case is not whether short term exposure to high heat causes the core body temperatures of those incarcerated at Dade CI to become uncontrollable. It is whether long term and persistent exposure to high heat causes a substantial risk of harm to the incarcerated population. Dr. Kenney never testified about researching the long-term effects of heat on the human body, evaluating the impacts of heat on the human body outside of a laboratory setting, or treating patients due to heat exposure. Thus, his opinion is not probative of the issues in this case.

### ***D. Testimony of Dr. Ajay Chaudhuri***

Dr. Ajay Chaudhuri was the second expert called by Defendants. He is the Chief of Endocrinology and a clinical Professor of Medicine at the University of Buffalo, Jacobs School of Medicine. (DE 160-4 at 3). He is board-certified in the specialty of diabetes endocrinology and metabolism and publishes on the topic. (*Id.*) Dr. Chaudhuri also has "substantial experience in treating patients with diabetes and endocrinology problems in extremes of temperature." (*Id.*)

[15] The design of Dr. Kenney's experiments aligns with his focus on athletic performance and sports medicine.

Dr. Chaudhuri's opinions are that individual factors need to be considered when assessing the effects of heat and humidity on those with endocrine conditions and that the high temperature and humidity at Dade CI do not expose those incarcerated there to a substantial risk of serious harm. (*Id.* at 3–4). He testified, "we need to make sure that people have the resources that can -- you know, especially if you're talking about heat, that they can keep themselves hydrated, and that they have access to proper medical care, which is all present in the Dade Correctional facility." (DE 261 at 117:6–11).

Dr. Chaudhuri testified that those with endocrine conditions incarcerated at Dade CI do not face a substantial risk of serious harm because they are receiving proper medical care.[16] (*Id.* at 177:18–23). His conclusion is premised on his review of the Correctional Medical Authority ("***CMA***") Audit, which was conducted from February 11th to 13th, 2025.[17] Dr. Chaudhuri did not visit Dade CI, speak with Dade CI medical staff, interview those incarcerated at Dade CI, or review the records underlying the CMA Audit. (*Id.* at 103:7–24, 185:3–10). The CMA Audit on which Dr. Chaudhuri relied contains only summary findings. (DE 279-18). And these summary findings flag multiple concerningly low compliance scores, challenging Dr. Chaudhuri's assumption that those with endocrine conditions – or anyone incarcerated at Dade CI – are receiving adequate health care and

---

[16] The Court has received no indication that there is an endocrinologist on staff at Dade CI.

[17] Dr. Chaudhury was asked, "So your opinion that Dade CI mitigates the risk of people with endocrine conditions, that's solely based on your review of the -- what we've been calling the CMA audit, correct?" (DE 261 at 177:18–21). He responded, "Yeah, because CMA audit, you know, they are tasked with that responsibility --" (*Id.* at 177:22–23). His answer was cut off by an objection, but he soon affirmed, "[i]n terms of documentation, yes, the CMA audit was the one that I relied on to say that people are getting proper medical care." (*Id.* at 178:12–14). He later again affirmed that he "was relying primarily on the CMA audit. That they had done their due diligence." (*Id.* at 185:10–18).

thus are protected from the dangers of persistent heat exposure.[18]

Notably, Dr. Chaudhuri agreed with Dr. Vassallo's opinion that people with

[18] The following is a non-exhaustive list of areas where Dade CI had low compliance:

- 54% compliance with "[p]atients are receiving insulin as prescribed." (DE 279-18 at 8). Though the medication administration record documented that this noncompliance was due to patient refusals, "there was no evidence of signed refusals from the patient or provider counseling regarding medication compliance." (*Id.*)
- 57% compliance with "[t]he inmate is seen at intervals required for their [medical]-grade or at intervals specified by the clinician." (*Id.* at 10).
- 60% compliance with "[a]ll [clinician] orders are received and implemented." (*Id.* at 18).
- 50% compliance with "[t]he inmate is seen in chronic illness clinic as regularly scheduled." (*Id.* at 21).
- 50% compliance with "[n]ew or pending consultations progress as clinically required." (*Id.* at 21).
- 40% compliance with "[t]he consultation is completed in a timely manner as dictated by the clinical needs of the inmate." (*Id.* at 22).
- 43% compliance with "[i]f the inmate missed medication doses (3 consecutive or 5 doses within one month), there is evidence of counseling for medication non-compliance." (*Id.* at 23).
- 50% compliance with "[t]he pre-confinement examination is completed prior to placement in special housing." (*Id.* at 33).
- 0% compliance with "[p]sychotropic medications continue as ordered while inmates are held in special housing." (*Id.* at 33).
- 50% compliance with "[t]he inmate is interviewed by mental health staff within 14 days of arrival." (*Id.* at 39).
- 47% compliance with "[t]he inmate received medication(s) as prescribed." (*Id.* at 41).

The Audit contains additional details explaining the reasons for these low compliance scores, including poor documentation of treatment and small sample sizes. *See* (*id.*) Dr. Chaudhuri testified that at least the low compliance score for "[p]atients are receiving insulin as prescribed" was addressed, per the August Corrective Action Plan that he reviewed. (DE 261 at 122:6–11, 195:1–5). However, although it was discussed at the Hearing, neither Party has filed or introduced into evidence the Corrective Action Plan nor explained how Dade CI has remedied its low compliance scores. *See* (DE 236; DE 238; DE 279). Further, the Court has not received updated information about Dade CI's compliance or lack thereof with health system guidelines since 2025, and Dr. Chaudhuri did not indicate that there were any additional materials that he reviewed regarding medical audits of Dade CI. *See* (DE 261 at 181:24–25, 182:1–9).

diabetes can be at a higher risk of dehydration. (DE 261 at 165:22–25). For example, he testified that one particular risk to diabetics is that, "if you are not able to keep up with that hydration, which is an indirect effect, you know, of heat, then blood sugars can get elevated to a level which could be serious." (*Id.* at 174:3–6). Chronically elevated blood sugar levels can increase the risk of neuropathy, retinopathy, and kidney disease. (*Id.* at 174:25, 175:1–8). Other conditions, like an overactive thyroid, can increase heat intolerance and sweating if not properly treated. (*Id.* at 176:2–5).

