**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:24-cv-24253-KMW**

DWAYNE WILSON, TYRONE HARRIS, and GARY WHEELER, individually and on behalf of those similarly situated,

Plaintiffs,

v.

RICKY DIXON, in his official capacity as Secretary of the Department of Corrections, FRANCISCO ACOSTA, in his official capacity as Warden of Dade Correctional Institution, and FLORIDA DEPARTMENT OF CORRECTIONS, an agency of the State of Florida,

Defendants.
_______________________________________/

**DEFENDANTS' PARTIAL OBJECTIONS TO MAGISTRATE JUDGE'S OMNIBUS ORDER DENYING MOTIONS TO EXCLUDE OR LIMIT EXPERT TESTIMONY**

Pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72(a), and Southern District of Florida Magistrate Judge Rule 4(a)(1), Defendants Ricky Dixon, Francisco Acosta, and the Florida Department of Corrections ("**Defendants**") object in part to the Magistrate Judge's October 16, 2026 Omnibus Order (D.E. 330), which denied their motions to exclude or limit the expert testimony of Dr. Benjamin Kirtman (D.E. 159) and Dr. Kevin Horn (D.E. 158).

## INTRODUCTION

Plaintiffs' claims depend on scientifically reliable proof that the environmental conditions inside the dormitories at Dade Correctional Institution ("**Dade CI**") expose inmates to a substantial risk of serious harm. Dr. Kirtman is Plaintiffs' only climate expert and the source of the historical outdoor heat-index estimates and warming-trend conclusions on which Plaintiffs' remaining

experts rely. Dr. Horn, in turn, relied on "Dr. Kirtman's report and heat-index data" in formulating his cause-of-death opinions. D.E. 330 at 24.

The Omnibus Order allows Dr. Kirtman to testify despite his own admissions that he (i) has never calculated the heat index in any peer-reviewed paper, (ii) accepted the metrics to form his opinions based on numbers provided by Plaintiffs' counsel rather than from his own professional judgment, (iii) relies on literature he did not write and on conversations with a sleep researcher at the University of Miami, and (iv) has "no idea" whether the heat index ***outside*** Homestead Air Force Base is representative of the conditions ***inside*** Dade CI. The Omnibus Order relegates these defects to cross-examination. But Rule 702 places the burden on Plaintiffs to establish that each challenged opinion is reliable. The Omnibus Order's acceptance of Dr. Kirtman's opinions, and its parallel ruling admitting Dr. Horn's causation testimony that depends on Dr. Kirtman's data, cannot be reconciled with that burden.

The Omnibus Order's analysis of Dr. Horn's opinions is likewise flawed. The Omnibus Order concedes that the "Maricopa Model" (the method by which Dr. Horn evaluates whether environmental heat contributed to an individual's death) does not "lend itself neatly to the conventional reliability analysis," D.E. 330 at 23, but then sanctions its use in this case. *Id.* The Omnibus Order allows Dr. Horn, a forensic pathologist without any training in indoor heat environments and without any Florida practice experience, to adopt an unverified assertion from ***another expert*** that indoor temperatures at Dade CI are similar to or higher than outdoor temperatures. In so doing, the Omnibus Order relaxes the gatekeeping function on the ground that this case will be decided at a bench trial, in tension with Rule 702's requirement that the proponent carries the burden of establishing reliability. And finally, the Omnibus Order accepts Dr. Horn's Supplemental Report as "rebuttal," even though it analyzes three deaths that no defense expert

addressed. Each of these rulings is contrary to law, and together they underscore the gatekeeping failure of the Omnibus Order. These portions of the Omnibus Order should thus be set aside.

## LEGAL STANDARD

Rule 72(a) and Southern District of Florida Magistrate Judge Rule 4(a)(1) require the district judge to modify or set aside any portion of the order that is clearly erroneous or contrary to law. *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1327 (11th Cir. 2020). A legal error, including misapplication of an admissibility rule, is contrary to law. *See In re Application of O'Keeffe*, 184 F. Supp. 3d 1362, 1366 (S.D. Fla. 2016). A factual finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005) (citation modified).

## OBJECTIONS

### A. Under Rule 72(a), the Magistrate Judge's Qualification Ruling on Dr. Kirtman Is Contrary to Law and Clearly Erroneous.