## III. LEGAL STANDARD

The certification of a class action is governed by Federal Rule of Civil Procedure 23. "Questions concerning class certification are left to the sound discretion of the district court." *Griffin v. Carlin*, 755 F.2d 1516, 1531 (11th Cir. 1985). For class certification to be considered appropriate, the plaintiffs must show that the proposed class: 1) is adequately defined and clearly ascertainable, 2) meets the requirements of Rule 23(a), and 3) satisfies one of the three requirements listed in Rule 23(b). *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012). In conducting this analysis, "the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003).

First, though not expressly required by Rule 23, "[t]he existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite[.]" *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). The Plaintiffs must show that its "membership is capable of being determined." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021). Second, under Rule 23(a), class

members may only sue or be sued in a representative capacity if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). Lastly, the party seeking class certification "must establish that the proposed class satisfies at least one of three requirements listed in Rule 23(b)." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016). Plaintiffs are proceeding under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

"The party seeking class certification has the burden of proof." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016). Even after a class has been certified, the "[p]laintiff maintains his 'burden of proof that class certification was proper[.]'" *Cox v. Porsche Fin. Servs., Inc.*, 337 F.R.D. 426, 432 (S.D. Fla. 2020) (quoting *Ezell v. Mobile Hous. Bd.*, 709 F.2d 1376, 1380 (11th Cir. 1983)).

## IV. DISCUSSION

At this stage, the Parties do not dispute whether the class is adequately defined and clearly ascertainable or whether the numerosity and adequacy prongs of Rule 23(a) are satisfied.[19] There are two main sources of disagreement between the Parties. First, the Parties dispute whether the evidence adduced during discovery supports a finding

[19] The Court has been provided no reason to disturb its findings regarding these requirements. The Court therefore rests on the analysis in its original Order. *See* (DE 63).

that Plaintiffs satisfy Rule 23(a)'s commonality and typicality factors. In challenging whether the Named Plaintiffs are typical of the classes, Defendants allege that Plaintiff Tyrone Harris in particular should not be permitted to proceed as a plaintiff because his claims are moot. Second, the Parties disagree as to whether the evidence establishes that a single injunction could provide appropriate relief for each of the classes, satisfying Rule 23(b)(2). Each issue is addressed in turn.

### *A. Plaintiffs have established that Rule 23(a)'s requirements are satisfied.*

#### 1. The commonality requirement is satisfied.

"The commonality requirement demands only that there be 'questions of law or fact common to the class.'" *Vega v. T–Mobile U.S.A. Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009) (quoting FED. R. CIV. P. 23(a)(2)). "Rule 23 does not require that all the questions of law and fact raised by the dispute be common." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986) (reversing denial of class certification alleging discrimination in salary, promotion, medication coverage, training, and other benefits by employer, even though acts of discrimination varied by person). Instead, the "relatively light burden" imposed by Rule 23(a)(2) requires the class action to "involve issues that are susceptible to class-wide proof." *Vega*, 564 F.3d at 1268, 1270 (quoting *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001)). At a minimum, commonality requires the class members to suffer the same injury. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011). In this case, the legal and factual issues raised relate to whether Plaintiffs are subjected to a heat mitigation policy that violates the Eighth Amendment.

In cases where plaintiffs allege unconstitutional conditions of confinement under the Eighth Amendment, they must establish: "(1) that the inmate 'is incarcerated under

conditions posing a substantial risk of serious harm'; and (2) that the defendant prison official was 'deliberately indifferent' to that risk." *Yates*, 868 F.3d at 370 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "Allowing a prisoner to be exposed to extreme temperatures can constitute a violation of the Eighth Amendment." *Blackmon v. Garza*, 484 Fed. Appx. 866, 869 (5th Cir. 2012); *see, e.g.*, *Yates*, 868 F.3d at 360 ("We have repeatedly upheld district court findings that the heat levels within these prisons violate the Eighth Amendment, and we have done so in the context of a class action in at least one case."); *Ball v. LeBlanc*, 792 F.3d 584, 598 (5th Cir. 2015) ("[C]ourts have upheld injunctions in Eighth Amendment cases alleging unreasonably risky exposure to extreme temperatures."); *see also Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (finding prison officials committed an Eighth Amendment violation by subjecting incarcerated individual "for a 7–hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation").

Additionally, poor ventilation, on its own or in conjunction with other extreme conditions of confinement, can rise to the level of a constitutional injury. *See e.g., Chandler v. Crosby*, 379 F.3d 1278, 1294 (11th Cir. 2004) ("Cooling and ventilation are distinct prison conditions, and a prisoner may state an Eighth Amendment claim by alleging a deficiency as to either condition in isolation or both in combination."); *Gates v. Cook*, 376 F.3d 323, 334 (5th Cir. 2004) ("The ventilation is inadequate to afford prisoners a minimal level of comfort during the summer months."); *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980) ("A necessary corollary to this ruling is that a state must provide within such living space reasonably adequate ventilation, sanitation, bedding, hygienic

materials, and utilities (i.e., hot and cold water, light, heat, plumbing)."); *Inmates of Occoquan v. Barry*, 717 F. Supp. 854, 867 (D.D.C. 1989) ("Defendants must submit a proposal to the Court within 60 days on how to remedy the nonexistent ventilation system in most of the dorms.").