#### 1. *The Omnibus Order's Finding that Dr. Kirtman is Qualified to Opine on Heat Index, Human Health, and Public Health is Contradicted by the Record.*

The Omnibus Order concludes that Dr. Kirtman "is qualified and may testify about matters related to climatology, including heat indices and heat's effects on public health." D.E. 330 at 28. To arrive at that conclusion, the Magistrate Judge reasoned that Dr. Kirtman "has calculated and presented heat-index data professionally and has extensively published on its underlying components, including temperature and relative humidity." D.E. 330 at 26–27. This portion of the Omnibus Order is clearly erroneous because Dr. Kirtman himself admitted that he does not "regularly" work with heat indices and he has never authored any publication on the heat index. D.E. 159-3 at 27:7–12. In fact, Dr. Kirtman could not identify a single paper in his thirty-page

curriculum vitae—which lists 247 journal articles—where he had previously calculated a heat index. D.E. 159-3 at 28:13–17. He is, by his own description, a "climate dynamicist" whose specialty is "predicting the state of the climate system from days to decades." D.E. 159-3 at 8:12–18; D.E. 159-1 ¶ 3. Simply because Dr. Kirtman has published some articles about temperature and humidity in the context of long-range climate modeling does not establish that he is qualified to testify as an expert about the heat index as a metric for Dade CI.

Similarly, the Omnibus Order's conclusion that Dr. Kirtman's "opinions concerning heat's effects on public health are grounded in his expertise concerning heat exposure and environmental conditions," D.E. 330 at 27, is contradicted by Dr. Kirtman's own testimony. When pressed on how he arrived at the "public health risks" conclusion in his Rebuttal Report, Dr. Kirtman conceded he was "going beyond [his] expertise." D.E. 159-3 at 94:9–16. He further testified that he is not a medical doctor and has no training to render any medical opinion. D.E. 159-3 at 14:7–14. Asked whether he had an opinion on how heat affected individual inmates at Dade CI, Dr. Kirtman answered: "I do not have an opinion." *Id.* at 16:5–9. When asked the basic question "how does heat affect human health?" he responded: "I don't know." D.E. 159-3 at 16:5–8, 46:8–9. The Omnibus Order neither addresses nor reconciles those fatal concessions, and thus clearly erred by relying on Dr. Kirtman's general familiarity with climatology to allow him to offer opinions on heat indices, human health, and public health at trial, all of which he admitted are not his areas of expertise.

***2. The Omnibus Order Impermissibly Permits Dr. Kirtman to Serve as a Conduit for Other Scientists' Opinions on Human Health.***

The Omnibus Order recites the controlling rule that an expert "cannot simply be a conduit for the opinion of an unproduced expert" or "simply parrot the work actually done by another expert." D.E. 330 at 27 (quoting *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d

1075, 1136 (S.D. Fla. 2022)). It then summarily—and without support—concludes that Dr. Kirtman "does not do so," relying on *In re Camp Lejeune Water Litig.*, No. 7:23-CV-897, 2025 WL 3565850, at *25 (E.D.N.C. Dec. 12, 2025), and *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009), for the proposition that experts may "review scientific literature and other expert reports to form their opinions." D.E. 330 at 27. But that general rule cannot sanction Dr. Kirtman's wholesale adoption of other scientists' human health and public health conclusions as his own, in fields where he admittedly lacks expertise.

For example, when Dr. Kirtman was asked to explain the basis of his opinion that the heat index is "the best scientific approximation" for how an environment "affects human health" (D.E. 159-1 ¶ 13), he answered: "[t]hat is what I have read in the scientific literature. . . . It's another scientist's peer-reviewed result"; "[i]t's based on what other scientists have . . . written." D.E. 159-3 at 42:14–25, 45:1–15. Dr. Kirtman's only identified basis for the "overnight temperatures" public health opinion in his Rebuttal Report was "interactions with a sleep expert at the University of Miami," with whom he discussed potential collaborations. D.E. 159-3 at 92:9–18. These admissions place Dr. Kirtman in the category the Eleventh Circuit forbids—an expert who seeks to testify in a field in which he has "never previously conducted any research" and whose opinion "was based solely on publications from other researchers." *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.,* 772 F.3d 1352, 1368 (11th Cir. 2014).