Courts have affirmed that the precise issue presented here – whether a corrections facility's heat mitigation policy creates a risk of serious harm to an incarcerated population and whether prison officials were deliberately indifferent to that risk – pose common issues of law and fact, satisfying the commonality requirement. *See e.g.*, *Yates*, 868 F.3d at 363 (ruling district court did not err by finding commonality met in case challenging conditions of confinement due to heat exposure); *Scott v. Quay*, 338 F.R.D. 178, 187 (E.D.N.Y. 2021) (finding commonality met due to common questions, such as, "whether defendants in fact failed to provide adequate clothing, heat, and hot water to people incarcerated in the MDC's West Building during the power outage"). Indeed, the Fifth Circuit has affirmed class-wide injunctive relief on such claims that mandates heat mitigation measures when the heat index is 90 degrees or above, or alternatively, during summer months. *See Gates v. Cook*, 376 F.3d 323, 339–40 (5th Cir. 2004).

When certification was initially raised, Defendants argued that the commonality requirement could not be met because each individual class member has different health conditions, a different heat tolerance, and a different housing assignment. (DE 22 at 6–10). They revive this argument once again, arguing that Plaintiffs must demonstrate that class members are "uniformly exposed to the *same* unconstitutional conditions." (DE 160 at 9) (emphasis in original). They now rely on the testimony and declarations of doctors to argue that "heat risk is physiologically individualized" and "mitigation make[s] classwide

determination impossible." (*Id.* at 14, 16); *see supra* Section II(A)(2).

First, Defendants misinterpret the law on evaluation of class-wide injury, and their experts' assertions that individualized factors contribute to a particular person's heat risk is not probative of the commonality issue. The commonality inquiry focuses on whether there is a *policy* to which all class members are subjected that creates a substantial risk of serious harm, not whether there are differences in the degree of harm suffered by each class member. *See, e.g., Braggs v. Dunn*, 317 F.R.D. 634, 657 (M.D. Ala. 2016) ("The fact that not every mentally ill prisoner is subjected to precisely the same level of risk also does not defeat commonality."); *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) ("As the district court recognized, although a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm."); *Hoffer v. Jones*, 323 F.R.D. 694, 697 (N.D. Fla. 2017) ("Defendant has not shown why differences in symptoms and treatment considerations should preclude awarding such class-wide relief."); *Lewis v. Cain*, 324 F.R.D. 159, 174 (M.D. La. 2018) ("Because Defendants admit that these policies and practices apply to all inmates, and all inmates will at some point will need some type of medical care while incarcerated, the alleged exposure of the entire Class to these policies is capable of class-wide resolution under Rule 23."); *Maney v. Brown*, 516 F. Supp. 3d 1161, 1175 (D. Or. 2021) ("However, here all of the proposed class members have suffered the same alleged injury—the substantial risk of contracting COVID-19 while housed in a correctional setting due to the lack of prompt vaccination . . . . The fact that some class members are at a higher risk than others

does not change the alleged constitutional injury.").

Indeed, in *Yates*, the Fifth Circuit affirmed the district court's conclusion that commonality was met because "[t]he evidence call[ed] into serious question the adequacy of [the Texas Department of Criminal Justice's] mitigation measures—as applied in practice—*in reducing the heat risk for all the inmates*, and particularly those with comorbidities that diminish their ability to thermoregulate." 868 F.3d at 363 (emphasis in original). The "obvious fact" that "[n]o two individuals have the exact same risk" to their health from heat exposure did not destroy this commonality. *Id.* In certifying a class of incarcerated individuals challenging FDC's inadequate treatment of Hepatitis C, one district court teased out the issue as follows:

> Defendant's misguidance is best illustrated through an example. Consider, for instance, a prison policy that states that every inmate with a broken bone must wait five years before they are treated. Under Defendant's logic, inmates subject to that policy could not initiate a class action to change the policy because each inmate suffers from individualized conditions. That, of course, would be pure applesauce. Although each inmate may be differently situated (e.g., one may have a broken toe, and another a broken rib), they each suffer from the same injury: being subject to the five-year delay.

*Hoffer*, 323 F.R.D. at 698 (footnote omitted). Defendants' reformulation of the applicable standard would eliminate the class action vehicle altogether for conditions of confinement cases. No two individuals ever face the exact same risk of harm, particularly in cases where the class-wide injury involves health.

The evidence adduced during discovery cuts against rather than supports Defendants' argument that the commonality requirement is not met here. Dr. Schiavon's Second Declaration establishes that, across all dormitories at Dade CI, the heat index exceeded an eighty-eight-degree threshold 97% of the time during the months in which

temperatures were measured. (160-23 ¶ 55).[20] Further, across all dormitories at Dade CI, the heat index exceeded a ninety-three-degree threshold 85% of the time during the months in which temperatures were measured. (*Id.*) Using this data, Dr. Vassallo opined that all those living in un-airconditioned environments at Dade CI are exposed to a substantial risk of serious harm because they are exposed to heat index values above the eighty-eight-degree threshold. (DE 160-25 at ¶ 20).[21] Other courts have adopted similar thresholds at which there is substantial risk of serious harm due to heat exposure.