Although experts may rely on the literature of other experts to form their opinions, "such expert must make some findings and not merely regurgitate another expert's opinion." *Eberli*, 615 F. Supp. 2d at 1364 (excluding expert "because it merely parrots another expert's opinion"). Dr. Kirtman admitted that his health opinions went beyond his expertise and could only defend them by pointing to his reading and discussions with other scientists. D.E. 159-3 at 94:9–23. The

Omnibus Order erroneously accepts Dr. Kirtman's justification without explaining what qualifies him to give those opinions. The Court should set aside the portion of the Omnibus Order allowing Dr. Kirtman's health opinions.

**B. The Omnibus Order's Methodology Ruling on Dr. Kirtman is Contrary to Law and Clearly Erroneous.**

***1. The Omnibus Order Treats Dr. Kirtman's Counsel-Dictated Metrics, Thresholds, and Date Ranges as Questions of Weight Rather Than Admissibility.***

As Defendants raised in their motion, Dr. Kirtman's three core methodological inputs for his analysis were provided by Plaintiffs' counsel, rather than through his own scientific judgment, and he used the heat index only because Plaintiffs' counsel told him to do so. *See* D.E. 159 at 13; D.E. 159-3 at 47:1–8, 35:15–20, 36:6–9, 38:22–39:6. Despite these admissions, the Omnibus Order concludes that "any dispute as to whether the key metrics, geographic scope, or time periods were the best inputs, goes to the weight of Dr. Kirtman's testimony rather than its admissibility, and can be addressed through cross-examination." D.E. 330 at 29. That ruling is contrary to law. Rule 702 requires the proponent of expert testimony to establish to the court that each foundational element of the opinion is reliable. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) ("The proponent of expert testimony always bears the burden to show . . . the methodology by which the expert reach[ed] his conclusions is sufficiently reliable.") . Plaintiffs fail to do so with Dr. Kirtman's testimony.

The record establishes that Dr. Kirtman's three core methodological inputs—(i) the heat-index metric itself, (ii) the May-through-September date range, and (iii) the Homestead AFB and Kendall weather-station selections—were not the product of Dr. Kirtman's independent scientific judgment. Each was provided by Plaintiffs' counsel. D.E. 159-3 at 36:3–9 ("I'm an expert witness. They've asked me to look at these dates, and I'm just following through on that."); *id.* at

47:1–8 (stating that counsel "chose" the heat index as a metric). When asked whether he considered any alternative metric before concluding that the heat index was "the best scientific approximation," Dr. Kirtman confessed that he "did not consider any other metrics." *Id.* at 47:17–48:3. He also had never heard of the OSHA-recommended wet-bulb globe temperature, the Universal Thermal Climate Index, or the "standard effective temperature" used in indoor thermal comfort science. *Id.* at 50:4–6, 53:4–25, 54:2–11.

Courts in this Circuit have excluded experts who—like Dr. Kirtman—depart from their usual professional methodology to arrive at a litigation-driven conclusion. *See Cordoves v. Miami-Dade Cnty.*, 104 F. Supp. 3d 1350, 1363–64 (S.D. Fla. 2015) (Altonaga, J.) (excluding expert who "contradicts not only his purported methodology, but also his own past practice"); *cf. Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (explaining that a court must "make certain" that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). Dr. Kirtman confirmed that he does not regularly use the heat index in his professional work, does not regularly use the thresholds he applied here, and did not independently verify any of the inputs supplied by counsel. *See* D.E. 159-3 at 27:7–12, 28:6–11, 47:1–8. These are not matters of "weight" subject to adversarial testing; they are threshold reliability defects that the gatekeeping function requires the court to resolve.

**2. *The Omnibus Order Did Not Make a Reliability Finding on Dr. Kirtman's Analytical Gap Between Outdoor Data and Indoor Conditions at Dade CI.***

Dr. Kirtman's conclusions relate to the heat index at Dade CI, yet his data comes from outdoor weather stations—principally Homestead Air Force Base—located miles away from Dade CI. He has not conducted any indoor analysis of Dade CI, nor has he ever visited the facility. Dr. Kirtman likewise does not have any knowledge of Dade CI's layout, ventilation, airflow, or occupancy, and testified that he "cannot answer" whether the heat index is a reliable measure of

indoor conditions because he is "not an expert on indoor temperatures." D.E. 159-3 at 48:4–9. Most importantly, Dr. Kirtman testified that he has "no idea" whether the heat index ***outside*** Homestead AFB is representative of the temperatures ***inside*** Dade CI. *Id.* at 58:23–59:2.