[20] A substantial portion of the testimony and argument at the Hearing centered on the merits question of whether there is a substantial risk of serious harm to all class members due to their consistent exposure to a heat index exceeding eighty-eight degrees. Defendants' arguments against this finding have been rejected in previous cases. For example, in *Ball*, the Fifth Circuit summarized, "[t]he State argues that the totality of the record evidence refutes Dr. Vassallo's opinion. Specifically, the district court discounted the State's arguments that no death-row prisoner has ever suffered a heat-related incident; these prisoners' medical records show no signs of heat-related illness; the prisoners' poor dietary choices and failure to exercise caused their health problems; and the prisoners' [sic] suffer high blood pressure all year, not just in the summer months. Thus, the State contends, the prisoners do not suffer an unreasonable risk of serious heat-related injury at all." 792 F.3d at 593. The Ball court found that "[t]hese facts fail to show that the district court clearly erred." *Id.* In this Order, the Court does not make a judgment on the merits. However, it does find these arguments unpersuasive in rebutting Plaintiffs' evidence of common questions of fact and law, given Dr. Vassallo's testimony and the supporting literature.

[21] Although Defendants argue that the commonality requirement cannot be met because heat risk is individualized, their expert, Dr. Kenney, appears to agree that there is a point at which heat poses a substantial risk of serious harm to the general population. Dr. Kenney testified, "there's not a single measurement [between compensable and uncompensable heat stress] for all people or for any group of people." (DE 261 at 25:21–24). However, Dr. Kenney's Rebuttal Report asserts that he calculated "[t]he critical environmental limit for all men aged 18-85 years tested in [his] series of studies." (DE 160-7 at 4). Indeed, in his own words, Dr. Kenney's research is to "determine the combinations of air temperature and humidity beyond which core temperature is no longer able to remain stable and instead continuously rises, which is when substantial risk of serious harm is likely." (*Id.* at 4). Using data from his experiments, he has calculated generally applicable "critical limits" of combinations of humidity and temperature. (*Id.* at 5). For example, his Rebuttal Report includes a graph of the average critical environmental limit for men and women eighteen to thirty-four years of age doing activities associated with daily living, with shading denoting safe and unsafe environments. (*Id.*)

*See Tiede v. Collier*, No. 1:23-CV-1004, 2025 WL 2469118, at *325 (W.D. Tex. Mar. 26, 2025) ("As set forth above, a heat index of 88° or higher poses a substantial risk of adverse health outcomes for everyone—even young, healthy people."); *Valigura v. Mendoza*, 265 Fed. Appx. 232, 235 (5th Cir. 2008) ("We have held that temperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment."). As discussed *supra* Section II(C), Dr. Kenney did not effectively rebut this conclusion.[22] At this point, the Court finds sufficient evidence of common questions of law and fact regarding whether the classes face a substantial risk of serious harm due to exposure to heat above a certain heat index value and whether Defendants have been deliberately indifferent to the risk.

Second, contrary to Defendants' arguments, differences in conditions across

[22] Defendants also challenge Dr. Vassallo's conclusions due to her use of the heat index. (DE 160 at 16). Dr. Kenney testified that "[n]obody would -- no thermophysiologist would ever use the heat index, other than to mention it as being there as the National Weather Service metric." (DE 261 at 41:12–14). However, he also testified that some epidemiological data shows associations "between higher heat indexes and morbidity" and mortality. (*Id.* at 79:21–25, 80:1). In fact, Dr. Kenney co-authored a study in which he concluded "that categorical thresholds associated with the widely used HI can be used to predict heat stress compensability under minimal activity conditions resembling the activities of daily living (fidgeting, self-care, showering, eating, dressing, washing dishes, etc.) in the absence of solar radiation." Daniel J. Vecellio et al., *Utility of the Heat Index in defining the upper limits of thermal balance during light physical activity (PSU HEAT Project)*, 66 INT'L J. OF BIOMETEOROLOGY 1759, 1767 (2022). Dr. Chaudhuri also does not appear to dispute that the heat index can be useful in gauging when precautionary measures should be taken. (DE 261 at 191:17–25, 192:1–13) (Dr. Chaudhuri concurring that "the combination of heat and humidity can be dangerous. . . . Whether you're working out or just hanging out, it's a good idea to check the heat index. Take steps to stay cool when it reaches 80 in the shade with 40 percent of humidity or above.").

dormitories, including heat mitigation measures and ventilation,[23] are not significant enough to defeat commonality. (DE 160 at 11–15). This argument is unpersuasive.[24] "[C]lass certification cannot be defeated simply because there are some factual variances among the proposed members." *Copeland v. Wabash Cty., Ind.*, 338 F.R.D. 595, 604 (N.D. Ind. 2021). Courts have determined that the commonality requirement was met in cases challenging the conditions of confinement across different types of living quarters and even across multiple detention centers. *See e.g.*, *id.* (certifying class challenging overcrowding in prison despite variance in whether class members "have been housed, for example, in the indoor recreation room, the library, or in a regular bunk room."); *Gayle v. Meade*, 614 F. Supp. 3d 1175, 1197–98 (S.D. Fla. 2020) (finding plaintiffs met commonality requirement in suit challenging conditions of confinement across three separate immigration detention facilities).

---

[23] Defendants also argue that the fans in the dorms produce air speeds that exceed the fixed value used by the heat index formula, at least at certain locations. (DE 160 at 11). This appears to be a challenge to the use of the heat index as a metric for any environment in which fans operate or there could be wind. However, experts and courts consistently rely on the measurement. *See Ball*, 792 F.3d at 591 ("The district court did not abuse its discretion by admitting evidence of or relying on the heat index. . . . This court also has relied on the heat index before.") (citing *Gates,* 376 F.3d at 339). Further, the evidence presented suggests that the ventilation system at Dade CI is too unreliable to create significant, consistent variation across dorms. Plaintiffs provided a spreadsheet of work orders for the fans at Dade CI. (DE 156-1). It demonstrates that, between 2020 and 2024, Dade CI had an average of well over 100 ventilation related work orders a year. See (*id.*) Further, as mentioned *supra* Section II(A)(2), the incarcerated individuals who submitted declarations universally described poor ventilation in the dorms. *See* (DE 160-6 ¶ 27) ("The exhaust fans are constantly breaking. It sometimes takes FDC weeks or even months to fix them."). This undermines Defendants' argument that Dade CI's fans meaningfully and reliably produce high air speeds such that the heat index is an inaccurate metric. Therefore, at this this stage, the Court finds Defendants' arguments regarding the validity of the heat index as a measurement of heat risk to be unpersuasive.