The Omnibus Order sidesteps Dr. Kirtman's analytical gap in a single sentence that contradicts his testimony: "these outdoor conditions are relevant to gain an understanding of the environmental conditions inside of Dade CI." D.E. 330 at 29. The Eleventh Circuit has warned "against leaping from an accepted scientific premise to an unsupported one," *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314 (11th Cir. 1999), and has required courts to guard against expert testimony that extrapolates "beyond good science." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1247 (11th Cir. 2005). The Omnibus Order fails to find that Dr. Kirtman's methodology bridges the gap between outdoor airport data and indoor dormitory conditions at Dade CI, nor could it, because Dr. Kirtman laid bare in deposition the fact that he has "no idea" how the two measurements relate to each other. D.E. 159-3 at 58:23–59:2. The Omnibus Order thus clearly errs by allowing Dr. Kirtman to testify on this issue despite his unambiguous lack of expertise.

Dr. Kirtman's reports also contain a series of shifting temperature thresholds—80°F, 88°F, 90°F, 95°F, 100°F, 103°F, 105°F, and 110°F—that he uses for his opinions. D.E. 159-1 ¶¶ 24–26, 38–51. The Omnibus Order sanctioned those thresholds because, according to the Magistrate Judge, Dr. Kirtman "testified that he employed thresholds that are commonly used and published in literature." D.E. 330 at 29. This finding in the Omnibus Order is directly contradicted by Dr. Kirtman himself. Dr. Kirtman conceded during his deposition that the thresholds he used for his report have no "independent significance in the field of climate in which [he is] an expert." D.E. 159-3 at 70:1–4. When asked why he chose thresholds of 80°F, 88°F, 90°F, and 103°F, he answered: "I've seen it reported that those are thresholds that people are particularly interested in

. . . . I just saw that reported, so they seem like good thresholds." *Id.* at 68:8–15. Asked to identify *where* he saw the thresholds or *who* was interested in them, he could not name a single author, study, publication, or report. *Id.* at 68:16–69:10 ("Not off the top of my head."). Asked specifically about the 88°F threshold, he conceded: "I'm not an expert on that threshold. . . . I've seen it out there in the published literature that that's an important threshold, but I took that threshold as what's commonly used." *Id.* at 61:18–21. The thresholds thus are not only unreliable but cannot be helpful to the court, as they have no established scientific significance.

The Omnibus Order's unqualified finding that Dr. Kirtman's thresholds are "commonly used and published in literature" rests solely on Dr. Kirtman's own say-so, unaccompanied by a single citation to any such literature. That is the "*ipse dixit*" the Eleventh Circuit rejects. *Frazier*, 387 F.3d at 1261 (stating that a court's "gatekeeping function requires more than simply taking the expert's word for it") (citation modified). On this record, the Omnibus Order's finding that Dr. Kirtman's thresholds have a reliable scientific foundation leaves "the definite and firm conviction that a mistake has been committed," *Holton*, 425 F.3d at 1350, and should be set aside.

### C. The Challenged Opinions by Dr. Kevin Horn Should Have Been Stricken as Contrary to Law and Clearly Erroneous.

The Omnibus Order's denial of Defendants' Motion to Strike or Limit Dr. Horn rests on four independent legal errors. First, the Omnibus Order sustains the "Maricopa Model" as a reliable methodology despite acknowledging that it "does not lend itself neatly to the conventional reliability analysis," D.E. 330 at 23, and despite record evidence that each *Daubert* reliability factor is absent. Second, the Omnibus Order allows Dr. Horn to adopt wholesale the data and conclusions of Dr. Kirtman and Dr. Schiavon in fields in which Dr. Horn admits he has no expertise. Third, the Omnibus Order relaxes the gatekeeping function because this case will be decided at a bench trial, a rationale that neither Rule 702 nor Eleventh Circuit precedent supports on this record.

Fourth, the Omnibus Order determines that the Supplemental Report and large portions of the Rebuttal Report constitute proper rebuttal, when Dr. Horn himself testified that those sections do not respond to any defense opinion.