[24] Defendants do not address the fact that the fans across Dade CI break down extremely frequently, thereby failing to consistently mitigate heat risk at the facility. *See supra* note 22.

Both the quantitative and qualitative information submitted to the Court establish that all those incarcerated in dormitories without air conditioning are exposed to a substantial risk of serious harm, regardless of variation between the dormitories. There are only "two structurally distinct dormitory types" at Dade CI. (DE 160 at 11). Both types are constructed of concrete and do not contain air conditioning. (DE 156-7 ¶ 11; 156-12 ¶ 4; DE 160-14 at 2; DE 160-17 at 1–3). Regardless of any variation in window construction or the number and type of fans available in the dorms, those incarcerated therein uniformly describe the ventilation as extremely poor and the heat mitigation measures as ineffective. *See supra* Section II(A)(2); (DE 156-7 ¶ 15) ("I shower at night. But as soon as I get back to my bed and try to sleep, around 10:00 p.m., I am covered in sweat."). As described above, the heat sensor data confirms that "the heat index is remarkably consistent in each dorm, such that everyone confined in an un-airconditioned dorm at Dade CI is exposed to the same relevant environmental conditions and faces the same baseline substantial risk of serious." (DE 160-25 ¶ 20). The temperatures at Dade CI fell within the caution, danger, and extreme danger zones a vast majority of the time across *all* dormitories during the months in which temperatures were measured. (DE 160-23 ¶ 55).

And to the degree that there is variation across the dormitories in the nature and number of fans installed, Dr. Vassallo testified that fans alone are not an effective heat mitigation measure, particularly when the heat and humidity exceed a certain level. (DE 260 at 95:21–25, 96:1–6). Therefore, Dade CI's policy – providing housing without air conditioning and supplying heat mitigation measures in the form of fans, cold water, and

showers –[25] is in all significant respects applied uniformly to the class and poses common questions of fact and law as to its constitutionality.[26]

Defendants further argue that the disability subclass in particular should be decertified because an individualized assessment is necessary to determine if each class member qualifies as disabled under the ADA. (DE 160 at 29). This argument has repeatedly been rejected by courts. "[T]he denial of a system that would have the effect of ensuring that [plaintiffs] and their fellow prisoners [are] appropriately accommodated[]" creates the class-wide injury. *Dunn v. Dunn*, 318 F.R.D. 652, 663 (M.D. Ala. 2016), *modified sub nom. Braggs v. Dunn*, No. 2:14CV601, 2020 WL 2395987 (M.D. Ala. May 12, 2020); *see, e.g.*, *Lewis*, 324 F.R.D. 159, 176 (M.D. La. 2018) ("The claims of the inmates with disabilities sub-class also satisfy the commonality requirement: either the Plaintiffs are housed in a facility that comports with the ADA or they are not."); *Bumgarner v. NCDOC*, 276 F.R.D. 452, 456 (E.D.N.C. 2011) ("In a lawsuit wherein individuals with varying disabilities challenge policies and practices that affect all of the putative class members, factual differences regarding their disabilities does not defeat commonality."); *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *overruled on other grounds by Johnson v. California,* 543 U.S. 499 (2005) ("Certainly, the differences that exist here do

[25] The Declarations submitted by those incarcerated indicate that water coolers containing ice are inconsistently brought to the dormitories, that the volume of ice is insufficient for the number of people housed in each unit, and that the water fountains, sinks, and showers at Dade CI do not dispense cold water. *See* (DE 156-7 ¶ 14; DE 156-10 ¶ 21; DE 156-12 ¶ 20; DE 156-14 ¶¶ 11, 18; DE 156-15 ¶¶ 10–11; DE 156-17 ¶ 19; DE 156-24 ¶ 15; DE 156-25 ¶ 23). One Declarant explained that he washes himself with toilet water "because the toilet water is cooler than the sink water." (DE 156-18 ¶ 15).

[26] Though the infirmary and Mental Health Unit are air-conditioned, (DE 156-35 at 4), the Parties have not suggested that the class should exclude individuals housed there. Nor have the Parties briefed whether patients reside in either location for extended periods of time or whether the population housed there is inherently transitory.

not justify requiring groups of persons with different disabilities, all of whom suffer similar harm from the Board's failure to accommodate their disabilities, to prosecute separate actions. The commonality requirement is met.").[27] This Court likewise finds the argument unpersuasive and sees no reason to disturb its ruling that Rule 23(a)'s commonality requirement is met.

**2. The typicality requirement is satisfied.**

Another Rule 23(a) prerequisite to class certification is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "A class representative satisfies the typicality requirement if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Carter v. City of Montgomery*, 108 F.4th 1334, 1341 (11th Cir. 2024) (citation and quotation marks omitted). "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3). The typicality requirement may be satisfied despite substantial factual differences, however, when there is a strong similarity of legal theories." *Murray*, 244 F.3d at 811 (citations and quotation marks omitted).