***1. The Omnibus Order's Reliability Analysis of the Maricopa Model is Contrary to Law.***

The Omnibus Order concludes that the Maricopa Model is sufficiently reliable to evaluate whether environmental heat contributed to an individual's death because Dr. Horn applies that model with "concrete and repeatable factors" drawn from his personal experience. D.E. 330 at 23. The Magistrate Judge concedes that the Maricopa Model "does not lend itself neatly to the conventional reliability analysis." *Id.* Rule 702 and Eleventh Circuit precedent do not permit a methodology to be admitted on that basis. "The proponent of expert testimony *always* bears the burden to show . . . the methodology by which the expert reach[ed] his conclusions is sufficiently reliable." *Frazier*, 387 F.3d at 1260 (cleaned up).

The record on each *Daubert* factor is undisputed. Dr. Horn could not identify any published or external peer review of the Maricopa Model; he testified only that his chief had "presented it at a national meeting." D.E. 158-4 at 81:5–12. He described internal peer review of a subset of the office's cases. *Id.* at 81:23–82:9. There is no known error rate of the model—asked directly for the error rate, Dr. Horn answered: "I don't know that." *Id.* at 81:18–22. Dr. Horn identified no independently validated mechanism for assessing false positives. *Id.* at 81:23–82:9. Dr. Horn conceded he is "not aware of a safeguard" against over-attribution of deaths to heat, and that the Maricopa Model is based solely on "our synthesis of data and our professional opinions as medical examiners." *Id.* at 82:14–18. The Maricopa Model does not have a written protocol; rather, it consists of internal "heat-attribute checklists" and PowerPoint training modules that are not publicly posted. *Id.* at 71:20–73:1. And the model does not have general acceptance

outside Maricopa County: Dr. Horn could not identify a single medical examiner's office that has adopted the full model, and he admitted that he did not know "for a fact" whether Clark County, Nevada, had adopted parts of the model. *Id.* at 85:8–86:17.

The record, in fact, points to the Maricopa Model being an exception, rather than the standard. An E&E News analysis cited in Dr. Horn's report states that Maricopa County recorded more heat-related deaths from 2018 through 2023 than California, Texas, Florida, and Louisiana *combined.* Dr. Horn had not independently confirmed that comparison but offered no reason to dispute it. D.E. 158-4 at 82:19–83:2, 144:2–22. Dr. Horn could not offer any explanation for the disparity other than his personal belief that other states have been "undercounting" for years. D.E. 158-4 at 83:9–10.

In the face of all these shortcomings, the Omnibus Order nonetheless concludes that the Maricopa Model is reliable because it considers "concrete and repeatable factors." D.E. 330 at 23. But concrete and repeatable factors do not make a methodology reliable. Indeed, if that were sufficient, even a clearly erroneous model could satisfy *Daubert* simply by virtue of that attribute—and here, there is *no record of any other expert* in Dr. Horn's field utilizing the model. The Omnibus Order's finding that the Maricopa Model satisfies Rule 702 is thus clear error because it leaves "the definite and firm conviction that a mistake has been committed." *Holton*, 425 F.3d at 1350.

Compounding these errors, the Omnibus Order concludes that Dr. Horn's forensic pathology credentials qualify him to opine on "cardiovascular mortality, hormones, insulin resistance, and the effects of various medications" because those topics "concern the physiological mechanisms by which heat can cause or contribute to death." D.E. 330 at 21. But simply because a subject intersects an expert's field at some level of generality is not a substitute for independent

qualification. Dr. Horn is not a cardiologist, pulmonologist, or endocrinologist, and he freely admitted this during his sworn deposition. D.E. 158-4 at 102:19–103:7. Instead, Dr. Horn's expertise is in forensic pathology, anatomic pathology, and clinical pathology. D.E. 158-4 at 103:3–7. That expertise, although perhaps relevant in a different case, does not provide him with scientific competence to opine on cortisol cascades, catecholamine release, insulin-resistance pathways, or heat–medication interactions in living patients. The Omnibus Order's failure to confine Dr. Horn to his specialty is the kind of "leap[] from an accepted scientific premise to an unsupported one" that the Eleventh Circuit forbids. *See Allison, 184* F.3d at 1314.

**2. *The Omnibus Order's Reliance on* Eberli *to Permit Dr. Horn's Wholesale Adoption of Dr. Kirtman's and Dr. Schiavon's Data Is Contrary to Law.***

The Omnibus Order excuses Dr. Horn's reliance on the reports of Dr. Kirtman and Dr. Schiavon under *Eberli v. Cirrus Design Corp.*, by reasoning that Dr. Horn "did not merely adopt another expert's conclusion" but instead merely "used the reports and data to independently formulate an opinion." D.E. 330 at 25 (citing 615 F. Supp. 2d at 1364). The record does not support this conclusion.