Though the commonality and typicality inquiries frequently overlap, "commonality refers to the group characteristics of the class as a whole and typicality refers to the individual characteristics of the named plaintiff in relation to the class." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). "[O]ne of the core purposes of conducting typicality review is to ensure that 'the named plaintiffs have incentives that

---

[27] *But see Hoffer v. Inch*, 382 F. Supp. 3d 1288, 1298 (N.D. Fla. 2019), *rev'd in part on other grounds sub nom. Hoffer v. Sec., Fla. Dept. of Corr.*, 973 F.3d 1263 (11th Cir. 2020).

align with those of absent class members so as to assure that the absentees' interests will be fairly represented.'" *Id.* (quoting *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994)).

As they previously argued when initially opposing class certification, (DE 22 at 17–18), Defendants contend that Named Plaintiffs are not typical because their "pleaded conditions and medications cover, at most, a sliver of the categories their class definitions sweep in . . . ." (DE 160 at 21). Numerous courts have found that differences between the conditions or symptoms of the named plaintiffs and the general class do not defeat typicality. *See, e.g.*, *Spurlock v. Wexford Health Sources, Inc.*, 175 F.4th 232, 247 (4th Cir. 2026) ("The district court did not abuse its discretion in concluding that the fact that symptoms may vary does not defeat typicality because all the class members experienced the same alleged constitutional injury."); *Dunn*, 318 F.R.D. at 666 ("Their claims were not disability or accommodation-specific, though; they challenged systemic practices with which they all interact and from which they all allegedly suffer."); *Lewis*, 324 F.R.D. at 170 ("While Defendants assert that the individually Named Plaintiffs' disabilities and alleged denied accommodations are different, the basis of liability Plaintiffs assert is not the denial of the accommodations themselves, but the denial of a system that would have the effect of ensuring that they and their fellow prisoners are appropriately accommodated."); *Baxley v. Jividen*, 338 F.R.D. 80, 88 (S.D.W. Va. 2020) ("Moreover, the fact that the individual class members may have different medical conditions, or may experience different 'specific' injuries, does not defeat typicality."). This is because "[t]he analysis focuses on whether the named representative's claims are typical, not whether the representative is." *Cole*, 2016 WL 3258345, at *8. "As has been made abundantly clear, the claimed injury is the exposure to policies and practices that

place both the named and unnamed class members at a substantial risk of harm." *Baxley*, 338 F.R.D. at 88–89.

Defendants point out the details of each Named Plaintiffs' medical challenges, but they do not identify how these characteristics would generate different legal theories or incentives for the Named Plaintiffs and general class.[28] *See Ahlman v. Barnes,* 445 F. Supp. 3d 671, 686 (C.D. Cal. 2020) ("But [Defendants] fail to identify specifically what those individual defenses are—if Plaintiffs' [conditions of confinement class] claims were truly subject [to] unique defenses that would distract them from prosecuting the class claims, presumably Defendants would be able to readily identify them."). The Named Plaintiffs are subjected to the same heat mitigation and ventilation policies as the general class and subclasses and proceed under the same legal theories as them. *See Baxley*, 338 F.R.D. at 89 (finding that plaintiffs met typicality requirement despite differences in their health because they seek a system of adequate health care "under the same legal theory of deliberate indifference"). Named Plaintiffs have an incentive aligned with the rest of the class members: to have Dade CI take reasonable measures to ensure heat exposure and lack of proper ventilation do not pose a substantial risk of serious harm to the class. The Court sees no reason to disturb its initial typicality finding.

Lastly, Defendants argue that Mr. Harris fails to meet the typicality requirement because his claims are moot. (DE 160 at 26). Defendants first raised this issue on May 26, 2026 in their Motion to Decertify. (*Id.*) However, the Court first certified the class on September 26, 2025. (DE 63). Once a class action is certified, the named plaintiffs acquire

[28] The one exception is Defendants' argument that Mr. Tyrone Harris is not typical of the class because his claims are now moot, which is addressed below.

a separate legal status as representatives of the class, and their claims may not be mooted by a loss in their personal stake in the litigation. *See Sosna v. Iowa*, 419 U.S. 393, 399 (1975). In this way, class certification "avert[s] the substantial possibility of the litigation becoming moot prior to decision." *Greklek v. Toia*, 565 F.2d 1259, 1261 (2d Cir. 1977).

Nonetheless, Defendants argue that Mr. Harris's claims are moot despite the certification of the classes because Mr. Harris was transferred out of Dade CI prior to the Certification Order. (DE 160 at 26). Defendants failed to raise this issue with the Court until roughly ten months after the transfer and eight months after the class had been certified, even though Defendants themselves effectuated Mr. Harris's transfer out of Dade CI. *See* (*id.*) In dictum, the Supreme Court opined that it may be appropriate to address class claims on appeal where "the District Court ha[s] certified a class and only later had it appeared that the named plaintiffs were not class members or were otherwise inappropriate class representatives." *E. Tex. Motor Freight System Inc. v. Rodriguez*, 431 U.S. 395, 406 n.12 (1977). "In such a case, the class claims would have already been tried, and, provided the initial certification was proper and decertification not appropriate, the claims of the class members would not need to be mooted or destroyed . . . ." *Id.* The Eleventh Circuit has since adopted the reasoning contained in this dictum. *Scott v. City of Anniston, Ala.*, 682 F.2d 1353, 1356 (11th Cir. 1982) (finding that the "decision of the District Court to decertify the class on the grounds of inadequate representation was error" because "the Supreme Court said that class claims need not be 'mooted or destroyed' if the class is certified before it is discovered that the named plaintiffs are inappropriate class representatives") (quoting *Rodriguez*, 431 U.S. at 406 n.12).