Dr. Horn's causation opinions depend on the premise that the indoor heat index at Dade CI is at least as hot as the outdoor heat index. D.E. 158-1 at 8. Without that premise, Dr. Horn has no basis to opine that any of the nine decedents were "exposed" to the environmental conditions his Maricopa Model treats as actionable. Yet Dr. Horn has never visited Dade CI, has never reviewed any indoor temperature or humidity log for the facility, has no training in indoor thermal environments, and does not purport to be an expert in heat-index calculation, deferring instead to Dr. Kirtman on that question. D.E. 158-4 at 26:1–17, 32:24–33:4, 129:16–130:17. His entire indoor conditions premise comes from an "assertion" made by Dr. Schiavon's expert report, one

that Dr. Horn conceded is "based on his analysis, not mine" and that he "did not independently verify." D.E. 158-4 at 90:14–25, 130:9–17.

That is the issue *Lebron* addresses: an expert who seeks to testify in a field in which he has "never previously conducted any research" and whose opinion "was based solely on publications from other researchers." *Lebron*, 772 F.3d at 1368. And *Eberli* does not help Plaintiffs either. An expert's testimony "may be formulated by the use of the facts, data and conclusions of other experts," but "such expert must make some findings and not merely regurgitate another expert's opinion." *Eberli*, 615 F. Supp. 2d at 1364. On the dispositive question of indoor heat index at Dade CI, Dr. Horn does not have any independent expertise, does not offer any independent analysis, and makes no independent findings.

***3. The Omnibus Order's Supplemental and Rebuttal Report Rulings Are Clearly Erroneous.***

The Omnibus Order rules that Dr. Horn's Supplemental Report (D.E. 158-3)—which added opinions on three additional decedents (Donald Moringiello, John Massey, and Robert Barnes)—"directly rebuts Dr. Diaz's opinion that the Miami-Dade medical examiners adequately investigated deaths at Dade CI." D.E. 330 at 25. But this ruling is not in line with the record.

Dr. Horn confirmed at deposition that no defense expert had opined on the deaths of Moringiello, Massey, or Barnes. D.E. 158-4 at 115:14–24 (Moringiello), 118:21–119:11 (Massey), 121:6–17 (Barnes). Thus, there was no defense opinion as to cause of death for these three individuals to "contradict or rebut." Fed. R. Civ. P. 26(a)(2)(D)(ii). The Omnibus Order's conclusion otherwise mistakes generalized subject-matter rebuttal (quarrels with Dr. Diaz's approach to investigation generally) with case-specific rebuttal (contradicting an opposing opinion on the same decedent). Rule 26(a)(2)(D)(ii) permits rebuttal on the same subject matter, but the new opinions still must actually contradict or rebut the opposing expert's testimony. The

Supplemental Report's analysis of three decedents on whom no defense expert ever opined is affirmative expert testimony, untimely disclosed, outside the permissible scope of Rule 26(a)(2)(D)(ii), and inadmissible under Rule 37(c)(1).

And that is not the only opinion which crosses the line from rebuttal to affirmative opinion. By Dr. Horn's own admission, large portions of his report do not respond to any defense opinion. The five-page Maricopa Model section "is not rebutting any particular opinion," D.E. 158-4 at 67:18–70:5; the cooling-centers and hydration-stations discussion rebuts "[n]one," *id.* at 68:22–69:4; the trail-closure discussion rebuts "[n]one," *id.* at 69:9–13; the multi-page physiology discussion of cortisol cascades, insulin resistance, and medication–thermoregulation interactions is "just a general discussion," and Dr. Horn conceded that Dr. Diaz's report "says nothing about cortisol or catecholamines or medication interactions," *id.* at 86:25–87:11. Those are affirmative opinions, which are not responsive to any defense expert, and were not timely disclosed under Rule 26(a)(2)(B).

Rule 26(a)(2)(D)(ii) requires that a rebuttal report be "intended solely to contradict or rebut" opposing expert testimony. Large portions of the Rebuttal Report, and the entirety of the Supplemental Report's analysis of Moringiello, Massey, and Barnes, were not. The Omnibus Order's contrary ruling leaves "the definite and firm conviction that a mistake has been committed," *Holton*, 425 F.3d at 1350, and it should be set aside.