Although the claims in this case have not yet been tried, *Rodriguez* and *Scott* remain instructive. At the time of the Certification Order, the Court properly found Mr. Harris to be an appropriate class representative in light of the information before it. This case was heavily litigated from the time when the Court certified the class to when Defendants raised the issue of Mr. Harris's transfer.[29] During this period, Plaintiffs filed their Motion to Supplement and Defendants filed their Response, but the Parties did not raise the issue of Mr. Harris's transfer or standing to represent the class. (DE 82; DE 89). Further, Defendants deposed Mr. Harris on March 12, 2026, despite his transfer. (DE 160-15). For over two months following the deposition, Defendants did not raise any issue as to the mootness of Mr. Harris's claims or his suitability as a class representative due to his transfer. At this juncture, and after the case has been substantially litigated since the initial Certification Order, the Court declines to retroactively decertify Mr. Harris's claims.[30] Thus, he still maintains "a separate legal status as representative[] of the class." *Sosna*, 419 U.S. at 399.[31]

---

[29] During this period, the Court held hearings and ruled on numerous discovery motions. *See* (DE 78; DE 80; DE 107; DE 109; DE 126; DE 136; DE 145).

[30] The Court is cognizant that some other courts have declined to apply *Rodriguez* in the pretrial context but allow the class action to proceed "with the substitution of appropriate class representatives" instead. *Whitlock v. Johnson*, 153 F.3d 380, 384 (7th Cir. 1998); *Tate v. Hartsville/Trousdale Cty.*, No. 3:09-0201, 2010 WL 4822270, at *4 (M.D. Tenn. Nov. 22, 2010). In light of the record, the Court might consider a motion to substitute if the Parties feel it necessary to do so.

[31] The Court need not consider whether the other exceptions to mootness in the class action context, such as the "picking off" and "inherently transitory" doctrines, apply in this case. *See Sos v. State Farm Mut. Auto. Ins. Co.*, No. 21-11769, 2023 WL 5608014, at *10 (11th Cir. Aug. 30, 2023) ("To adapt the mootness doctrine to the class action mechanism . . . the Supreme Court has crafted several exceptions to the general rule that pre-certification mootness of the named plaintiff's claims divests the federal courts of jurisdiction over the entire action.").

## ***II. Plaintiffs satisfy Rule 23(b)(2).***

Plaintiffs must also satisfy one of the three provisions of Rule 23(b) in order to establish that class certification is appropriate. *Little*, 691 F.3d at 1304. Plaintiffs are proceeding under Rule 23(b)(2), which "permits class actions for declaratory or injunctive relief where the party opposing the class has acted or refused to act on grounds generally applicable to the class." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Rule 23(b)(2) "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

"Rule 23(b)(2) has been liberally applied in the area of civil rights, including suits challenging conditions and practices at various detention facilities, as well as claims for violations of the ADA and Rehabilitation Act." *Braggs v. Dunn*, 321 F.R.D. 653, 666 (M.D. Ala. 2017) (quoting *Bumgarner v. NCDOC*, 276 F.R.D. 452, 457 (E.D.N.C. 2011)); *see Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980) ("Because one purpose of Rule 23(b)(2) was to enable plaintiffs to bring lawsuits vindicating civil rights, the rule must be read liberally in the context of civil rights suits.") (citation and quotation marks omitted).

### 1. A single injunction would provide relief to the entire incarcerated population at Dade CI.

Rule 23(b)(2) is satisfied when an injunction requiring a correctional facility to change its practices would apply to all those incarcerated there. *See Hoffer*, 323 F.R.D. at 699 (certifying class under Rule 23(b)(2) because "if this Court enters an injunction forcing Defendant to change FDC's policies and practices with respect to HCV treatment, then each member of the proposed class will be able to enjoy those changes"); *Braggs v. Dunn*, 317 F.R.D. 634, 667 (M.D. Ala. 2016) ("[L]iability in this case is premised on the notion that ADOC's policies and procedures result in systematic discrimination against

the members of the settlement class because of their mental disabilities. . . . Therefore, class certification pursuant to Rule 23(b)(2) is appropriate.”).

Courts facing substantially similar facts have found that a single injunction appropriately provides relief to an incarcerated population subjected to extreme heat. *See Yates*, 868 F.3d at 367–68; *Voice of the Experienced v. Leblanc*, 3:23-cv-01304, at *25–26 (M.D. La. Dec. 23, 2025); *see also Graves v. Arpaio*, 623 F.3d 1043, 1045 (9th Cir. 2010) (affirming judgment requiring sheriff to house detainees taking psychotropic medications in environment where temperature does not exceed eighty-five degrees Fahrenheit). For example, in *Yates*, the Fifth Circuit found that Rule 23(b)(2) applied because “there is no serious question that Defendants have engaged in common behavior that ‘appl[ies] generally to the class[es].’” 868 F.3d at 367–68 (quoting FED. R. CIV. P. 23(b)(2)). They reasoned, “[a]ll inmates, regardless of age or health, are subject to the *same* policy on climate control (*i.e.*, their housing units are not air-conditioned), all have the *same* heat-mitigation measures available to them (whether or not those measures are effective), and all are (allegedly) harmed in essentially the *same* way—*i.e.*, by exposure to a substantial risk of serious harm because of exposure to excessive heat.” *Id.* at 368 (emphasis in original). Plaintiffs likewise satisfy Rule 23(b)(2)’s requirements.

Similar to their Rule 23(a) commonality argument, Defendants argue that a single injunction could not afford relief to the class because “heat risk is irreducibly individualized” and because conditions and mitigation measures vary across dorms. (DE 160 at 9). Again, Defendants misunderstand that the injury here is “exposure to a substantial risk of serious harm because of exposure to excessive heat[,]” not a specific physiological response to heat. *Yates*, 868 F.3d at 368. “[T]he language of Rule 23(b)(2)

focuses on the nature of defendants' acts and omissions and the suitability of class-wide relief, and does not require that the class-wide relief benefit each class member in precisely the same way." *Braggs*, 317 F.R.D. at 668. "Indeed, (b)(2) classes have been certified in a legion of civil rights cases where commonality findings were based primarily on the fact that defendant's conduct is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct." *Baby Neal*, 43 F.3d at 57. Further, as described *supra* Section IV(A)(2), the evidence presented establishes that Dade CI has a policy of housing all incarcerated individuals, except those in the infirmary and Mental Health Unit, in dormitories with neither air conditioning nor effective ventilation and periodically providing them with ice and showers. A single injunction requiring Dade CI to reform its heat mitigation measures would supply relief to the entire class.