#### 4. *The Omnibus Order Fails to Consider Whether Dr. Horn's Causation Opinions Fit the Legal Standard.*

The Omnibus Order allows Dr. Horn to evaluate whether environmental heat "contributed" to a death and to testify whether heat "caused or played a role" in the decedents' deaths. D.E. 330 at 21, 23. But Dr. Horn admitted that he lacked the individualized medical data that could move his opinion from "heat as a contributor" to "heat as the cause," D.E. 158-4 at 131:6–23, and

expressly distinguished his conclusion that heat was a "contributor" from a finding that heat caused a death, *id.* 99:1–24. An opinion regarding a contributing factor, however, does not fit this case and would not be helpful to the trier of fact. Under governing law, Dr. Horn's opinions must establish that the heat was a "but-for" cause or, at minimum, a "substantial factor" in causing the deaths. *See Riley v. Tesla, Inc.*, No. 22-12515, 2025 WL 881387, at *9 (11th Cir. Mar. 21, 2025). The Magistrate Judge acknowledge this gap during the hearing on Defendants' motion, D.E. 249 at 116:16–117:3, and then overlooked it in the Omnibus Order, *see* D.E. 330. This, too, was erroneous, and the Court therefore should exclude that opinion for the purpose of proving death causation or, at a minimum, limit it to the narrower issue of potential heat-related risk.

***5. Rule 403 Requires Plaintiffs to Choose Between Dr. Horn and Dr. Vassallo for Duplicative Cause-of-Death Opinions.***

Dr. Vassallo separately concluded that prolonged heat exposure likely contributed to the deaths of James Beam, Charlie Glover, Joseph Williams, and Percell Wise. D.E. 165-2 ¶¶ 153, 160, 168, 175. Dr. Horn then offered rebuttal opinions about the cause of death for those same four inmates. D.E. 158-1 at 11–17. Although Dr. Vassallo specializes in emergency medicine and Dr. Horn in forensic pathology, both propose to tell the Court that heat contributed to those same deaths. Plaintiffs should not be permitted to offer that identical individualized conclusion twice.[1]

Rule 403 permits exclusion of needlessly cumulative testimony even when both witnesses are otherwise qualified. The rule protects a bench trial from needless repetition and wasted time. Fed. R. Evid. 403; Fed. R. Evid. 611(a). Plaintiffs themselves sought to limit Defendants' experts to one expert per topic, including opinions about cause of death. *See* D.E. 229 at 35–45. The same rule should apply here. The Court should require Plaintiffs to elect either Dr. Horn or Dr. Vassallo

---

[1] For clarity, Defendants have objected to the Magistrate Judge's order finding that Dr. Vassallo can provide cause-of-death opinions, D.E. 333, and make these arguments *arguendo*.

to offer opinions that heat caused or contributed to the deaths of Beam, Glover, Williams, and Wise, not both.[2]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court sustain these objections, set aside the portions of the Omnibus Order (D.E. 330) to which Defendants have objected, exclude the testimony of Dr. Kirtman and Dr. Horn or grant the limited relief requested in the Motions (D.E. 159 and D.E. 158), or recommit the Motions to the Magistrate Judge for case-specific findings under Rule 702.

Dated: October 30, 2026

Respectfully submitted,

*/s/ Mathew D. Gutierrez*

Paul C. Huck Jr. (FBN: 968358)
Mathew D. Gutierrez (FBN: 94014)
Carlos Haag (FBN: 1018828)
**LAWSON HUCK GONZALEZ, PLLC**
121 Alhambra Plaza,
PH1 Floor, Suite 1604
Coral Gables, FL 33134
850-825-4334
paul@lawsonhuckgonzalez.com
mathew@lawsonhuckgonzalez.com
carlos@lawsonhuckgonzalez.com
michelle@lawsonhuckgonzalez.com
anelis@lawsonhuckgonzalez.com

*Counsel for Defendants*

[2] Defendants renew their objection to the Court allowing Dr. Horn to testify in Plaintiffs' case in chief, as he was only disclosed as a rebuttal expert and therefore should only be permitted to testify if Defendants offer *affirmative* cause-of-death expert testimony at trial. D.E. 342 at 3.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed via CM/ECF, and a copy of said document has been served via Notices of Electronic Filing generated by CM/ECF on October 30, 2026, to all counsel of record.

*/s/ Mathew D. Gutierrez*
Mathew D. Gutierrez