**2. The requested relief would satisfy Rule 23(b)'s specificity requirement.**

Rule 65(d)(1)(C) requires orders granting injunctive relief to "describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required." FED. R. CIV. P. 65(d)(1)(C). Defendants argue that, to satisfy Rule 23(b)(2)'s requirements, "Plaintiffs must, under Rule 65(d), identify what single injunction could remedy the classwide injury, with specificity." (DE 160 at 5). They further argue that Plaintiffs fail to satisfy Rule 23(b)(2) because their Complaint does not plead the requested relief with the requisite specificity. (*Id.*) Rule 65(d)(1)(C) places requirements on a court's order of injunctive relief. It is not a separate pleading standard. *See Shook v. Bd. of Cty. Comm'rs. of Cty. of El Paso*, 543 F.3d 597, 605 n.4 (10th Cir. 2008) ("***Shook II***"). Instead, courts refer to Rule 65(d)(1)(C) at the class certification stage "because,

without sufficient detail, the district court [is] not [able to] assess whether the injunctive or declaratory relief sought could provide relief to each member of the class." *Harvard v. Dixon*, No. 4:19-CV-212, 2022 WL 21694010, at *2 (N.D. Fla. July 25, 2022) (citation and quotation marks omitted). "Rule 23(b)(2) does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage; it requires only 'reasonable detail' as to the 'acts required.'" *Yates*, 868 F.3d at 368 (quoting *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 848 (5th Cir. 2012)).

Under *Shook II's* standard, which Defendants argue is applicable, Plaintiffs need only describe their proposed relief with enough specificity "to allow the district court to see how it might satisfy Rule 65(d)'s constraints and thus conform with Rule 23(b)(2)'s requirement[.]" *Shook*, 543 F.3d at 605 n.4.[32] They need not "come forward with an injunction that satisfies Rule 65(d) with exacting precision at the class certification stage." *Id.* A request for an injunction to keep the heat index below a certain value, or to initiate certain heat mitigation measures once the heat index rises above that value, satisfies the specificity requirement. For example, in *Yates*, the Court found, "[w]hile Plaintiffs requested that the district court 'enjoin Defendants to maintain a safe indoor apparent

[32] Some Courts have declined to adopt the standard of specificity articulated in *Shook II*, particularly in cases challenging conditions of confinement. *See Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014); *Gray v. Golden Gate Nat. Recreational Area*, 279 F.R.D. 501, 521 (N.D. Cal. 2011). That is because "an injunction in any such case must closely track the violations established by the evidence at trial, that any such relief must comply with the PLRA's extensive requirements, that prison officials must play a role in shaping injunctions, that ultimate proof of some violations but not others might easily change the structure of a remedial plan, that conditions in prisons might change over the course of litigation, and that the class certification hearing is not a dress rehearsal of the trial on the merits (let alone a dress rehearsal of the remedy proceedings)." *Parsons*, 754 F.3d at 689 n.35. The Court need not resolve whether a less rigorous standard than that articulated in *Shook II* applies, as Plaintiffs pleaded their claims with a level of specificity that would meet the *Shook II* standard.

temperature' (which admittedly offers little content), they *also* identified specific relief in 'reasonable detail' that would fit this standard: 'maintaining a heat index of 88 degrees or lower.'" 868 F.3d at 368 (emphasis in original). The Court found that this was sufficient specificity to satisfy Rule 23(b)(2). *Id.*

The Complaint specifies that "[p]rolonged exposure to a heat index of 88 degrees or higher subjects an otherwise 'healthy' person to a substantial risk of serious harm." (DE 1 ¶ 138). It then requests injustice relief:

> [R]equiring Defendants to develop and execute a plan that remedies and abates Plaintiffs' and the class members' serious risk of harm due to the heat index and lack of ventilation; this plan could include (but not be limited to) the installation of air conditioning or other measures that maintain the heat index in the Dade CI dormitories at safe levels[.]

(*Id.* at 62). The Complaint therefore requests the Court order Dade CI to maintain the heat index at a safe level, which would be below eighty-eight degrees according to Dr. Vassallo, and suggests one method of achieving this. If there were any ambiguity about the requested relief, Plaintiffs have clarified that they "propose[] reducing the heat index to 88ºF in the Dade CI dorms." (DE 181 at 5). Plaintiffs' request is virtually identical to the request in *Yates*. The Court need not make a merits determination about whether Dade CI is constitutionally required to maintain a heat index below eighty-eight degrees. The Court is capable of "see[ing] how it might satisfy Rule 65(d)'s constraints" by issuing an injunction, should Plaintiffs ultimately prevail. *Shook* 543 F.3d at 605 n.4. Therefore, Defendants' specificity argument is unavailing, and Plaintiffs satisfy Rule 23(b)(2).

## V. CONCLUSION

For the reasons set forth above, the evidence presented demonstrates that each of Rule 23(a)'s requirements are satisfied. It also demonstrates that Rule 23(b)(2) is

satisfied. Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Renewed Motion to Certify (DE 156) is **GRANTED**.
2. Defendants' Motion to Decertify (DE 160) is **DENIED**.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 23rd day of October, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE